UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| EDDIE        LANDRY,        MARIO CONSTANCIO,    JR.,    AND    MARK TAMAYO, | § § § | |
| | § | CIVIL  ACTION NO. 1:16-cv-621-JB-LF |
| Plaintiffs, | § § | |
| v. | § § | |
| SWIRE OILFIELD SERVICES L.L.C. and SWIRE WATER SOLUTIONS INC., | § § § | JURY TRIAL DEMANDED |
| Defendants. | § § | |

**PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION, *HOFFMAN LA ROCHE* NOTICE, AND EXPEDITED RULING**

Plaintiffs Eddie Landry, Mario Constancio, and Mark Tamayo request court supervised notice to two classes of employees who worked for Defendants Swire Oilfield Services L.L.C. and Swire Water Solutions, Inc.: (1) *Salary Class*: all of Defendants' current and former oilfield manual laborers throughout the United States who were paid on a salary basis without overtime in the last three years and (2) *FWW Class*: all of Defendants' current and former oilfield manual laborers throughout the United States who were paid according to the fluctuating workweek method of pay in the last three years. The sole question this motion presents is whether these two classes of oilfield workers should be given notice and an opportunity to join this case.

Over 40 opt-in Plaintiffs have already joined this suit.  The workers Plaintiffs seek to represent all performed the same primary duties and were paid according to the same Swire policies.  *See* Notice of Filing Consents at Dkt. 8, 11, 23, 30, 32.  The opt-in plaintiffs were oil field manual laborers that Swire either misclassified as exempt from overtime pay or paid improperly under the fluctuating workweek method.  Both decisions were company-wide and not based upon position, individual manager, or geographic location.

1

I.     FACTUAL AND PROCEDURAL BACKGROUND

    *a. The opt-in plaintiffs and the putative class worked long hours as oilfield manual laborers and Swire employed them to perform similar duties—rigging up, rigging down, and monitoring fracking equipment at oil wells*

Defendants provide water and chemical transfer services for the oil and gas industry throughout United States.  The plaintiffs set up, monitored, and maintained water transfer and chemical blending equipment used throughout fracking operations by Defendants' clients.  *See* Ex. 4 through 9, Declarations of E. Landry, M. Sutton, I. Ruiz, R. Acosta, J. Silva, and M. Constancio at ¶ 2.  Companies like Swire supply mechanical equipment and manual labor to well owners to run their fracking operations and monitor producing oil and gas wells.  Defendants hired plaintiffs as manual laborers to provide the water and chemical transfer services needed to complete fracking jobs at wellsites.

Although Defendants hired Plaintiffs under several different job titles, their primary duties were all the same: rigging up, monitoring, maintaining, and rigging down water transfer and chemical blending equipment at well sites. *See* Ex. 4 through 9, Declarations of E. Landry (Fluid Supervisor), M. Sutton (Water Transfer Tech and Water Transfer Supervisor), I. Ruiz (Water Transfer Tech and mechanic), J. Silva (Water Transfer Tech, Water Transfer Specialist, Blending Tech, Senior Operator, and rig hand), R. Acosta (Water Transfer Tech and Pump Operator), and M. Constancio (Senior Operator) at ¶ 2.  Depending on the job, some plaintiffs set up both chemical and water transfer equipment, and plaintiffs all participated in setting up and maintaining equipment throughout the process of completing fracking jobs at well-sites.  *See, e.g.*, Ex. 8, Dec. of J. Silva at ¶ 2.  Universally, their jobs were physically intense and required moving heavy equipment, setting up frack tanks, and laying out hoses across well sites.  *See* Ex. 4 through 9, Declarations of E. Landry, M. Sutton, I. Ruiz, R. Acosta, and J. Silva at ¶ 2.  Once the job was

running, the workers would continue to move around the jobsite to "check the frack tanks, check the fluids, and make sure pressure was sustained in accordance with procedures" set out by Swire. *See, e.g.*, Dec. of E. Landry at ¶ 2.

Plaintiffs all worked long hours on extended rotations, resulting in many weeks where they worked over 80 hours of overtime. *See* Ex. 4 through 9, Plaintiff Declarations at ¶ 5. Shifts on the well site began at either 4:30am or 6am and often lasted until 7:30pm or later. *See, e.g.*, Ex. 8, Dec. of J. Silva at ¶ 2. Some Plaintiffs worked extended or double shifts that reached up to 56 hours total. *See, e.g.*, Ex. 5, Dec. of Michael Sutton at ¶ 2, 4. Swire typically scheduled its workers to work continuously for 3 weeks, followed by one week off. *See* Plaintiff Declarations at ¶ 5. Workers, however, were routinely called to work during their scheduled time off. *See* Ex. 4 through 8, Declarations of E. Landry, M. Sutton, I. Ruiz, R. Acosta, and J. Silva at ¶ 4. Swire's schedules not only resulted in high numbers of overtime hours worked per week, they also cause many workers' salaries to dip below the minimum wage for all hours worked. *See, e.g.*, Ex. 6, Dec. of I. Ruiz at ¶ 5, Ex. 2-3 I. Ruiz and M. Constancio Paystubs.

Additionally, none of the six declarants had the authority to hire or fire employees or make decisions for customers about how to perform a job. *See* Ex. 4 through 6, Declarations of E. Landry, M. Sutton, I. Ruiz, R. Acosta, J. Silva, and M. Constancio at ¶ 7, 6. Instead, they reported to jobsites as instructed by the Defendant, followed the relevant policies and procedures for the jobsite, and followed the instructions given by the Defendant's customers about how work was to be performed. *See id.* They each allege that, based on their personal knowledge, all the water transfer technicians, chemical blending technicians, water transfer supervisors, operators, mechanics, and other oilfield manual laborers had the same general job duties, regardless of job title. *Id.* at ¶ 8.

  **b.** *Initially, Swire illegally misclassified nearly all its oilfield manual laborers as exempt from overtime.  Then, Swire eventually switched some oilfield manual laborers to fluctuating workweek method of pay, but failed to meet the legal requirements to comply with the FLSA.*

As late as the fall of 2013, Swire classified nearly all of its oilfield manual laborers as exempt from overtime and paid them on a salary basis.  After several lawsuits were filed against Swire for this illegal pay practice, Swire changed some of its workforce to non-exempt status in late 2013 and early 2014.  For most of 2014, Swire's entry level, manual labor employees received hourly pay with overtime.  *See, e.g.*, Ex. 6, Dec. of Isaac Ruiz at ¶ 5.  Some job titles, however, were still improperly classified as exempt.  *See, e.g.*, Ex. 5, Dec. of Mark Sutton at ¶ 2 (describing how he was paid salary even though he performed the same manual labor duties when he was a water transfer "supervisor" as when was a water transfer technician).  These workers, along with the workers initially misclassified as exempt, were all denied overtime pay and make up the salary class.

Then, beginning at the end of 2014, Swire attempted to pay its hourly workers—the same workers Swire recently re-classified—under the fluctuating workweek method.  *See* 29 C.F.R. § 778.114 (description of the fluctuating workweek method).  But Swire failed to properly satisfy the requirements to utilize the fluctuating workweek method.

The fluctuating workweek method, when properly implemented, allows an employer to pay its non-exempt employees at half the employees' regular rates of pay (the "half time" premium) for any hours worked over 40 as opposed to paying the employees "one and one-half times" their regular rates of pay.  *Id.*  The regulation governing the fluctuating workweek method of pay provides as follows:

  Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each

4

workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay.

*Id.* at § 778.114(a).

Thus, to utilize the fluctuating workweek method, the following elements must be satisfied:

> (1) the employee's hours fluctuate from week to week,
> (2) there is a clear mutual understanding amongst the employee and employer,
> (3) that the employee will receive a fixed payment for every hour worked,
> (4) the amount of the *salary* provides compensation to the employee at least at the minimum wage rate for all hours worked; and
> (5) the employee must be paid overtime at least at one-half his regular rate of pay.

*See id.* (emphasis added)

Here, Swire's pay system failed to satisfy the elements of the fluctuating workweek method because (1) there was no clear mutual understand between the Swire and its employees concerning the fluctuating workweek and (2) Plaintiffs and the FWW Class Members were not paid a salary sufficient to compensate them at the minimum wage rate for every hour they worked.

First, using the fluctuating workweek method requires that "the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest." 29 C.F.R. § 778.114.  If the employer does not pay the worker a salary that guarantees pay at least at the minimum wage rate, the employer cannot use the fluctuating workweek method to pay overtime.  *See West v. Verizon Servs. Corp*., No. Civ. A. 8:08-cv-1324, 2011 WL 208314 (M.D. Fla. Jan. 21, 2011); *see also* 51 Op. Wage and Hour Admin. 1010 (1969) ("Opinion Letter

1010") (requiring an employer to renegotiate the overtime calculation where the base salary failed to provide the minimum wage).

In this case, Swire failed to pay the Plaintiffs and FWW Class Members salaries that would provide pay at least at the minimum wage rate. A cursory review of the pay records demonstrates that there were numerous weeks when the salary of the Plaintiffs fell below the minimum wage rate.[1] Again, the fluctuating workweek method requires that the salary provide compensation "at a rate not less than **the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest**." 29 C.F.R. § 778.114 (emphasis added). Several instances of this violation are identified in Exhibits 2 and 3. For example, Plaintiff Isaac Ruiz was paid an hourly rate of $6.35 during the pay period beginning December 6, 2015 and an hourly rate of $6.77 during the pay period beginning August 30, 2015. Additionally, Plaintiff Mario Constancio was paid an hourly rate of $5.04 during the pay period beginning January 1, 2014. These all fall below the federal minimum wage of $7.25 per hour.

Further, because Swire failed to adequately explain its pay policy, Swire did not create a clear mutual understanding about how it paid its workers. Because Swire failed to pay its employees a salary that was sufficient to compensate them at least the minimum wage, Swire could not have created a "clear mutual understanding" with respect to how it paid its workers. Such an understanding would be contrary to law and public policy because Swire's workers could not have agreed to be paid less than the minimum wage for all hours worked. Moreover, at least some employees never received any notice at all that Swire changed their pay method. Opt-in Plaintiff Issac Ruiz reported that he found out about the change in his compensation when he received his first check under the new system and complained to his manager that his check was missing pay.

---

[1] *See* Exhibits 2 and 3, Ruiz and Constancio Paystubs.

*See* Ex. 6, Dec. of I. Ruiz at ¶ 5.  Mr. Ruiz never received any formal documentation explaining the change in his pay.  *Id*.  Other employees also reported that the pay system was confusing and not explained adequately.  *See* Ex. 7, Dec. of R. Acosta at ¶ 5.

## II.    ARGUMENT & AUTHORITIES

To use Section 216(b)'s collective-action mechanism, each employee who wishes to pursue his FLSA claims must opt in to the case in writing.  *See* 29 U.S.C. § 216(b)("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such an action is brought.").  Therefore, to decide whether to participate, potential plaintiffs must obtain notice about the pending collective action. *See Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).  The FLSA authorizes parties to send notice of the opportunity to opt in to the collective action if members of the proposed class are "similarly situated." 29 U.S.C. § 216(b).  *Bustillos v. Bd. of Cty. Comm'rs of Hidalgo Cty*., 310 F.R.D. 631, 662 (D.N.M. 2015) (Browning, J.).

Here, through the allegations in their pleadings and the attached declarations, Plaintiffs demonstrate they are similarly situated classes proposed.  Demonstrating that Plaintiffs and the putative class members are similarly situated is a lenient burden.  *Abrams v. City of Albuquerque*, 10-0872 MV/RHS, 2013 WL 11336856, at *2 (D.N.M. Sept. 24, 2013) (Vasquez, J.) ("The notice stage determination is made using a fairly lenient standard, and typically results in conditional certification of a representative class.").  Plaintiffs have satisfied the burden by demonstrating sufficient facts to suggest that Plaintiffs and the class "were victims of a single corporate decision, policy, or plan".  *See Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir.2001).

Below, Plaintiffs ask the court to certify two classes—one class of workers who were paid salary because Swire misclassified them as exempt from overtime and another class of workers improperly paid under the fluctuating workweek method.  Each is supported by declarations and exhibits.  *See* Ex. 4 through 9, Declarations of E. Landry (Salary), M. Sutton (Salary), I. Ruiz (Salary and FWW), J. Silva (FWW), R. Acosta (FWW), M. Tamayo (FWW), M. Constancio (FWW).  Because Plaintiffs and the class members are similarly situated, the court should send notice via regular mail, email, and text-message to all class members.

> a.  *The Court should apply the lenient, ad hoc standard for conditional certification adopted by the Tenth Circuit in* Thiessen.

Although the FLSA does not define the phrase "similarly situated," the Tenth Circuit has established an ad hoc approach where the court determines on a case-by-case basis whether the members of the putative class are similarly situated.  *See Thiessen*, 267 F.3d at 1105.  By adopting the "similarly situated" standard, as opposed to Rule 23's standard, the Tenth Circuit has found that Congress chose to authorize collective actions under a less-stringent standard than rule 23 class actions. *Id.*  at 1105 ("Congress clearly chose not to have the Rule 23 standards apply to class actions under the ADEA, and instead adopted the 'similarly situated' standard. To now interpret this 'similarly situated' standard by simply incorporating the requirements of Rule 23 ... would effectively ignore Congress' directive."); *accord Bustillos*, 310 F.R.D. at 662.

Under the Tenth Circuit's approach, the court engages in a two-step process. First, during the notice stage, the court makes an initial determination whether the plaintiffs are "similarly situated." *Bustillos*, 310 F.R.D. at 662–63.  The initial determination decides whether a collective action should be certified for purposes of notifying potential class members.  *See id.* citing *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir.2010) (Livingston, J.); *Renfro v. Spartan Computer Servs., Inc*., 243 F.R.D. 431, 432 (D. Kan. 2007) (Vratil, J.). At this stage, the plaintiff bears the

burden of showing that she is "similarly situated" to other potential class members; however, this burden is not great. *Abrams*, 2013 WL 11336856, at *2. A plaintiff "need only describe the potential class within reasonable limits and provide some factual basis from which the court can determine if similarly situated potential plaintiffs exist." *Schwed v. Gen. Elec. Co.*, 159 F.R.D. 373, 375–76 (N.D.N.Y. 1995); *see Renfro,* 243 F.R.D. at 432 (finding that this stage requires nothing more than substantial allegations that the proposed class members were together the "victims of a single decision, policy or plan").

  i.  <u>At the first stage, Plaintiffs need only make substantial allegations that putative class members were victims of a single decision, policy, or plan.</u>

Courts, including this one, consistently hold that "similarly situated" requires only a minimal showing. *See Bustillos,* 310 F.R.D. at 663 citing *Myers,* 624 F.3d at 555 (requiring plaintiffs to "make a 'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law'"); *Abrams*, 2013 WL 11336856, at *2. Thus, courts in the Tenth Circuit and elsewhere describe the standard for conditional certification as "lenient" and "typically resulting in class certification". *See Gieseke v. First Horizon Home Loan Corp.*, 408 F. Supp. 2d 1164, 1166-67 (D. Kan. 2006) citing *Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1214 (5th Cir.1995), overruled on other grounds by *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). Although the plaintiff must make a "modest factual showing" to support conditional certification, "it should remain a low standard of proof because the purpose of this first stage is merely to determine whether 'similarly situated' plaintiffs do in fact exist." *Bustillos,* 310 F.R.D. at 663 citing *Myers v. Hertz Corp.,* 624 F.3d at 555.

Thus, during the notice stage "[t]he court does not weigh the evidence, resolve factual disputes, or rule on the merits of plaintiffs' claims." *Greenstein v. Meredith Corp.*, 948 F. Supp.

2d 1266, 1267 (D. Kan. 2013) citing *Brown v. Money Tree Mortg., Inc.*, 222 F.R.D. 676, 679 (D. Kan. 2004).  Instead, the Court merely reviews evidence—typically limited to Plaintiffs' pleadings and affidavits—to determine if class notice is warranted.  In general, if putative class members are employees with similar positions, allegations that the defendants "engaged in a pattern or practice of not paying overtime is sufficient to allege that plaintiffs were together the victims of a single decision, policy or plan." *Renfro*, 243 F.R.D. at 433-34 citing *Brown*, 222 F.R.D. at 681.  Thus, courts determine whether class members are similarly situated by looking at whether (1) the proposed class includes employees with similar positions and (2) defendants had a single decision, policy, or plan to not pay class members overtime.  *See Foster v. Nova Hardbanding, LLC*, No. CV 15-1047 CG/LAM, 2016 WL 4492829, at *2 (D.N.M. Apr. 20, 2016) (Garza, J.).

> ii.   The Court should consider merits based defenses only at the second stage, after discovery is complete.

The second step occurs at the close of discovery, after all potential plaintiffs have opted in to the action. See *Thiessen*, 267 F.3d at 1103; *see also Comer v. Wal–Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir.2006) (Boggs, J.).  The second stage requires the court to use a stricter standard to determine whether the class is "similarly situated" and may therefore proceed to trial as a collective action.   This second determination requires the court to evaluate several factors, including: (i) individual plaintiffs' disparate factual and employment settings; (ii) the defendants' various defenses that appear to be individual to each plaintiff; and (iii) fairness and procedural considerations. *Thiessen*, 267 F.3d at 1102–03.

Thus, the notice stage "is not the appropriate juncture for the court to weigh evidence or make factual determinations as to the possible ultimate merits of plaintiffs' claims."  *Green v. Drake Beam Morin, Inc.*, No. 11-cv-01063-REB-CBS, 2011 WL 6046940, *2 (D. Colo. Dec. 6, 2011) (Blackburn, J.).   Rather, the Court simply evaluates "the substantial allegations of the

complaint along with any supporting affidavits or declarations." *Renfro*, 243 F.R.D. at 434 (citing *Thiessen*, 267 F.3d at 1102). "Indeed, '[w]hether the positions the Plaintiff held were exempt is not an issue when deciding whether to authorize notice in an FLSA action.' " *Fortna v. QC Holdings, Inc.*, No. 06-CV-0016-CVE-PJC, 2006 WL 2385303, at *7 (N.D. Okla. Aug. 17, 2006) (unpublished) (quoting *Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 101, 105 (S.D.N.Y. 2003)).

Because of the lenient burden for conditional certification, when litigation is in the early stages, courts hold that investigating the merits of Plaintiffs' claims through evidentiary submissions is "legally erroneous and simply unfair." *Green*, 2011 WL 6046940 at *2.  In fact, the Tenth Circuit has held that a district court should not address the merits of an underlying FLSA claim when ruling on a procedural request for collective action certification.  In *Thiessen*, the Tenth Circuit concluded that the district court erred in decertifying the collective action in part because the district court "made findings regarding [merits-related] issues in the guise of determining whether plaintiffs were "similarly situated." 267 F.3d at 1106-07 (citations omitted). The *Thiessen* court explained that "[b]y doing so, the district court essentially deprived plaintiffs of their right to have the issues decided by a jury, or to at least have the court determine, under summary judgment standards, whether there was sufficient evidence to send the issue to the jury." *Id.* at 1107.  This court has consistently followed this rule.  *See, e.g., Bustillos,* 310 F.R.D. at 663; *Abrams v. City of Albuquerque*, 2013 WL 11336856, at *4; *Foster v. Nova Hardbanding, LLC*, 2016 WL 4492829, at *5; Ex. 10, *Williamson v. Ameriflow Energy Services L.L.C.*, Civ. No. 2:15-000878 MCA/GJF, Dkt. 66 at 6 (D.N.M. Sept. 15, 2016) (Armijo, J.).

> b. *Plaintiffs make substantial allegations that the FWW Class were victims of a single decision, policy, or plan—a company-wide policy to compensate employees under the FWW method without ensuring that their base salaries were sufficient to compensate them at the minimum wage and without establishing a clear mutual understanding about their compensation.*

The declarations of Plaintiffs Isaac Ruiz, Mario Constancio, Juan Silva, and Roel Acosta, taken together with the allegations in the Plaintiffs' complaint, are substantial allegations that the proposed FWW class were victims of a single decisions, policy, or plan.  The putative members of the FWW class performed similar job duties as oilfield manual laborers and were all subject to the same illegal, company-wide policy to compensate them under the FWW method.  Plaintiffs Isaac Ruiz, Mario Constancio, Juan Silva, and Roel Acosta all describe how their primary duties were "physically intense" and involved rigging up, rigging down, maintaining, and monitoring water and fluid transfer equipment at well sites.  *See* Ex. 6 through 9 at ¶ 2.  Each Plaintiff also describes how they were subject to the same pay policy: the fluctuating workweek.  *See id.* at ¶ 5.

First, the proposed class includes workers in similar positions.  When evaluating whether or not employees had similar positions, courts evaluate substantive duties rather than their formal job titles.  *See Foster*, 2016 WL 4492829, at *4.  Although there may be some variation in the duties of each job, it is sufficient for conditional certification if class members have similar positions.  *Greenstein*, 948 F. Supp at 1269; *see Renfo* 243 F.R.D. at 434 (conditionally certifying a class of field technicians and installers with different job titles); *Pivonka v. Bd. Of County Comm'rs of Johnson County, Kan.*, No. 04-2598-JWL, 2005 WL 1799208, at *4 (D. Kan. July 27, 2005) (variations in responsibilities of class members not fatal to initial class certification where all individuals share general duties and defendant denied overtime to all).  Swire gave its field workers a variety of job titles, however, all the workers shared similar basic duties—rigging up

and monitoring fracking equipment that pumped and controlled the flow of waters and chemicals at well sites.  *See* Ex. 6 through 9, FWW Plaintiffs' Declarations, at ¶ 2.

Because the standard for conditional certification is lenient, Plaintiffs can be similarly situated even if their level of responsibility or precise duties vary.  For example, the facts here are strikingly similar those in *Foster v. Nova Hardbanding*, where the court granted conditional certification. 2016 WL 4492829, at *1.   There, the plaintiff worked for a drill pipe inspection company as a Hard Band Helper, Inspection Operator, Inspector, and as an Inspection Supervisor. *Id.*  Plaintiff "cleaned, inspected, tested and measured pipe and tubing and operated an imager at work sites" and declared that all inspectors "had the same basic duties."  *Id.*  There, twelve opt-in Plaintiffs filed consents to join the action, including workers classified as "inspection operators" and "inspection helpers."  *Id*. at 2.  Plaintiff sought to certify a class of "all Drill Pipe Hands and Drill Pipe Operator/Inspectors." *Id*. at 3.  Defendant argued that because it had never published any job descriptions with these titles, no employees could be similarly situated.  The Court found that plaintiffs were similarly situated because their substantive duties were the same and job descriptions revealed that "inspection helpers" and Level I, Level II, and Level III inspectors, each with a greater supervisory role, still had the basic duty of "inspecting drill pipe."  *Id*. at 4.  Just like in *Foster*, the workers composing the putative class shared the same basic duties, despite surface level differences in job title and responsibilities.

Second, the FWW class were victims of a single decision, plan, or policy—Swire's decision to change their compensation across the board to the fluctuating workweek system. Plaintiffs' declarations allege that in December of 2014, Swire made the decision to change its compensation system for nearly all of its field employees from hourly with time and a half to the fluctuating workweek system.  *See* Ex. 6, Dec. of I. Ruiz, Ex. 9, Dec. of M. Constancio at ¶ 5.

Swire made this change without clearly communicating the change to all its employees and without ensuring that employees were paid enough to compensate them at the minimum wage for all hours worked. *See id*. These are substantial allegations of a company-wide decision that impacted the entire putative class. The allegations are sufficient to support conditional certification.

Courts regularly find evidence of an identifiable corporate level policy for calculating compensation support class certification in FLSA cases. For example, in *Abrams v. City of Albuquerque*, the court found that undisputed evidence of a city-wide pay cut, supported by Plaintiffs' affidavits and undisputed by Defendant, constituted a substantial allegation that the putative class members were together the victims of a single decision. No. 10-0872 MV/RHS, 2013 WL 11336856, at *5 (D.N.M. Sept. 24, 2013) (Vasquez, J). The court emphasized that other differences between the class members, including that the notice received of the pay cut and that rate of the pay reduction varied between putative class members, did not preclude a finding that the class members were similarly situated. *See id*.

Thus, substantial allegations that the single policy or compensation system affected all the class members meets the lenient burden of conditional certification, even where individuals job duties or rate of pay may differ. *See, e.g., Reab v. Electronic Arts, Inc.*, 214 F.R.D. 623, 629 (D. Colo. 2002) (holding that the "plaintiffs have made substantial allegations that the putative class members were together the victims of a single ... plan" by alleging that "they and the putative class members were Defendants' employees and received compensation below minimum wage or no compensation from Defendants for the work, labor and services they provided to Defendants"). Here, because all the FWW class members were subject to the same allegedly improper method of calculating their overtime—the fluctuating workweek method—they are similarly situated

regardless of the individual rates of pay, minor differences in their job duties, or any other subtle factual distinctions.

Additionally, courts throughout the country have routinely certified FLSA cases based on factual allegations of company policies virtually identical to those made here—allegations that fluctuating workweek was improperly implemented.  *See, e.g., Sealy v. The Keiser School, Inc*., No. Civ. A. 11-61426, 2011 WL 7641238 (S.D. Fla. Nov. 8, 2011) (conditionally certifying a class of workers who challenged their employer's fluctuating workweek pay system by arguing that there was not a "clear mutual understanding."); *Bredbenner v. Liberty Travel, Inc*., No. Civ. A. 09-905 (WJM)(MF), 2009 WL 2391279 (D.N.J. Jul. 31, 2009) (same); *Gandhi v. Dell Inc.*, No. Civ. A. 08-248-JRN, 2009 WL 1940144 (W.D. Tex. Jul. 2, 2009) (same); *Smith v. Lowe's Companies, Inc*., No. Civ. A. 04-774, 2005 WL 6742234 (S.D. Ohio May 11, 2005) (same); *Evans v. Lowe's Home Centers, Inc*., No. Civ. A. 03-438, 2004 WL 6039927 (M.D. Pa. Jun. 17, 2011) (same).  The decision to use the fluctuating workweek is typically made at a corporate level as a human resources decision that must be implemented by a company's payroll department.  Thus, claims that the fluctuating workweek was implemented improperly are not only by their nature allegations of a single policy affecting all the class members, they are also involve the sort of common questions of fact that are particularly suitable to class-wide resolution.

      c.  *Plaintiffs make substantial allegations that the Salary Class were victims of a single decision, policy, or plan—a company-wide policy that misclassified workers to avoid paying them overtime.*

The declarations of Plaintiffs Isaac Ruiz, Mark Sutton, and Eddie Landry, taken together with the allegations in the Plaintiff's complaint, are substantial allegations that the proposed salary class were victims of a single decision, policy, or plan.  The putative members of the fluctuating workweek class performed similar job duties as oilfield manual laborers and were all subject to

the same illegal, company-wide policy to pay them salary, regardless of the number of overtime hours worked.  Plaintiffs Isaac Ruiz, Eddie Landry, and Mark Sutton, all describe how their primary duties were "physically intense" and involved rigging up, rigging down, maintaining, and monitoring water and fluid transfer equipment at well sites.  *See* Ex. 4 through 6 at ¶ 2.  Each Salary Plaintiff also describes how they were subject to the same pay policy: being denied overtime pay.  *See id.* at ¶ 5.

First, the proposed salary class includes employees in similar positions.  When evaluating whether or not employees had similar positions, courts evaluate substantive duties rather than formal job titles.  *See Foster,* 2016 WL 4492829, at *4.  Although there may be some variation in the duties of each job, it is sufficient for conditional certification if class members have similar positions.  *Greenstein*, 948 F. Supp at 1269; *see Renfo* 243 F.R.D. at 434 (conditionally certifying a class of field technicians and installers with different job titles).  As explained above, Swire gave its field workers different job titles, however, all the workers shared similar basic duties—rigging up and monitoring fracking equipment that pumped and controlled the flow of waters and chemicals at wellsites.  *See* Ex. 4 through 6, Salary Plaintiffs' Declarations at ¶ 2.

Here, all the putative members of the salary class, including plaintiffs paid salary prior to being re-classified as non-exempt and those whose classification was never changed, are similarly situated because their basic job duties were substantially similar.  Artificial differences in job titles or other employer classifications do not control over Plaintiffs' actual job duties.  For example, in *Gieseke v First Horizon Home Loan Corp*., the District Court for the District of Kansas, certified as class containing employees with different titles in different divisions of the company because Plaintiffs' affidavits revealed they performed the same basic tasks and were all denied overtime. 408 F. Supp. 2d 1164, 1168 (D. Kan. 2006) (Murguia, J).  There, the plaintiff sought to certify a

class composed of both loan originators in two different company divisions: one division sold home loans to consumers and other sold various loan products to businesses.  Defendants argued that that differences in "job duties, places of employment, compensation plans, and experience levels" should preclude collective treatment. *Id.* at 1169.  The court held that Plaintiffs' allegations were sufficient to show plaintiffs job duties were similar because their basic job duties were the same: selling loan products.  *Id.*  Just like the Plaintiffs in *Gieseke*, despite superficial differences— like whether Swire classified the workers a chemical blending tech or a senior operator—the putative class members here all shared the same basic job duties at the wellsite: rigging up and monitoring fracking equipment.

Second, Swire had a single decision, plan, or policy not to pay the salary class members overtime.  When the plaintiff has shown that the proposed class includes employees in similar positions, Courts will certify a class based on allegations that Defendants classified the putative class members as exempt from overtime and failed to pay them overtime for hours over 40 worked in a week.  *See, e.g., Koehler v. Freightquote.com*, Inc., 93 F. Supp. 3d 1257, 1264 (D. Kan. 2015) (certifying class where plaintiffs have made substantial allegations that they were together subject to a single decision that improperly classified three categories of employees as exempt from overtime laws) citing *Young v. Cooper Cameron Corp.*, 229 F.R.D. 50, 55 (S.D.N.Y.2005) (concluding that the defendant's admission that (1) the putative plaintiff class performed the same job duties, (2) the defendant classified all putative plaintiffs as exempt, and (3) the defendant had a policy not to compensate employees in the putative plaintiff class for hours worked over 40 hours was "more than sufficient to show that all [putative plaintiffs] are similarly situated for purposes of authorizing a collective action notice.").  Thus, where a Plaintiff provides allegations of a company-wide decision to misclassify workers as exempt and not pay overtime, differences in

compensation, location of employment, or experience level will not defeat conditional certification. *See Gieseke,* 408 F. Supp. 2d at 1168 (policy of misclassifying workers with similar job duties sufficient to support class certification).

Here, Swire made a company-wide decision to classify nearly all of its oilfield manual laborers as exempt from overtime. Swire eventually decided to re-classified some of its employees as non-exempt, but continued to pay many of its employees a straight salary with no overtime. All of these employees were the victim of the same, continuing policy and they are similarly situated for the purpose of authorizing notice.

> ### d. The evidence presented is more than sufficient to justify conditional certification for both proposed classes

Other courts weighing evidence and allegations have granted class notice with far less evidence than Plaintiffs have presented in this motion. *See, e.g., Brown v. Money Tree Mortg. Inc*., 222 F.R.D. 676, 680 (D. Kan. 2004) (two affidavits); *Williams v. Sprint/United Mgmt. Co*., 222 F.R.D. 483, 487 (D. Kan. 2004) (allegations in complaint were "more than sufficient to support provisional certification"); *Reab v. Elec. Arts, Inc.,* 214 F.R.D. 623, 628 (D. Colo. 2002) (allegations in complaint). Here, each of the declarants supporting certification states he has spoken to other employees who have confirmed that they were paid according to the fluctuating workweek and believed there were weeks when they made below the minimum wage. *See* Ex. 4 through 9, Plaintiff Declarations at ¶ 8.

Personal knowledge of how other employees were subject to the same illegal pay policy based on conversations with other workers provide substantial allegations that the putative class members were victims of a single decision, policy, or plan. For example, in *Sharp v. CGG Land*, the Court granted conditional certification based on allegation in a single declaration where the named plaintiff alleged that he "spoke to other employees, each of whom confirmed that defendant

had calculated their rate of overtime pay in the same way that they calculated his rate." *Sharp v. CGG Land (U.S.) Inc.*, No. 14-CV-0614-CVE-TLW, 2015 WL 222486, at *3 (N.D. Okla. Jan. 14, 2015) (Eagan, J.) citing *Thiessen*, 267 F.3d at 1102.  Here, Plaintiffs not only present the court with six declarations detailing their allegations about Swire's fluctuating workweek and salary policies, they also point to over 40 Plaintiffs who have already filed opt-in consents joining this litigation to pursue their claims against Swire. *See* Ex. 4 through 9, Plaintiff Declarations at ¶ 8; Notice of Filing Consents filed at Dkt. 8, 11, 23, 30, 32.

> e.   *The Court should approve the proposed notice because it is timely, accurate, and informative.*

District courts have the authority to issue court-approved notice to putative collective action members. *Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 170 (1989). FLSA collective actions "depend upon employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Id*. District courts are encouraged to become involved in the notice process early to insure "timely, accurate, and informative" notice. *Id*. at 171–72. "Under the FLSA, the Court has the power and duty to ensure that the notice is fair and accurate, but it should not alter plaintiff's proposed notice unless such alteration is necessary."  *Darrow v. WKRP Mgmt., LLC*, No. 09-CV-01613-CMA-BNB, 2012 WL 638119, at *5 (D. Colo. Feb. 28, 2012) (citing *Wass v. NPC Int'l, Inc.*, No. 09-2254-JWL, 2011 WL 1118774, at *8 (D. Kan. Mar. 28, 2011)).

Plaintiff's proposed notice and consent form, *see* Exhibit 1, to the potential opt-ins is "timely, accurate, and informative," as required.  *Hoffmann-La Roche*, 493 U.S. at 172.  It mirrors judicial notice forms that have been approved by other federal courts, including the forms approved by the District of New Mexico in *Saenz v. Rod's Production Services, LLC*, Case No. 14-525 (D.N.M.) (*see* Dkt. Nos. 74-1, 76).  It provides accurate notice of the pendency of the action and

of the opportunity to opt in.  It makes no comment on the merits of the case. The potential opt-ins

are advised that they are not required to participate.  The notice provides clear instructions on how

to opt-in and accurately states the prohibition against retaliation for participation in a FLSA action.

*See* 29 U.S.C. § 215(a)(3). As such, the proposed notice achieves the goal of providing employees

accurate and timely notice concerning the pendency of the lawsuit, and should be adopted.

Plaintiff requests that Defendants be ordered to produce within ten (10) days of the granting

of this Motion in an electronic format such as an excel spreadsheet, the names, all known

addresses, all phone numbers (home, mobile, etc.), dates of birth, all known email addresses (work

and personal), and dates of employment for all the class members employed from three years prior

to the filing of this lawsuit to the present.  This information will allow Plaintiffs to confirm current

addresses and/or to locate those persons who may have moved from their last known addresses.

Defendants and their counsel have this information and are allowed to use it.  Plaintiff should be

afforded the same right.

Plaintiff proposes that the notice and consent forms be sent by first class mail, by electronic

mail, and by text message within seven (7) days of receiving the class list from Defendants.

Plaintiff's counsel will oversee the mailing (both regular mail, electronic mail, and text message)

of such notices and pay the up-front charges for same (postage, copying, etc.).  Further, Plaintiff's

counsel requests that it be permitted to hire a third-party class action administration company to

conduct the actual mailing of the forms if it deems appropriate.

Sending notice by email increases the chance of the class members receiving and reading

the notice. The benefits of sending notice in an FLSA case "depend on employees receiving

accurate and timely notice concerning the pendency of the collective action, so that they can make

informed decisions about whether to participate." *Hoffmann-La Roche,* 493 U.S. at 170.  The point

of sending out notice to class members is for them to receive it, become aware of the pending litigation, and make a decision regarding joining the case.  Sending email notice increases the chance of the class members receiving and reading the notice.  As courts have observed, "we live in a time when all manner of commercial transactions are routinely cemented by electronic submission." *Mraz v. Aetna Life Ins. Co*., 2014 WL 5018862, at *5 (M.D. Pa. Oct. 7, 2014). The federal court system is based on an electronic case filing system and email notice precisely because it is an affordable, instantaneous, and reliable way for important legal issues to be communicated to large groups of people. Likewise, email notice has become a common form of notification in FLSA cases.  "With regard to the use of email to notify potential plaintiffs of this litigation, 'communication through email is [now] the norm.'" *Butler v. DirectSAT USA, LLC*, 876 F. Supp. 2d 560, 575 (D. Md. 2012); *Saenz v. Rod's Production Services, LLC*, Case No. 14-525 (D. N.M. 2015) (approving email notice).  "Email is an efficient, reasonable, and low-cost supplemental form of notice." *Phelps v. MC Communications, Inc*., 2011 WL 3298414 *6 (D. Nev. Aug. 1, 2011).  Courts should "not view the disclosure of email addresses to class counsel as being unduly intrusive on the privacy and personal interests of class members."  *Jones v. JGC Dallas LLC*, 2012 WL 6928101 at *5 (N.D. Tex. Nov. 29, 2012).  Email is an even more appropriate form of notice in case such as this because the potential class members are likely dispersed to various wellsites around the country and may be away from their homes and addresses of record for weeks or months at a time.

For similar reasons, notice via text message is also appropriate in this case.  Other courts have found that in industries with high turnover, notice via text message is a viable and efficient means of communicating with many prospective members of a collective action.  *Bhumithanarn v. 22 Noodle Mkt. Corp.*, 14-CV-2625 RJS, 2015 WL 4240985, at *5 (S.D.N.Y. July 13, 2015); *see*

*Chamorro v. Bahman Ghermezian*, No. 12–cv–8159 (TPG), ECF No. 17 ¶ 5 (S.D.N.Y. Feb. 25, 2013) (authorizing dissemination of FLSA § 216(b) notice via text message); *see also McKinzie v. Westlake Hardware, Inc.*, No. 09–cv–796 (FJG), 2010 WL 2426310, at *5 (W.D.Mo. Jun. 11, 2010) (ordering defendant to provide cellular phone numbers following conditional certification). Text notice, perhaps even more effectively than email notice, can reach workers in remote locations with limited access to either regular mail or to a personal computer.

Further, Plaintiff proposes that class members be allowed to execute their consent form electronically[2] via a service called Right Signature which tracks the IP address and email address from which the form is being accessed and executed. This service allows class members to sign their consent forms electronically by clicking on a link, which in turn takes them to a website where they can review the document they are signing, click a box indicating they have read and understood the consent form and insert information such as their name and address. Users are instantaneously provided with a PDF copy of the form they signed and a copy of the form is made accessible to Plaintiff's counsel who will, in turn, file same with the Court, just as if such document had been received via regular mail. This would merely be an additional option for signing the consent form.

As with the logic of sending notice by email, permitting the putative class members to join electronically is justified in this case because of the difficulty of receiving and sending mail from an isolated wellsite. Several recent decisions have approved the use of online electronic signature opt-in forms. *See, e.g., Dyson v. Stuart Petroleum Testers, Inc.*, 308 F.R.D. 510, 517 (W.D. Tex. 2015); *White v. Integrated Elec. Tech., Inc.*, 2013 WL 2903070 (E.D. La. June 13, 2013); *Jones*,

---

[2] Congress addressed this very issue by passing the Electronic Signatures in Global and National Commerce Act ("E–Sign Act") in 2000. Under the E–Sign Act, "with respect to any transaction in or affecting interstate or foreign commerce" a "signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form." 15 U.S.C. § 7001(a)(1).

2012 WL 6928101 at *5.  The courts in *Dyson*, *Jones*, and *White* permitted this method over the objection of the Defendant.  Also, the New Mexico court in *Saenz v. Rod's Production Services, LLC*, Case No. 14-525 (D. New Mexico) approved class members signing consent forms through Plaintiff's counsel's electronic signature service.  New Mexico law also explicitly allows the use of electronic signatures.  *See* N.M. Stat. Ann. § 14-16-7 (West) ("A record or signature may not be denied legal effect or enforceability solely because it is in electronic form.").

Additionally, the Plaintiff requests that the Court authorize the mailing of a reminder notice via regular mail, electronic mail, and text message 30 days into the opt-in period.  Here, reminder notices are particularly appropriate because potential plaintiffs are oilfield workers who work at remote locations for extended periods of time, thus the reminder mailing furthers the remedial purposes of the FLSA by ensuring class members are timely apprised of their rights.  *See Jones v. Cretic Energy Services, LLC*, 149 F.Supp.3d 761, 776-777 (S.D.Tex. 2015) (reminder notices appropriate where potential class members work at remote locations for extended periods of time). Because "notice under the FLSA is intended to inform as many potential plaintiffs as possible of the collective action and their right to opt-in", courts routinely find that a reminder notice is appropriate.  *See, e.g., Chhab v. Darden Restaurants, Inc.*, No. 11 CIV. 8345 NRB, 2013 WL 5308004, at *16 (S.D.N.Y. Sept. 20, 2013); *Morris v. Lettire Const., Corp*., 896 F. Supp. 2d 265, 275 (S.D.N.Y. 2012); *Harris v. Vector Mktg. Corp.,* 716 F.Supp.2d 835, 847 (N.D.Cal.2010).  A reminder letter gives notice to putative plaintiffs who do not receive, open, or view the initial letter; it also helps putative plaintiffs who misplace or forget about the initial letter.  *Hussein v. Capital Bldg. Servs. Grp., Inc.*, 152 F. Supp. 3d 1182, 1198–99 (D. Minn. 2015).  Thus, sending a reminder letter via both mail and email 30 days into the notice period is reasonable and common practice. *Id*. at 1198 ("the Court finds that sending a reminder letter, via mail and email, at approximately

23

the 30-day point is reasonable."); *see Ortiz–Alvarado v. Gomez*, No. 14–cv–209 (MJD/SER), 2014 WL 3952434, at *6 (D.Minn. Aug. 13, 2014) (finding that one reminder notice was a reasonable way to ensure that potential class members received notice and, if they chose to do so, filed a timely opt-in form).

Further, Plaintiff requests that class members be given 75 days to opt into the lawsuit. Such amount of time is reasonable[3] and necessary given the unique obstacles in this case that could delay potential plaintiffs' receipt of the notice. Oilfield laborers like Plaintiffs are on the job at remote well sites for weeks at a time. Receiving and sending mail from these sites is difficult. The industry also has high turnover, and oilfield workers often move from state to state seeking work. Thus, it is reasonable to expect that potential opt-in plaintiffs who worked for Defendants in the past are likely to have moved several times since then, and often away from the area. This leads to a high likelihood that class members will have difficulty receiving and returning the notice.

Also, during the opt-in period, Plaintiffs request that the court issue an order prohibiting Defendants from communicating with the class members regarding this lawsuit or its resolution.

If the Court grants conditional certification, Plaintiffs urge the court to make rulings regarding both the content of the notice and the method of delivery. Some courts will grant certification and then invite the parties to reach an agreement on the content of the notice and method of delivery. Unfortunately, this typically results in the parties not agreeing on the language

---

[3] *See Wass v. NPC Int'l, Inc.*, No. 09-2254-JWL, 2011 WL 1118774, at *11 (D. Kan. Mar. 28, 2011) ("the Court agrees with plaintiffs that 90 days represents a reasonable period in which to attempt to contact (and repeat efforts to contact, when necessary) potential class members.") (citing *Gieseke v. First Horizon Home Loan Corp.*, No. CIV.A. 04-2511-CM, 2006 WL 2919076, at *2 (D. Kan. Oct. 11, 2006) (rejecting Defendant's proposed change of opt-in period from 90 days to 60 days); *Smith v. Pizza Hut, Inc.*, No. 09-CV-01632-CMA-BNB, 2012 WL 1414325, at *10 (D. Colo. Apr. 21, 2012) (approving 90 day opt-in period); *Darrow v. WKRP Mgmt.*, LLC, No. 09-CV-01613-CMA-BNB, 2012 WL 638119, at *7 (D. Colo. Feb. 28, 2012) ("ninety days is reasonable given the potential difficulties inherent in contacting delivery drivers across several states, many of whom may no longer be employed by Defendants"); *Saenz v. Rod's Production Services, LLC*, Case No. 14-525 (D. New Mexico) (approving 70-day opt-in period for flow testers).

of the proposed notice or whether email notice, electronic signature, and a second mailing are appropriate.  Then, after more time passes, the Court will request that the parties file briefs on contested issues.  All these skirmishes further delay class notice.  Accordingly, if Defendants disagree with Plaintiffs' proposed notice and requests related to dissemination, Plaintiffs respectfully ask the court to address those issues in its ruling.

### III.   REQUEST THAT THE COURT EXPEDITE CONSIDERATION OF THIS MOTION

The statute of limitations is running against the claims of the potential opt-in plaintiffs. Actions for violations of the FLSA "must be commenced with two years," unless a willful violation is proven.  Willful violations may be commenced within three years.  29 U.S.C. § 255(a). However, for an opt-in plaintiff in a collective action, the action is not considered "commenced" until his individual written consent is filed with the court.  29 U.S.C. § 256(b).  The rolling statute of limitations running against plaintiffs in actions to recover unpaid wages means that their claims are reduced by each day that passes between the filing of the action and the day on which their consent form is received by the Clerk of the Court.  For that reason, Plaintiff requests that the Court expedite briefing and determination of this motion.

### CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court grant Plaintiffs' motion for conditional certification and authorize notice to all potential plaintiffs by first class mail, email, and text message according to the schedule on Plaintiffs' proposed order. The Court should:

1. Conditionally certify this case as a collective action under 29 U.S.C. § 216(b) with respect to the following classes of workers:

    a. *Salary Class*: All of Defendants' current and former oilfield manual laborers throughout the United States who were paid on a salary basis without overtime in the last three years and

    b.  *FWW Class*: All of Defendants' current and former oilfield manual laborers throughout the United States who were paid on a salary basis without overtime in the last three years

2.  Authorize two mailings of the proposed notice and consent forms (Exhibit 1) via regular mail, email, and text message and allow class members to execute their consent form electronically;

3.  Require that Defendant produce the names and all known addresses, cell phone numbers, and email addresses for the collective members, so that notice may be implemented.

Respectfully submitted,

KENNEDY HODGES, L.L.P.

By:  _/s/ Galvin B. Kennedy_____
      Galvin B. Kennedy
      Gkennedy@kennedyhodges.com
      Texas State Bar No. 00796870
      4409 Montrose Blvd, Suite 200
      Houston, TX 77006
      Telephone: (713) 523-0001
      Facsimile: (713) 523-1116

LEAD ATTORNEY IN CHARGE FOR PLAINTIFF AND CLASS MEMBERS

**CERTIFICATE OF SERVICE**

I certify that this document was served on all parties via this District's CM/ECF system on January 13, 2017.

/s/ Galvin Kennedy
Galvin Kennedy

**CERTIFICATE OF CONFERENCE**

I certify that counsel for Plaintiff has attempted to confer in good faith multiple times via telephone and email concerning the relief sought in this motion. Mostly recently, on December 21, 2016 Plaintiff requested that Defendants agree to a tolling agreement while the parties evaluate whether the case can be resolved via ADR. Plaintiff requested that Defendants reply by December 28, 2016 and they received no reply to this request. On several previous occasions, defense counsel stated they would inquire with their client about similar requests, however, Plaintiff has not received a reply. Additionally, throughout the parties' discussions of ADR, defense counsel has consistently maintained the position that they will not agree to conditional certification. Based on these conversations, Plaintiff believes Defendants are opposed to the relief sought in this motion.

/s/ Meredith R. Harrison
Meredith R. Harrison