# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

EDDIE LANDRY; MARIO
CONSTANCIO, JR. and MARK
TAMAYO,

      Plaintiffs,

vs.                                          No. CIV 16-621 JB/LF

SWIRE OILFIELD SERVICES, L.L.C. and
SWIRE WATER SOLUTIONS, INC.,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiffs' Motion for Conditional Certification, *Hoffman La Roche* Notice, and Expedited Ruling, filed January 13, 2017 (Doc. 35)("Motion"). The Court held a hearing on March 23, 2017. The primary issues are: (i) whether the Court should conditionally certify this case as a collective action pursuant to § 216(b) of the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 ("FLSA"), with respect to two classes of employees who worked for Defendants Swire Oilfield Services, L.L.C. and Swire Water Solutions, Inc. (collectively "Swire Oil")[1] throughout the United States of America within the last three years, *i.e.*,

---

[1]Swire Oilfield Services U.S. Holdings, L.L.C., a Delaware limited liability company, owns Swire Oilfield Services, L.L.C. and Swire Water Solutions, Inc. See Original Complaint, Collective Action, Class Action, and Jury Demand ¶ 18, at 4, filed June 21, 2016 (Doc. 1)("Complaint"). Swire Oilfield Services Holdings, UK Ltd., a privately-owned company organized under the laws of Great Britain, owns Swire Oilfield U.S. Holdings, L.L.C. See Complaint ¶ 18, at 4. The Plaintiffs allege that, "[f]or all intents and purposes, Defendants Swire Oilfield Services, L.L.C. and Swire Water Solutions, Inc. are the same company." Complaint ¶ 19, at 4-5. They share the same corporate management, advertise on the same webpage, intermingle employees, and share equipment. See Complaint ¶ 19, at 4-5. Further, at various times, some proposed class members received paychecks from both Swire Oilfield Services, L.L.C. and Swire Water Solutions, Inc. See Complaint ¶ 19, at 5. Accordingly, the Court will collectively refer to the Defendants as "Swire Oil."

(a) oilfield manual laborers whom Swire Oil paid on a salary basis without overtime (the "Salary Class"), and (b) oilfield manual laborers whom Swire Oil paid according to the fluctuating workweek method (the "FWW Class"); (ii) whether the Court should approve the Plaintiffs' Proposed Notice and Consent Form, filed January 13, 2017 (Doc. 35-1)("Notice and Consent Form"); (iii) whether the Court should authorize two mailings of the Notice and Consent Form to all potential Plaintiffs via regular mail, email, and text message and allow class members to execute their consent forms electronically; and (iv) whether the Court should order Swire Oil to produce all potential Plaintiffs' names and known addresses, cellular telephone numbers, and email addresses, so that notice may be implemented. The Plaintiffs request that the Court expedite its consideration of the Motion.

The Court will grant the requests in the Motion. Specifically, the Court will conditionally certify as a collective action the Salary Class and the FWW Class. The Court approves the proposed Notice and Consent Form, and will authorize notice to all potential Plaintiffs via regular mail, email, and text message. The Court will also require that Swire Oil produce the potential Plaintiffs' names and known contact information so that notice may be implemented as the Plaintiffs request.

## FINDINGS OF FACT

The central issue that the Motion presents is whether the Court should conditionally certify this case as a collective action pursuant to FLSA § 216(b). See Motion at 1. A § 216(b) certification decision turns on whether a proposed class is comprised of "similarly situated" employees. Thiessen v. General Electric Capital Corp., 267 F.3d 1095, 1102 (10th Cir. 2001). The Court's determination as to a particular group of employees' similarity is a finding of fact, see Zavala v. Wal-Mart Stores Inc., 691 F.3d 527, 534 (3d Cir. 2012); Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1260 (11th Cir. 2008), which the Tenth Circuit reviews for clear error, see Colony Ins. Co. v. Burke, 698

F.3d 1222, 1238 n.21 (10th Cir. 2012)(citing Fed. R. Civ. P. 52(a)(6); <u>Anderson v. Bessemer City</u>, 470 U.S. 564, 573 (1985)).  Here, both the Plaintiffs and Swire Oil have submitted briefings on the issue of conditional certification under § 216(b).  <u>See</u> Motion; Defendant's [sic] Response Opposing Plaintiffs' Motion for Conditional Certification, *Hoffman La Roche* Notice, and Expedited Ruling at 1, filed January 27, 2017 (Doc. 37)("Response"); Plaintiffs' Reply Brief in Support of Their Motion for Conditional Certification, *Hoffman La Roche* Notice, and Expedited Ruling at 1, filed February 2, 2017 (Doc. 44)("Reply").  In determining whether to grant conditional certification, the Court has carefully considered all factual assertions that these briefings raise.  The Court accepts some factual assertions and rejects others.  The Court also liberally judicially notices adjudicative, background facts.  <u>See</u> Fed. R. Evid. 201.

The Court's findings of fact are authoritative only on the question of conditional certification under § 216(b).  At the "notice stage," before the completion of discovery, the Court uses a lenient "similarly situated" standard, which "requires nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan."  <u>Thiessen v. General Electric Capital Corp.</u>, 267 F.3d at 1102 (brackets, citations, and internal quotation marks omitted).  At this stage, the Court "does not weigh the evidence, resolve factual disputes, or rule on the merits" of the plaintiffs' claims.  <u>Greenstein v. Meredith Corp.</u>, 948 F. Supp. 2d 1266, 1267 (D. Kan. 2013)(Robinson, J.)(citation omitted).  Certification at this initial stage is thus conditional; after the completion of discovery, the Court "makes a second determination, utilizing a stricter standard of 'similarly situated.'"  <u>Thiessen v. General Electric Capital Corp.</u>, 267 F.3d at 1102-03 (citation omitted).  Accordingly, after discovery concludes, the parties may relitigate the factual findings that the Court presently makes for purposes of conditional certification.

1.     **Overview of the Parties**.

1.     Swire Oil provides oilfield services, including oilfield fluid management, to drilling companies around the world, "including virtually every major oil play in the State of New Mexico and the United States." Original Complaint, Collective Action, Class Action, and Jury Demand ¶ 29, at 6, filed June 21, 2016 (Doc. 1)("Complaint").

2.     To assist with the drilling process, Swire Oil employs oilfield manual laborers, <u>i.e.</u>, equipment operators, to rig, monitor, and maintain the water transfer and chemical blending equipment that it supplies. <u>See</u> Complaint ¶ 30, at 6.

3.     During the last three years, Plaintiffs Eddie Landry, Mario Constancio, Jr., and Mark Tamayo worked as operators of the equipment that Swire Oil supplied for its clients' hydraulic fracturing ("fracking") jobs at well sites in the United States. <u>See</u> Complaint ¶¶ 9-11, at 3. <u>See also</u> Motion at 2 (specifying that the Plaintiffs worked on fracking jobs).

4.     Tamayo worked as an operator at well sites located in New Mexico. <u>See</u> Complaint ¶ 11, at 3.

5.     The Plaintiffs seek to represent a nationwide class comprised of all current and former Swire Oil operators "who were paid on a salary basis without overtime in the last three years," <u>i.e.</u>, the "Salary Class." Complaint ¶ 54, at 9.

6.     The Plaintiffs also seek to represent a nationwide class comprised of all current and former Swire Oil operators "who were paid under the fluctuating work week method during the last three years," <u>i.e.</u>, the "FWW Class." Complaint ¶ 54, at 9.

7.     Finally, Tamayo seeks to represent a class of current and former Swire Oil operators "who worked in New Mexico during the last three years and who were paid under the fluctuating workweek method," <u>i.e.</u>, the "New Mexico Class." Complaint ¶ 56, at 10.

8.      Thus far, forty-six current and former Swire Oil operators have noticed their written consent join in this lawsuit. See Motion at 1 (citing Plaintiffs' Notice of Filing Consent at 1-2, filed June 27, 2016 (Doc. 8)(noticing forty individuals' consent to join, including: Bradley Ramsey; Chris Weller; Christopher Wells; Clay Sanderford; David Carroll; David Crager; Duane Burleson; Eric Adkison; Eric Kelly; Ernbie Salinas; Fidencio Vasquez; Garrekk Singleton; George Bryant; George Murphy; Hau Bui; Hugo Valdez; Isaac Ruiz; Ivan Rizo; Jeremy Warren; Jiminsky Evans; John Moy; Jose Gonzalez; Juan Silva; Julio Ramirez; Harvey Keith Cook; Logan Byerly; Louis Walton; Martin Mena; Michael Sutton; Mikah White; Nathan Calderon; Roel Acosta; Sammy Rodriguez; Santos De La Cruz; Sergio Rizo; Shawn Horn; Travis Mearns; Ulysses Dozier; Walter Glasier; and Wayne Hrozek); Plaintiffs' Notice of Filing Consent at 1, filed August 11, 2016 (Doc. 11)(Jessie Brown); Plaintiffs' Notice of Filing Consent at 1, filed September 16, 2016 (Doc. 23)(Michael Musch); Plaintiffs' Notice of Filing Consent at 1, filed November 9, 2016 (Doc. 30)(Johnny McKeever); Plaintiffs' Notice of Filing Consent at 1, filed December 21, 2016 (Doc. 32)(Sergio Perales); Plaintiffs' Notice of Filing Consent at 1, filed February 24, 2017 (Doc. 49)(Phillip Hunter and Christopher Gullett)).

## 2.      **Swire Oil Operators' Job Descriptions.**

9.      Although Swire Oil hired operators such as the Plaintiffs under various job titles, all operators had essentially the same primary duties: rigging up, monitoring, maintaining, and rigging down water transfer and chemical blending equipment at oil well sites. See Declaration of Eddie Landry ¶ 2, at 1 (executed January 11, 2017), filed January 13, 2017 (Doc. 35-4)("Landry Decl.")(stating that duties included "rig[ging] up jobs," "servicing," and "maintaining fluid transfer equipment"); Declaration of Michael Sutton ¶ 2, at 1 (executed January 11, 2017), filed January 13, 2017 (Doc. 35-5)("Sutton Decl.")(stating that he would "rig up jobs," "monitor[] water tank levels,"

and "rig down equipment"); Declaration of Isaac Ruiz ¶ 2, at 1 (executed January 13, 2017), filed January 13, 2017 (Doc. 35-6)("Ruiz Decl.")("rigging up and rigging down jobs" and "maintenance on wellsite equipment"); Declaration of Roel Acosta ¶ 2, at 1 (executed January 12, 2017), filed January 13, 2017 (Doc. 35-7)("Acosta Decl.")("maintaining water transfer equipment," "rigging up and down jobs," and "monitor[ing] water levels"); Declaration of Juan Silva ¶ 2, at 1 (executed January 12, 2017), filed January 13, 2017 (Doc. 35-8)("Silva Decl.")("maintaining water transfer or chemical blending equipment," "rigging up and down jobs," and "mak[ing] sure equipment was well kept and ready for use"); Declaration of Mario Constancio ¶ 2, at 1 (executed January 12, 2017), filed January 13, 2017 (Doc. 35-9)("Constancio Decl.")("maintaining water and fluid transfer equipment," "rigging up and rigging down jobs," and "mak[ing] sure equipment was well kept and ready for use"); Declaration of Harvey Keith Cook ¶ 2, at 1 (executed February 10, 2017), filed February 10, 2017 (Doc. 44-1)("Cook Decl.")("maintaining fluid transfer equipment").

10.     All operators' positions were "physically intense," Landry Decl. ¶ 2, at 1; Sutton Decl. ¶ 2, at 1; Ruiz Decl. ¶ 2, at 1; Acosta Decl. ¶ 2, at 1; Silva Decl. ¶ 2, at 1; Constancio Decl. ¶ 2, at 1; Cook Decl. ¶ 2, at 1, requiring them to continuously move around jobsites to "check the frack tanks, check the fluids, and make sure pressure was sustained in accordance with [Swire Oil] procedures," Landry Decl. ¶ 2, at 1.

11.     Swire Oil operators such as the Plaintiffs commonly worked "in excess of 12 hours a day, often more than 90 hours a week" and were "commonly called upon to work day after day with little rest." Complaint ¶ 31, at 6.

12.     Swire Oil operators all worked long hours on extended rotations, resulting in many weeks where they logged substantial hours of overtime. See Landry Decl. ¶ 4, at 1 ("I regularly worked 100 hours or more hours per workweek," "typically work[ed] 13 to 18 hours a day," and

"worked on a 20 days on, 10 days off schedule"); Sutton Decl. ¶ 4, at 2 ("I regularly worked 120 or more hours per workweek," "typically work[ed] 14 to 16 hours a day but sometimes worked 24 hour or longer shifts," and "worked on a 20 days on, 10 days off schedule"); Ruiz Decl. ¶ 4, at 2 ("I regularly worked 80 or more hours per workweek," "typically work[ed] 12 to 16 hours a day," and "worked on a 20 days on, 10 days off schedule"); Acosta Decl. ¶ 4, at 1 ("I regularly worked 120 or more hours per workweek," "typically work[ed] 14 to 16 hours a day," and "worked on a 20 days on, 10 days off schedule"); Silva Decl. ¶ 4, at 2 ("I regularly worked 120 or more hours per workweek," "typically work[ed] 14 to 16 hours a day," and "worked on a 20 days on, 10 days off schedule"); Constancio Decl. ¶ 4, at 2 ("I regularly worked 80 or more hours per workweek," "frequently worked 21 hours a day," and "worked on a 20 days on, 10 days off schedule"); Cook Decl. ¶ 3, at 1 ("I regularly worked 84 or more hours per workweek" and "would typically work 13 to 18 hours a day").

13.     Shifts at well sites began as early as 4:30 a.m. and often lasted until 7:30 p.m. or later. See Silva. Decl. ¶ 2, at 1.

14.     Some operators' extended shifts lasted up to 56 hours.  See Sutton Decl. ¶ 2, at 1.

15.     Swire Oil typically scheduled its operators to work continuously for three consecutive weeks, followed by one week off.  See Landry Decl. ¶ 5, at 2; Sutton Decl. ¶ 5, at 2; Ruiz Decl. ¶ 5, at 2; Acosta Decl. ¶ 5, at 2; Silva Decl. ¶ 5, at 2; Constancio Decl. ¶ 5, at 2.

16.     Swire Oil's "schedules not only resulted in high numbers of overtime hours worked per week, they also cause[d] many workers' salaries to dip below the minimum wage for all hours worked."  Motion at 3 (alteration added)(citing Ruiz Decl. ¶ 5, at 2; Earnings Statements for Isaac Ruiz at 1-2, filed January 13, 2017 (Doc. 35-2)("Ruiz Paystubs"); Earnings Statement for Mario Constancio at 1, filed January 13, 2017 (Doc. 35-3)("Constancio Paystub")).

17. Operators in the proposed classes were lower-level employees and not managers; they reported to jobsites as Swire Oil instructed, followed relevant policies and procedures that pertained to the particular jobsite, and followed clients' instructions regarding how work was to be performed. <u>See</u> Complaint ¶¶ 34-38, at 7. <u>See also</u> Landry Decl. ¶ 7, at 2 ("I did not have the authority to hire and/or fire any employees" and "did not make decisions . . . regarding how or when a job was to be performed," but "instead reported to a jobsite as [Swire Oil] instructed," "followed [Swire Oil's and its clients'] safety policies and procedures," and "followed [clients'] instructions . . . about how a job was to be performed"); Sutton Decl. ¶ 7, at 2 (same); Ruiz Decl. ¶ 7, at 2 (same); Acosta Decl. ¶ 7, at 2 (same); Silva Decl. ¶ 7, at 2 (same); Constancio Decl. ¶ 7, at 2 (same); Cook Decl. ¶ 6, at 2 (same).

**3. <u>Swire Oil's Compensation Structures.</u>**

18. As of late 2013, Swire Oil classified "nearly all," Motion at 4, operators as exempt from the FLSA's overtime pay requirements, and paid them on a flat salary basis or on a salary basis with a day rate payment for each day spent in the field, <u>see</u> Complaint ¶¶ 33-39, at 6-7.

19. Swire Oil paid operators such as Landry under this compensation system. <u>See</u> Landry Decl. ¶ 5, at 2.

20. Several employees sued Swire Oil for using this system and, in response, Swire Oil changed some of its workforce to non-exempt status in late 2013 and early 2014. <u>See</u> Ruiz Decl. ¶ 5, at 2.

21. For most of 2014, Swire Oil's "entry level, manual labor employees received hourly pay with overtime." Motion at 4 (citing Ruiz Decl. ¶ 5, at 2).

22. Some job titles, however, remained misclassified as exempt. <u>See</u> Sutton Decl. ¶ 2, at 1.

23. Sutton, for example, performed identical manual labor duties when he was a water

transfer "supervisor" as when he was a transfer "technician."  Sutton Decl. ¶ 2, at 1.

24.     These operators, along with the operators that Swire Oil initially classified as exempt, constitute the Salary Class.  See Motion at 4.

25.     Beginning in late 2014, Swire Oil transitioned salaried operators -- the same operators that it recently re-classified -- off a flat salary basis, and paid them overtime under the FWW method.  See Complaint ¶ 40, at 7; Motion at 4.

26.     Among the operators that Swire Oil transitioned to the FWW method were Constancio, Tamayo, and Ruiz.  See Complaint ¶ 40, at 7; Ruiz Decl. ¶¶ 4, 8, at 2.

27.     Swire Oil compensated operators working in New Mexico, such as Tamayo, under the FWW method.  See Complaint ¶ 42, at 8.

28.     Several operators compensated under this method, such as Constancio and Ruiz, experienced numerous weeks in which their salaries fell below the $7.25 per hour minimum wage rate.  See Constancio Paystub at 1; Ruiz Paystubs at 1-2.

29.     Constancio, for example, was paid an hourly rate of $5.04 during the pay period beginning January 1, 2014.  See Constancio Paystub at 1.

30.     Ruiz was paid an hourly rate of $6.77 during the pay period beginning August 30, 2015, and an hourly rate of $6.35 during the pay period beginning December 6, 2015.  See Ruiz Paystubs at 1-2.

31.     Some operators "never received any notice at all that Swire changed their pay method."  Motion at 6.

32.     Ruiz, for example, found out about the change when he received his first paycheck under the FWW method and complained to his manager that his paycheck was missing pay.  See Ruiz Decl. ¶ 5, at 2.

33.     Ruiz never received formal documentation explaining the change to the FWW method.  See Ruiz Decl. ¶ 5, at 2.

## PROCEDURAL BACKGROUND

In ruling on a collective action certification motion, the Court does not accept as true the facts alleged in the pleadings, but must find all facts bearing on the question of certification, even if those facts also bear on the merits of the substantive claims.  The Court is cognizant that it must not decide the merits at this stage of the case and expressly does not decide the case's merits.  The above findings of fact are tentative and made solely to allow the Court to determine whether conditional certification under FLSA § 216(b) is appropriate.  See Thiessen v. General Electric Capital Corp., 267 F.3d at 1102-03.

The Court will outline the basic allegations underlying the Plaintiffs' case.  The Court will then discuss the Motion and its responsive briefings.  Finally, the Court will discuss the March 23, 2017, hearing that it held regarding certification.  The Court will later make conclusions of law to rule on the Motion.

### 1.     The Complaint.

1.     On June 21, 2016, the Plaintiffs commenced this suit as a proposed collective action pursuant to FLSA § 216(b) and as a proposed class action pursuant to rule 23 of the Federal Rules of Civil Procedure.  See Complaint ¶¶ 47-65, at 8-12.

2.     With respect to the FLSA, the Plaintiffs bring this suit on behalf of two proposed classes: (i) the Salary Class, i.e., "[a]ll of Defendants' current and former operators throughout the United States who were paid on a salary basis without overtime in the last three years"; and (ii) the FWW Class, i.e., "[a]ll of Defendants' current and former operators throughout the United States who were paid under the fluctuating work week method during the last three years."  Complaint ¶

54, at 9.

3.	The Plaintiffs allege that the potential Salary Class members are similarly situated to Landry "in that they share the same duties and were subject to Swire's policies of misclassifying non-exempt employees as salaried exempt," and that the FWW Class members are similarly situated to Constancio and Tamayo "in that they share the same duties and were subject to Swire's polices of . . . paying overtime under a non-compliant FWW system."  Complaint ¶ 49, at 9.

4.	The Plaintiffs assert two causes of action against Swire Oil on behalf of the Salary Class and the FWW Class: (i) failure to pay overtime, in violation of FLSA § 207 (Count I), <u>see</u> Complaint ¶¶ 66-74, at 12-13; and (ii) failure to pay the minimum wage, in violation of FLSA § 206 (Count II), <u>see</u> Complaint ¶¶ 75-82, at 13-14.  The Complaint indicates that the Plaintiffs will seek to certify Counts I and II as collective actions pursuant to FLSA § 216(b).  <u>See</u> Complaint ¶ 74, at 13 (Count I); <u>id.</u> ¶ 82, at 14 (Count II).

5.	As to the Complaint's rule 23 class-action allegations, Tamayo asserts overtime claims under the New Mexico Minimum Wage Act, N.M. Stat. Ann. §§ 50-4-1 to -30 ("NMMWA"), on behalf of the New Mexico Class, <u>i.e.</u>, "[a]ll current and former operators of Defendants who worked in New Mexico during the last three years and who were paid under the fluctuating workweek method."  Complaint ¶ 56, at 10.

6.	The Complaint alleges that the "FWW method is illegal under New Mexico law," because the NMMWA "requires payment of one and one-half times the employee's regular rate for each hour worked per week over 40 hours."  Complaint ¶ 85, at 14 (citing N.M. Stat. Ann. § 50-4-22(D)).

7.	The Complaint thus asserts a cause of action against Swire Oil for failure to pay overtime, in violation of NMMWA § 50-4-26(C)-(E) (Count III).  <u>See</u> Complaint ¶¶ 83-88, at 14-15.

The Complaint indicates that the Plaintiffs will seek to certify Count III as a class action under rule 23. See Complaint ¶ 88, at 15.

**2.**     **The Motion.**

8.     On January 13, 2017, the Plaintiffs moved to conditionally certify this case as a collective action pursuant to FLSA § 216(b). See Motion at 1. The Plaintiffs seek certification on behalf of themselves, and on behalf of all potential Salary Class and FWW Class members, including the forty-six individuals who have already noticed their written consent to join in this litigation should the Court certify it as a § 216(b) collective action. See Motion at 1.

9.     The Plaintiffs attach a proposed Notice and Consent Form, and request that the Court authorize two mailings of that form to all potential Salary Class and FWW Class members by regular mail, email, and text message to allow them an opportunity to join this litigation. See Motion at 1.

10.     The Plaintiffs request, further, that the Court order Swire Oil to produce the potential Salary Class and FWW Class members' names and known contact information, so that notice may be implemented in the manner that they propose. See Motion at 1.

11.     The Court divides its discussion of the Motion into four sections. First, the Court reviews the Plaintiffs' allegations as to the illegality of Swire Oil's salary and FWW compensation structures. Second, the Court discusses the Plaintiffs' arguments regarding conditional certification under § 216(b)'s collective-action mechanism, specifically whether the proposed classes' members are "similarly situated" as that section requires. Third, the Court reviews the Plaintiffs' arguments regarding their proposed Notice and Consent Form. Fourth, and finally, the Court briefly considers the Plaintiffs' request that the Court expedite its consideration of the Motion.

**a.**     **Swire Oil's Compensation Structures.**

12.     The Plaintiffs argue that, as of late 2013, Swire Oil "illegally misclassified" nearly all

of its oilfield manual laborers as exempt from the FLSA's overtime requirements, and paid them on a salary basis. Motion at 4. According to the Plaintiffs, this classification was illegal, because the FLSA does not provide an overtime pay exemption for low-level field employees such as Swire Oil operators. See Motion at 4.

13. The Plaintiffs contend that, beginning in late 2014, Swire Oil paid hourly workers overtime under the FWW method. See Motion at 4 (citing 29 C.F.R. § 778.114). The Plaintiffs aver that Swire Oil's use of this compensation structure was illegal, because Swire Oil "failed to properly satisfy the requirements to utilize the fluctuating workweek method." Motion at 4.

14. Specifically, the Plaintiffs argue that "there was no clear mutual understand[ing] between [] Swire and its employees concerning the fluctuating workweek" method as the regulations governing the FWW method require. Motion at 5 (relying on 29 C.F.R. § 778.114(a)(2)). The Plaintiffs reason that "there were numerous weeks when the salary of the Plaintiffs fell below the minimum wage rate" and that, accordingly, a clear mutual understanding as to Swire Oil's FWW method was not possible, because it would be "contrary to law and public policy" for workers to "agree[] to be paid less than the minimum wage for all hours worked." Motion at 6 (relying on Ruiz Paystubs at 1-2; Constancio Paystub at 1).

15. The Plaintiffs also contend that the "Plaintiffs and the FWW Class Members were not paid a salary sufficient to compensate them at the minimum wage rate for every hour they worked" as the regulations governing the FWW method require. Motion at 5 (relying on 29 C.F.R. § 778.114(a)(4)).

**b.** **Conditional Certification Under § 216(b).**

16. Turning to their conditional certification arguments, the Plaintiffs note that employees wishing to pursue FLSA claims under § 216(b)'s collective-action mechanism must opt into the case

in writing.  See Motion at 7 (citing 29 U.S.C. § 216(b)).  Thus, the Plaintiffs note, potential Plaintiffs must obtain notice as to the pending collective action so that they can decide whether to participate in it.  See Motion at 7 (citing Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 170 (1989)).

17.     The Plaintiffs note that the FLSA authorizes notice only to "similarly situated" members of a proposed class.  Motion at 7 (citing 29 U.S.C. § 216(b); Bustillos v. Bd. of Cnty. Comm'rs of Hidalgo Cnty., 310 F.R.D. 631, 662 (D.N.M. 2015)(Browning, J.)).  The Plaintiffs aver that similarity is a low bar, and that, here, they "have satisfied the burden by demonstrating sufficient facts to suggest that Plaintiffs and the class 'were the victims of a single corporate decision, policy, or plan.'"  Motion at 7 (quoting Thiessen v. General Electric Capital Corp., 267 F.3d at 1102).  Thus, the Plaintiffs request that the Court conditionally certify the proposed FWW Class and Salary Class, and authorize notice to all similarly situated potential Plaintiffs.  See Motion at 14.

18.     The Plaintiffs advance two primary arguments regarding conditional certification under § 216(b).

19.     First, the Plaintiffs argue that the United States Court of Appeals for the Tenth Circuit has adopted a "lenient, ad hoc standard" for determining whether a proposed class' members are similarly situated.  Motion at 8 (relying on Thiessen v. General Electric Capital Corp., 267 F.3d at 1105)).  The Plaintiffs contend that this standard entails a two-step process, beginning in the notice stage with an initial determination whether a plaintiff is similarly situated to other potential class members.  See Motion at 8-9 (relying on Bustillos v. Bd. of Cnty. Comm'rs of Hidalgo Cnty., 310 F.R.D. at 662-63).  The Plaintiffs argue that this standard requires only that a plaintiff "describe the potential class within reasonable limits and provide some factual basis from which the court can determine if similarly situated potential plaintiffs exist."  Motion at 9 (quoting Schwed v. Gen. Elec. Co., 159 F.R.D. 373, 375-76 (N.D.N.Y. 1995)(Hurd, J.))(internal quotation marks omitted).

20.     At the notice stage, they aver, the court "'does not weigh the evidence, resolve factual disputes, or rule on the merits of plaintiffs' claims.'"  Motion at 9 (quoting Greenstein v. Meredith Corp., 948 F. Supp. 2d at 1267 (citation omitted)).  Further, they state, if proposed class members are employees with similar positions, allegations that the defendants "'engaged in a pattern or practice of not paying overtime [are] sufficient to allege that plaintiffs were together the victims of a single decision, policy or plan.'"  Motion at 10 (alteration added)(quoting Renfro v. Spartan Computer Servs., Inc., 243 F.R.D. 431, 433-34 (D. Kan. 2007)(Vratil, J.)(citation omitted)).  In short, the Plaintiffs contend that, at the notice stage, courts determine similarity by examining (i) whether "the proposed class includes employees with similar positions"; and (ii) whether the "defendants had a single decision, policy, or plan to not pay class members overtime."  Motion at 10 (citing Foster v. Nova Hardbanding, LLC, 2016 U.S. Dist. LEXIS 53426, at *7 (D.N.M. 2016)(Garza, J.)).

21.     According to the Plaintiffs, courts should not consider a claim's merits until the second stage, which "occurs at the close of discovery, after all potential plaintiffs have opted in the action."  Motion at 10 (citing Thiessen v. General Electric Capital Corp., 267 F.3d at 1103).  At that stage, the Plaintiffs argue, courts use a "stricter standard to determine whether the class is 'similarly situated' and may therefore proceed to trial as a collective action."  Motion at 10.

22.     The Plaintiffs stress that, before the second stage, a court "simply evaluates 'the substantial allegations of the complaint along with any supporting affidavits or declarations.'"  Motion at 10-11 (quoting Renfro v. Spartan Computer Servs., Inc., 243 F.R.D. at 434 (citing Thiessen v. General Electric Capital Corp., 267 F.3d at 1102).  Indeed, the Plaintiffs note, "the Tenth Circuit has held that a district court should not address the merits of an underlying FLSA claim when ruling on a procedural request for collective action certification."  Motion at 11 (relying on Thiessen v. General Electric Capital Corp.).

23.     Here, at the notice stage, the Plaintiffs contend that they have made sufficiently "substantial allegations" that the FWW Class members are similarly situated.  Motion at 12 (relying on Ruiz Decl.; Constancio Decl.; Silva Decl.; Acosta Decl.).  The Plaintiffs maintain that the FWW Class includes workers in substantively similar positions entailing "similar job duties as oilfield manual laborers" as well as "physically intense" duties such as "rigging up, rigging down, maintaining, and monitoring water and fluid transfer equipment at well sites."  Motion at 12 (citing Ruiz Decl. ¶ 2, at 1; Acosta Decl. ¶ 2, at 1; Silva Decl. ¶ 2, at 1; Constancio Decl. ¶ 2, at 1).  That the potential FWW Class members' job titles and levels of responsibility vary somewhat is immaterial, the Plaintiffs argue.  See Motion at 13.  The Plaintiffs contend, moreover, that the potential FWW Class members "were victims of a single decision, plan, or policy -- Swire's decision to change their compensation."  Motion at 13.  The Plaintiffs avow that "[c]ourts regularly find evidence of an identifiable corporate level policy for calculating compensation support class certification in FLSA cases."  Motion at 14.  Thus, here, the Plaintiffs contend, "because all the FWW class members were subject to the same allegedly improper method of calculating their overtime . . . they are similarly situated regardless of the individual rates of pay, minor differences in their job duties, or any other subtle factual distinctions."  Motion at 14-15.

24.     The Plaintiffs also assert that they have made "substantial allegations" that the Salary Class members are similarly situated.  Motion at 15 (relying on Landry Decl.; Sutton Decl.; Ruiz Decl.).  As with the FWW Class, the Plaintiffs contend that the proposed Salary Class includes employees with substantively similar job duties including "rigging up and monitoring fracking equipment that pumped and controlled the flow of waters and chemicals at well sites."  Motion at 16 (citing Landry Decl. ¶ 2, at 1; Sutton Decl. ¶ 2, at 1; Ruiz Decl. ¶ 2, at 1).  The Plaintiffs likewise maintain that "[a]rtificial differences in job titles or other employer classifications do not control

over Plaintiffs' actual job duties." Motion at 16. With respect to Swire Oil's alleged "decision, plan, or policy" regarding the Salary Class' compensation, the Plaintiffs say that "Swire made a company-wide decision to classify nearly all of its oilfield manual laborers as exempt from overtime." Motion at 18. In the Plaintiffs' view, courts routinely "certify a class based on allegations that Defendants classified the putative class members as exempt from overtime and failed to pay them overtime for hours over 40 worked in a week." Motion at 17 (citing Koehler v. Freightquote.com, Inc., 93 F. Supp. 3d 1257, 1264 (D. Kan. 2015)(Crabtree, J.)). Thus, here, the Plaintiffs argue, "differences in compensation, location of employment, or experience level will not defeat conditional certification," because they have alleged "a company-wide decision to misclassify workers as exempt and not pay overtime." Motion at 17-18 (relying on Gieseke v. First Horizon Home Loan Corp., 2006 U.S. Dist. LEXIS 76732, at *2 (D. Kan. 2006)(Murguia, J.)).

25. Second, the Plaintiffs contend that they have proffered evidence that is "more than sufficient to justify conditional certification for both proposed classes." Motion at 14. Here, they assert, "each of the declarants supporting certification states he has spoken to other employees who have confirmed that they were paid according to the fluctuating workweek and believed there were weeks when they made below the minimum wage." Motion at 18 (citing Landry Decl. ¶ 9, at 3; Sutton Decl. ¶ 9, at 3; Ruiz Decl. ¶ 9, at 3; Acosta Decl. ¶ 9, at 3; Silva Decl. ¶ 9, at 3; Constancio Decl. ¶ 9, at 3). They posit that "[o]ther courts weighing evidence and allegations have granted class notice with far less evidence than Plaintiffs have presented in this motion." Motion at 18 (citing Brown v. Money Tree Mortg., Inc., 222 F.R.D. 676, 680 (D. Kan. 2004)(Lungstrum, J.); Williams v. Sprint/United Mgmt. Co., 222 F.R.D. 483,487 (D. Kan. 2004)(Lungstrum, J.); Reab v. Elec. Arts, Inc., 214 F.R.D. 623, 628 (D. Colo. 2002)(Babcock, J.)).

26. The Plaintiffs contend, moreover, that "[p]ersonal knowledge of how other employees

were subject to the same illegal pay policy based on conversations with other workers provide substantial allegations that the putative class members were victims of a single decision, policy, or plan." Motion at 18. Here, they aver, they "not only present the court with six declarations detailing their allegations about Swire's fluctuating workweek and salary policies, they also point to over 40 Plaintiffs who have already filed opt-in consents joining this litigation to pursue their claims against Swire." Motion at 18 (citing Landry Decl. ¶ 8, at 2; Sutton Decl. ¶ 8, at 2; Ruiz Decl. ¶ 8, at 2; Acosta Decl. ¶ 8, at 2; Silva Decl. ¶ 8, at 2; Constancio Decl. ¶ 8, at 2).

        **c.**        <u>**The Proposed Notice and Consent Form**</u>.

        27.      The Plaintiffs attach to the Motion a proposed Notice and Consent Form that briefly describes this case, instructs potential Plaintiffs on how to opt into the case, explains that the FLSA prohibits retaliation for participating in the case, and describes the effects of joining the case. <u>See</u> Notice and Consent Form at 1-3.

        28.      The Plaintiffs contend that the Notice and Consent Form is "timely, accurate, and informative" as the Supreme Court of the United States of America requires. Motion at 19 (citing <u>Hoffmann-La Roche v. Sperling</u>, 493 U.S. at 172 (internal quotation marks omitted). The Plaintiffs explain that the Notice and Consent Form "provides accurate notice of the pendency of the action and of the opportunity to opt in" and makes "no comments on the merits of the case." Motion at 19-20. They assert, moreover, that it "provides clear instructions on how to opt-in and accurately states the prohibition against retaliation for participating in a FLSA action." Motion at 20 (citing 29 U.S.C. § 215(a)(3)). Accordingly, they assert, "the proposed notice achieves the goal of providing employees accurate and timely notice concerning the pendency of the lawsuit, and should be adopted." Motion at 20.

        29.      The Plaintiffs add that the Notice and Consent Form "mirrors judicial notice forms

that have been approved by other federal courts, including the forms approved by the District of New

Mexico . . . ." Motion at 19 (relying on <u>Saenz v. Rod's Prod. Servs.</u>, 2015 U.S. Dist. LEXIS 177697

(D.N.M. 2015)(Brack, J.)).

30.     To ensure that the Notice and Consent Form reaches all potential Plaintiffs, the

Plaintiffs request that the Court order Swire Oil to

> produce within ten (10) days of the granting of this Motion in an electronic format
> such as an excel spreadsheet the names, all known addresses, all phone numbers
> (home, mobile, etc.), dates of birth, all known email addresses (work and personal),
> and dates of employment for all the class members employed from three years prior
> to the filing of this lawsuit to the present.

Motion at 20.  The Plaintiffs assert that "[t]his information will allow Plaintiffs to confirm current

addresses and/or to locate those persons who may have moved from their last known addresses."

Motion at 20.

31.     In addition, the Plaintiffs request that the Court authorize that the Notice and Consent

Form "be sent by first class mail, by electronic mail, and by text message within seven (7) days of

receiving the class list from Defendants."  Motion at 20.  The Plaintiffs propose that their "counsel

will oversee the mailing . . . of such notices and pay the up-front charges for same (postage, copying,

etc.)."  Motion at 20.

32.     Finally, the Plaintiffs request authorization for their counsel to "hire a third-party

class action administration company to conduct the actual mailing of the forms if it deems

appropriate."  Motion at 20.

33.     The Plaintiffs provide several justifications for their request to send the Notice and

Consent Form by email and by text message.  <u>See</u> Motion at 20-22.

34.     Regarding email, the Plaintiffs argue that such notice "increases the chance of the

class members receiving and reading the notice."  Motion at 21.  The Plaintiffs note that courts have

observed that "'all manner of commercial transactions are routinely cemented by electronic submission,'" Motion at 21 (quoting Mraz v. Aetna Life Ins. Co., 2014 U.S. Dist. LEXIS 142923, at *5 (M.D. Pa. 2014)(Conaboy, J.)), and that "'communication through email is now the norm'" in FLSA cases, Motion at 21 (alteration omitted)(quoting Butler v. DirectSAT USA, LLC, 876 F. Supp. 2d 560, 575 (D. Md. 2012)(Chasanow, J.)(citation omitted)).  Further, the Plaintiffs argue, email is particularly "appropriate . . . in [a] case such as this because the potential class members are likely dispersed to various wellsites around the country and may be away from their homes and addresses of record for weeks or months at a time."  Motion at 21 (alteration added).

35.     With respect to notice via text message, the Plaintiffs avow that such notice "is a viable and efficient means of communicating with many prospective members of a collective action."  Motion at 21 (citing Bhumithanarn v. 22 Noodle Mkt. Corp., 2015 U.S. Dist. LEXIS 90616, at *5 (S.D.N.Y. 2015)(Sullivan, J.)).  They posit that "[t]ext notice, perhaps even more effectively than email notice, can reach workers in remote locations with limited access to either regular mail or to a personal computer."  Motion at 21.

36.     In addition to the above requests, the Plaintiffs also propose "that class members be allowed to execute their consent form electronically via a service called Right Signature which tracks the IP address and email address from which the form is being accessed and executed."  Motion at 22 (footnote omitted).  The Plaintiffs explain that this service enables class members to sign their forms "by clicking on a link, which in turn takes them to a website where they can review the document they are signing, click a box indicating they have read and understood the consent form and insert information such as their name and address."  Motion at 22.  At that point, the Plaintiffs continue, "a copy of the form is made accessible to Plaintiff's counsel who will, in turn, file same with the Court . . . ."  Motion at 22.

37.     This practice, the Plaintiffs contend, "is justified in this case because of the difficulty of receiving and sending mail from an isolated wellsite." Motion at 22. They add, moreover, that "[s]everal recent decisions have approved the use of online electronic signature opt-in forms," Motion at 22 (citing, among others, Dyson v. Stuart Petrol. Testers, Inc., 308 F.R.D. 510, 517 (W.D. Tex. 2015)(Pitman, J.)), and that "New Mexico law [] explicitly allows the use of electronic signatures," Motion at 23 (citing N.M. Stat. Ann. § 14-16-7).

38.     The Plaintiffs make several additional requests. See Motion at 23-25.

39.     The Plaintiffs request that the Court "authorize the mailing of a reminder notice via regular mail, electronic mail, and text message 30 days into the opt-in period." Motion at 23. They emphasize the potential Plaintiffs' remote locations as a justification for a reminder and assert that courts routinely find that a reminder is appropriate in FLSA cases. See Motion at 23 (citing, among others, Chhab v. Darden Rests., Inc., 2013 U.S. Dist. LEXIS 135926, at *16 (S.D.N.Y. 2013)(Buchwald, J.)).

40.     The Plaintiffs also request that "class members be given 75 days to opt into the lawsuit." Motion at 24. They posit that such an amount of time is "reasonable and necessary given the unique obstacles in this case that could delay potential plaintiffs' receipt of the notice." Motion at 24 (footnote omitted).

41.     Next, the Plaintiffs ask that, during the opt-in period, "the court issue an order prohibiting Defendants from communicating with the class members regarding this lawsuit or its resolution." Motion at 24.

42.     Finally, the Plaintiffs "urge the court to make rulings regarding both the content of the notice and the method of delivery" should the Court grant conditional certification. Motion at 24. The Plaintiffs note that some courts grant certification and then invite the parties to negotiate the

notice's language and its methods of communication; in the Plaintiffs' view, such a practice results in protracted disputes over contested issues, which "further delay class notice." Motion at 24-25.

### d.     The Request for Expedited Consideration.

43.     The Plaintiffs note that the "statute of limitations is running against the claims of the potential opt-in plaintiffs." Motion at 25. They contend that FLSA actions "'must be commenced with[in] two years,' unless a willful violation is proven," which "may be commenced within three years." Motion at 25 (quoting 29 U.S.C. § 255(a)). They note, however, that an FLSA action is not considered "commenced" with respect to opt-in plaintiffs in a collection until their "written consent is filed with the court." Motion at 25 (citing 29 U.S.C. § 256(b)). Thus, they assert, "[t]he rolling statute of limitations running against plaintiffs in actions to recover unpaid wages means that their claims are reduced by each day that passes between the filing of the action and the day on which their consent form is received by the Clerk of the Court." Motion at 25.

44.     For that reason, the Plaintiffs request that the Court expedite its consideration of the Motion. See Motion at 25.

### 3.     The Response.

45.     Swire Oil responded to the Motion on January 27, 2017. See Response at 1.

46.     Swire Oil advances four primary arguments in opposition to conditional certification. First, Swire Oil argues that the proposed FWW Class and Salary Class members are not similarly situated, because the Plaintiffs fail to identify a decision, policy, or plan to violate the class members' FLSA rights. See Response at 2-4. Second, Swire Oil contends that the proposed FWW Class and Salary Class members are not similarly situated, because the classes are comprised of employees with dissimilar positions and because some opt-in Plaintiffs have already settled their claims with Swire Oil. See Response at 4-7. Third, Swire Oil argues that the proposed classes'

scopes are overbroad.  See Response at 7-8.  Fourth, and finally, Swire Oil asserts that the Plaintiffs' proposed Notice and Consent Form is deficient, because it does not address payment of court costs and expenses in the event that the Plaintiffs lose.  See Response at 8-9.

47.    The Court reviews these arguments in turn.

### a.    Swire Oil's Alleged Decision, Policy, or Plan to Violate the Proposed Class Members' FLSA Rights.

48.    Swire Oil begins by noting that the Court has discretion whether to conditionally certify a collective action under § 216(b) and by arguing that, although the "similarly situated" test is "lenient, it is not automatic."  Response at 2 (citing Thiessen v. General Electric Capital Corp., 267 F.3d at 1102).  Swire Oil contends that, to meet the similarly situated test, plaintiffs "must submit 'substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.'"  Response at 2 (quoting Thiessen v. General Electric Capital Corp., 267 F.3d at 1102 (citation omitted)).  Swire Oil argues that the Plaintiffs have not made such "substantial allegations," because they "fail to identify any single 'decision, policy, or plan' by Swire to violate their rights under the FLSA.'"  Response at 2-3.

49.    According to Swire Oil, the Plaintiffs admit that "they were subject to differing methods of pay at differing times," that some Plaintiffs "received notice of a change to the FWW method of payment[] while others did not," and that Swire Oil explained the FWW method to some Plaintiffs and not to others.  Response at 3 (citing Motion at 4, 6).  Swire Oil contends that these "admissions demonstrate that [the Plaintiffs] were not all victims of a single 'decision, policy, or plan' by Swire."  Response at 3.

50.    Swire Oil posits, moreover, that the Plaintiffs admit that, "as late as the fall of 2013, 'nearly' all of Swire's manual laborers were paid on a salaried basis."  Response at 3 (quoting Motion at 4).  In Swire Oil's view, if "some manual laborers were not paid in this manner, clearly no

single decision, policy or plan governed at the time." Response at 3.

51. Similarly, Swire Oil notes that "[s]ome Plaintiffs admit that they were paid hourly for most of 2014, but allege other positions were improperly classified as exempt." Response at 3. Swire Oil contends that this is "not evidence of a single 'decision, policy, or plan' by Swire." Response at 3.

52. Finally, Swire Oil notes that the "Plaintiffs allege that 'at the end of 2014' Swire began paying its hourly workers under FWW." Response at 3. This alleged policy, Swire Oil notes, was adopted "at least a year and a half after Swire had allegedly made another alleged 'decision, policy, or plan' to improperly classify certain positions as exempt." Response at 3-4. Swire Oil asserts that these "varying alleged decisions by Swire to support [the Plaintiffs'] varying claims" fail to meet the test for similarly under § 216(b). Response at 4.

**b. The Similarity of the Proposed Class Members' Positions at Swire Oil and Swire Oil's Settlement of Certain Proposed Class Members' Claims.**

53. Turning to the similarly situated test's second requirement, Swire Oil avers that the proposed FWW Class and Salary Class are not comprised of employees with similar positions. See Response at 4.

54. Swire Oil contends that, despite the Plaintiffs' assertion that the operators' primary duties were essentially the same, "the declarations submitted in support of the Motion [demonstrate] that, while engaged in a common enterprise, Plaintiffs' job duties differed." Response at 4. Swire Oil argues that, although "[a]ll the Plaintiffs apparently played some role in setting up the equipment on site and rigging it down after the job was complete," Response at 4 (relying on Landry Decl.; Sutton Decl.; Ruiz Decl.; Acosta Decl.; Silva Decl.; Constancio Decl.), their "specific duties differed," Response at 5. Swire Oil notes, for example, that Field Supervisors such as Landry "check the frack tanks, check the fluids, and make sure pressure is sustained in accordance with

procedures," whereas Water Transfer Technicians such as Constancio "work with pump and tank operators to run the pump, flow the tank, record how much water was pumped and make sure equipment is maintained." Response at 4-5. Swire Oil concludes that "[s]imply because employees are engaged in a common enterprise" does not mean they are "similarly situated." Response at 6. Rather, Swire Oil argues, "[w]hile Plaintiffs were all oilfield workers, they performed differing duties and were not similarly situated." Response at 6.

55.     Aside from alleged dissimilarities in their employment, Swire Oil argues that certain proposed class members are not similarly situated, because they have already settled their claims with Swire Oil. See Response at 6.

56.     Swire Oil notes that several opt-in Plaintiffs also opted into the lawsuits that employees previously filed against Swire Oil for the company's classification of oilfield manual laborers as exempt from the FLSA's overtime compensation requirements. See Response at 6 (referencing Bergman v. Swire Oilfield Servs., LLC, No. CIV 13-0989, Complaint (W.D. Tex. Oct. 30, 2013)(W.D. Tex. Doc. 1), filed January 27, 2017 (D.N.M. Doc. 37-1.B); McCain v. Swire Oilfield Servs., LLC, No. CIV 14-2526, Complaint (S.D. Tex. Sept. 1, 2015)(S.D. Tex. Doc. 1), filed January 27, 2017 (D.N.M. Doc. 37-1.C)). Swire Oil notes that both cases "resolved with no finding of liability and were dismissed with prejudice." Response at 6 (citing Bergman v. Swire Oilfield Servs., LLC, No. CIV 13-0989, Order Approving Collective Action Settlement and Dismissing Action (W.D. Tex. Aug. 12, 2014)(W.D. Tex. Doc. 45), filed January 27, 2017 (D.N.M. Doc. 37-1.D); McCain v. Swire Oilfield Servs., LLC, No. CIV 14-2526, Order Dismissing Action with Prejudice (S.D. Tex. May 26, 2016)(S.D. Tex. Doc. 18), filed January 27, 2017 (D.N.M. Doc. 37-1.D)). Swire Oil discusses both cases in turn.

57.     First, Swire Oil notes that Bergman v. Swire Oilfield Servs., LLC involved

allegations "that Swire improperly paid Water Transfer Technicians . . . a salary plus daily bonus until September 1, 2013, when it changed their pay method to hourly plus overtime." Response at 6. Swire Oil notes that opt-in Plaintiffs Jiminsky Evans, George Murphy, Ernie Salinas, Hugo Valdez, and Mikah Wilhite also opted into Bergman v. Swire Oilfield Servs., LLC, and settled their claims against Swire Oil. See Response at 6 (referencing, among others, Bergman v. Swire Oilfield Servs., LLC, No. CIV 13-0989, Notice of Consent to Join by Jiminsky Evans (W.D. Tex. April 11, 2014)(W.D. Tex. Doc. 36-5), filed January 27, 2017 (D.N.M. Doc. 37-1.E)). Swire Oil notes that it funded the Bergman v. Swire Oilfield Servs., LLC settlement in September 2014. See Response at 6 (citing Declaration of Vicki Tucker ¶ 5, at 2 (executed January 24, 2017), filed January 27, 2017 (Doc. 37.1-A)("Tucker Decl.")).

58.      Swire Oil adds that Valdez and Wilhite are not entitled to further payment, because it paid them on an hourly basis or as salaried exempt supervisors from the time they settled their claims until their employment terminated. See Response at 6-7 (citing Tucker Dec. ¶¶ 4-5, at 1-2). Swire Oil notes, moreover, that, although Tamayo did not opt into Bergman v. Swire Oilfield Servs., LLC, "he later settled his claims against Swire pursuant to the formula used to calculate damages in that case," and "signed a release and Swire paid [him] in or around August of 2015." Response at 7 (citing Tucker Decl. ¶ 6, at 2).

59.      Second, Swire Oil notes that McCain v. Swire Oilfield Servs., LLC involved allegations "that Swire improperly paid its field operators a salary plus daily bonus." Response at 7. Swire Oil notes that opt-in Plaintiffs Eric Adkison, Travis Mearns, and Clay Sanderford also opted into McCain v. Swire Oilfield Servs., LLC, and settled their claims against Swire Oil. See Response at 7 (citing McCain v. Swire Oilfield Servs., LLC, No. CIV 14-2526, Sealed, Unopposed Motion to Permit Disbursement at 1-2 (S.D. Tex. May 25, 2016)(S.D. Tex. Doc. 17), filed January 27, 2017

(D.N.M. Doc. 38)).  Swire Oil notes that it funded the <u>McCain v. Swire Oilfield Servs., LLC</u>

settlement in April 2016.  <u>See</u> Response at 7 (citing Tucker Decl. ¶ 8, at 2).

60.    Swire Oil adds that Adkison's employment with Swire Oil terminated on August 17,

2015, and that, as a result, "he is not entitled to additional compensation."  Response at 7 (citing

Tucker Decl. ¶ 9, at 2).  Swire Oil asserts that "[t]he same is true with respect to Mr. Sanderford,

whose second and final employment by Swire terminated on August 15, 2015."  Response at 7

(citing Tucker Decl. ¶ 10, at 2).

### c.    The Proposed Classes' Scopes.

61.    The proposed class members' alleged dissimilarities notwithstanding, Swire Oil

contends that the proposed classes are overbroad.  <u>See</u> Response at 7.

62.    Swire Oil contends that the Plaintiffs "have not demonstrated that alleged

misclassification of non-exempt employees or improper payment under the FWW is occurring

nationwide." Response at 7.  Swire Oil asserts that "FLSA violations at one of a company's multiple

locations generally are not, without more, sufficient to support company-wide notice."  Response at 7

(quoting <u>Graham v. Jet Specialty, Inc.</u>, 2016 U.S. Dist. LEXIS 3420, at *10 (W.D. Tex. 2016)(Ezra,

J.))(quoting <u>McCloud v. McClinton Energy Grp., L.L.C.</u>, 2015 U.S. Dist. LEXIS 20374, at *21 (W.D.

Tex. 2015)(Ezra, J.))(internal quotation marks omitted).

63.    Here, Swire Oil notes, the Plaintiffs "proffer only declarations from individuals with

knowledge of Swire's practices in New Mexico, Texas, Oklahoma and North Dakota."  Response at 8

(referencing Landry Decl. ¶ 3, at 1; Sutton Decl. ¶ 3, at 1; Ruiz Decl. ¶ 3, at 1; Acosta Decl. ¶ 3, at 1;

Silva Decl. ¶ 3, at 1; Constancio Decl. ¶ 3, at 1).  Swire Oil notes that none of the declarants mentions

"any discussion with employees of Swire . . . -- from any state -- about Swire's practices outside of

New Mexico, Texas, Oklahoma and North Dakota."  Response at 8.  Similarly, Swire Oil observes,

"none of the declarations allege any personal knowledge of Swire's nationwide policies." Response at 8 (citing, among others, <u>Bryant v. Act Fast Delivery of Colo., Inc.</u>, 2015 U.S. Dist. LEXIS 82730 (D. Colo. 2015)(Krieger, C.J.)).

64.     Swire Oil reasons that, accordingly, "[t]here is no reasonable basis to conclude the alleged illegal practices extended beyond the borders of New Mexico, Texas, Oklahoma and North Dakota." Response at 8. Thus, Swire Oil requests that, if the Court grants conditional certification, the Court limit the proposed classes' scope to these four states. <u>See</u> Response at 8.

### d.     The Proposed Notice and Consent Form.

65.     Last, Swire Oil addresses the Plaintiffs' proposed Notice and Consent Form. <u>See</u> Response at 8.

66.     Swire Oil raises one objection to the proposed form -- that, although it addresses the potential for an unfavorable outcome for the Plaintiffs, it does not indicate that the Plaintiffs may be responsible for paying court costs in the event that they lose. <u>See</u> Response at 8-9.

67.     Swire Oil argues that, "[i]n the Tenth Circuit, courts regularly include a notice that plaintiffs may have to pay court costs if they do not prevail." Response at 8 (citing <u>Creten-Miller v. Westlake Hardware, Inc.</u>, 2009 U.S. Dist. LEXIS 60393, at *3-4 (D. Kan. 2009)(Vratil, J.); <u>Wass v. NPC Int'l, Inc.</u>, 2011 U.S. Dist. LEXIS 32761, at *8 (D. Kan. 2011)(Lungstrum, J.)).

68.     Accordingly, Swire Oil requests that, should the Court grant conditional certification, it order that the following sentence be inserted at the end of the first paragraph in section six of the Notice and Consent Form: "Also, if plaintiffs lose, they could be responsible for paying court costs and expenses." Response at 8-9.

### 4.     The Reply.

69.     The Plaintiffs replied on February 10, 2017. <u>See</u> Reply at 1.

70.    The Plaintiffs contend that Swire Oil's arguments are based on a "post-discovery framework" rather than the "pre-discovery framework" that the FLSA requires.  Reply at 1.

71.    The Plaintiffs advance four arguments in support of conditional certification.  First, they assert that Swire Oil's argument that they fail to allege a "single decision, policy, or plan" to violate the FLSA "overstates Plaintiffs' burden" at the pre-discovery phase.  Reply at 1.  Second, they aver that Swire Oil effectively changes the "lenient 'similarly situated' standard to an 'identical' standard when [it] emphasize[s] minor differences between the job duties of one manual laborer in the oil field from another."  Reply at 1.  Third, as to Swire Oil's arguments regarding the opt-in Plaintiffs who have already settled their claims against Swire Oil, the Plaintiffs contend that those settlements do not defeat conditional certification, because they "do not affect any continuing or new FLSA violations that [took] place after the effective date of the settlements."  Reply at 2 (alteration added).  If anything, the Plaintiffs posit, "[t]he Court can exclude from the class any employee who released their claims and did not continue to work for Defendants after the release date."  Reply at 2. Fourth, the Plaintiffs argue that the proposed classes' scopes are appropriate.  See Reply at 2.  Fifth, and finally, the Plaintiffs respond to Swire Oil's single objection to the proposed Notice and Consent Form.  See Reply at 8.

72.    The Court reviews these arguments in turn.

73.    First, the Plaintiffs contend that they have "clearly identified two [] policies/plans" to violate the proposed class members' FLSA rights.  Reply at 3.  They note that the Motion alleges that Swire Oil had a "policy of denying overtime pay to a group of manual laborers working in oilfields by misclassifying them as exempt."  Reply at 3 (citing Motion at 1-3).  They note that the motion also alleges a "policy of paying oilfield manual laborers under the fluctuating workweek method [] of pay without complying with the statute's arduous prerequisites."  Reply at 3 (citing

Motion at 1-3). The Plaintiffs admit that "there are two different policies/plan[]s in question here," but contend that "[t]he fact that Defendants paid some employees under both illegal plan[]s does not amount to the lack of a 'single' plan." Reply at 3 (alterations added). Rather, they argue, "[t]here simply are two different classes and within each class Plaintiffs have identified separate plan[]s/policies that violate the law." Reply at 3 (alteration added).

74. In the Plaintiffs' view, Swire Oil "cannot pay any employee in the same week under both the compensation systems"; "[t]hey are mutually exclusive in that one envisions some form of overtime and the other envisions no overtime pay." Reply at 3. Thus, they conclude, "there will be zero overlap over the two classes because Defendants did not and could not have used both compensation systems in the same week for any given employee." Reply at 3. They add that this conclusion is "supported by [] substantial allegations," including the six declarations attached to the Motion, the Cook Decl. -- which the Plaintiffs attach to the Reply -- as well as "the overwhelming interest in this case as show[n] by 47 opt in plaintiffs," Reply at 3 (alteration added).

75. Second, the Plaintiffs contend that they have made "substantial allegations" that the proposed classes' members are similarly situated. Reply at 4. The Plaintiffs observe that, before discovery, the standard for similarity is "lenient," and that, at the close of discovery, "the parties can brief the Court on whether the case should proceed to trial under a collective basis." Reply at 4. They remind the Court that "[t]he only relief sought here is the mailing of a notice to potential class members." Reply at 4. The Plaintiffs assert that, at this lenient pre-discovery stage, they have made sufficiently substantial allegations of similarity to justify mailing a notice to potential class members. See Reply at 4.

76. In support of this argument, the Plaintiffs note that the potential class members "were all manual laborers working in oilfields who were paid under one or both suspect pay practices."

Reply at 4. As in the Motion, they maintain that it is irrelevant for conditional certification purposes "[w]hether one employee turned a wrench or another operated a flow back pump," because "[t]he jobs were *similar* in *material* respects and the pay methods were identical within each defined class." Reply at 4 (emphases in original). They note, for example, that the Salary Class members were "all exempt regardless of their job titles or duties," and as "such, they are similarly situated." Reply at 4.

77. Third, the Plaintiffs argue that Swire Oil's "identification of 3 out of 47 Plaintiffs who released their claims and then ceased working for Defendants has no effect on certification." Reply at 5. The Plaintiffs admit that, if true, those plaintiffs who settled their claims against Swire Oil and then terminated their employment "have no additional wage claim." Reply at 5. They aver, however, that "[t]hat fact . . . has no bearing on certification." Reply at 5. They contend that "FLSA settlement agreements generally do not preclude subsequent claims arising out of the employment relationship." Reply at 5. Indeed, they note, courts in the Tenth Circuit "have refrained from approving FLSA settlement agreements that generally release the employer from future claims." Reply at 5 (citing Gambrell v. Weber Carpet, Inc., 2012 U.S. Dist. LEXIS 154586, at *5 (D. Kan. 2012)(Vratil, J.)).

78. The Plaintiffs argue, further, that "even employees who settled their claims but then continued to work for an employer and suffered a pay violation have a right to pursue their wage claims." Reply at 5. Such is the case, they posit, "with the other six Plaintiffs who participated in prior settlements, but continued to work for Defendants and fall under one or both class definitions." Reply at 6.

79. The Plaintiffs conclude that the Court can just "exclude from the class definitions any employee who released their claims and did not continue to work for Defendants after the release date." Reply at 7. They assert that "[t]his will assure that only employees who continued to work

and suffer the violations participate in this case." Reply at 7.

80.    Fourth, the Plaintiffs argue that the proposed classes' nationwide scope "is tailored to include only the people affected by [Swire Oil]'s policies, regardless of the state in which they worked." Reply at 7. The Plaintiffs note that, although Swire Oil objects that the Plaintiffs submit declarations from employees who worked only in New Mexico, Texas, Oklahoma, and North Dakota, Swire Oil "has not submitted any evidence that its pay practices were limited to these four states," nor does it "make that argument." Reply at 7. Regardless, the Plaintiffs contend that the "class definitions . . . categorically will exclude any employee who was not paid under one or both of the suspect pay practices." Reply at 7. The Plaintiffs note, moreover, that they have attached to the Reply the declaration of a Swire Oil employee who worked in Louisiana. See Reply at 7 (relying on Cook Decl.). Finally, they argue that "courts regularly certify cases on a national basis without evidence from an employee in each state." Reply at 7 (relying on Hose v. Henry Indus., Inc., 49 F. Supp. 3d 906, 909-10, 919 (D. Kan. 2014)(Marten, J.)).

81.    Fifth, the Plaintiffs note that Swire Oil's sole objection to the proposed Notice and Consent Form is that it should contain the following sentence: "Also, if plaintiffs lose, they could be responsible for paying court costs and expenses." Reply at 8. The Plaintiffs aver that such language "would only serve to dissuade people from exercising their rights and is clearly retaliatory in nature." Reply at 8. Accordingly, they argue that the proposed language should not be added to the Notice and Consent Form. See Reply at 8.

**5.    The Hearing.**

82.    The Court held a hearing on March 23, 2017. See Draft Transcript of Motion Hearing (taken March 23, 2017)("Tr.").[2]

---

[2]The Court's citations to the hearing transcript refer to the court reporter's original, unedited

83.     The Plaintiffs opened by asserting that the Motion presents a narrow issue, that is, whether the Court should authorize notice to all Swire Oil employees who fall within the proposed Salary Class and FWW Class.  See Tr. at 3:21-25 (Kennedy).  The Plaintiffs argued that the standard for conditional certification is "very lenient," because such decisions are "not made [on] the merits" and are usually made at the pre-discovery stage.  Tr. at 4:4-8 (Kennedy).  According to the Plaintiffs, conditional certification requires only "substantial allegations of a policy that violated the FLSA."  Tr. at 4:8-10 (Kennedy).  The Plaintiffs contended that they have proffered substantial allegations that Swire Oil implemented two compensation structures which violated the FLSA over the last three years, i.e., (i) salary without overtime; and (ii) sub-minimum wage pay under the FWW method.  See Tr. at 4:13-7:22 (Kennedy).  The Plaintiffs noted that Swire Oil has not submitted countervailing declarations disputing these allegations, nor has it denied that these compensation structures violated the FSLA.  See Tr. at 7:23-8:5 (Kennedy).

84.     Specifically regarding the FWW Class, the Plaintiffs argued that "this is as cohesive a group as [you] can [] get in a wage and hour case."  Tr. at 8:19-20 (Kennedy).  They stressed that the FWW method's illegality is "common across all of the plaintiffs" and that slight variances in class members' specific job duties are immaterial, because such differences do not change that Swire Oil improperly implemented the FWW method across the FWW Class.  Tr. at 8:25-9:5 (Kennedy).  The Plaintiffs asserted that the class members' job duties need not be "identical," but rather "similar."  Tr. at 9:11-13 (Kennedy).  In short, the Plaintiffs stated, the FWW Class' members were all subject to the same compensation policy, "regardless of which subset of duties they handled on the frac[k] site."  Tr. at 10:9-13 (Kennedy).

85.     Swire Oil took up argument, contending that the proposed classes' members are not

version.  Any final transcript may contain slightly different page and/or line numbers.

similarly situated.  See Tr. at 11:21-25 (Gatling).  The Motion and the declarations that the Plaintiffs

proffer in support of the Motion admit that the proposed classes' members are not similarly situated,

Swire Oil asserted.  See Tr. at 11:25-12:3 (Gatling).  Swire Oil argued that Sutton, for example, had

different duties as a water transfer supervisor than the other Plaintiffs had.  See Tr. at 12:6-11

(Gatling).  Swire Oil also argued that Ruiz, as a mechanic "doing maintenance on well site

equipment," performed "very different" duties than the other Plaintiffs.  Tr. at 12:16-20 (Gatling).

86.     Swire Oil turned to the proposed classes' scopes and stressed that the Plaintiffs "have

only submitted declarations of employees who worked in New Mexico, Texas, Oklahoma and North

Dakota."  Tr. at 12:23-13:2 (Gatling).  Thus, Swire Oil concluded, the Plaintiffs do not "have any

evidence of any actions that have taken place throughout the United States involving Swire."  Tr. at

13:3-5 (Gatling).

87.     Next, Swire Oil contended that the Plaintiffs "have not identified any single decision

or policy to classify any of these employees as salaried."  Tr. at 13:7-9 (Gatling).  Swire Oil posited

that the Plaintiffs "are just asserting the fact that some of these employees were classified as salary

and they haven't identified any decision or policy of Swire to do that."  Tr. at 13:9-13 (Gatling).

88.     As to the FWW Class, Swire Oil noted that the Tucker Decl. asserts that "Swire had

no single policy or plan regarding the payment of its employees in the United States . . . ."  Tr. at

13:14-20 (Gatling).  Swire Oil noted that the Tucker Decl. also explains that Swire Oil started paying

fluid technicians under the FWW method before it paid service operators and service specialists

under that method.  See Tr. at 13:20-23 (Gatling).  Thus, Swire Oil argued, "these are very different

decisions at different times.  There was no single policy or plan that they can identify that would

apply to all of these employees."  Tr. at 13:24-14:2 (Gatling).  Indeed, Swire Oil stated, the Plaintiffs

"admit this."  Tr. at 14:5 (Gatling).

89.    In rejoinder, the Plaintiffs noted that they have submitted declarations from Swire Oil employees in five states, including Louisiana.  See Tr. at 17:15-18 (Kennedy).  The Plaintiffs argued that Swire Oil has not taken the position that the salary and FWW compensation structures were isolated to those five states; indeed, they asserted, "if the practice was limited to those states, [Swire oil] would have brought that [to the] Court's attention." Tr. at 17:22-18:4 (Kennedy).  The Plaintiffs concluded that "submitting evidence of pay practices in five states is a sufficient enough sample to know that the practice is nationwide."  Tr. at 18:4-7 (Kennedy).

90.    The Plaintiffs argued, moreover, that the proposed class definitions are self-limiting; that is, "if the Court were to certify [the FWW Class] as all employees paid under the fluctuating workweek it by definition would [only] include people who were paid under [that method]." Tr. at 18:8-13 (Kennedy).  In other words, the Plaintiffs noted, the Court would not be certifying an overly broad class, because the FWW Class by definition would not include individuals who were not paid under the FWW method, regardless of where they are located.  See Tr. at 18:13-16 (Kennedy).  The Plaintiffs noted that the same logic holds true for the Salary Class.  See Tr. at 18:22-23 (Kennedy).

91.    With respect to the proposed class members' job duties, the Plaintiffs contended that they have made sufficient allegations to meet the "lenient" standard of similarity that applies at the pre-discovery stage.  Tr. at 18:23-19:8 (Kennedy).  The Plaintiffs noted that, once discovery concludes, a more rigorous similarity standard will apply.  See Tr. at 19:3-4 (Kennedy).

92.    Last, the Plaintiffs argued that it is immaterial whether Swire Oil had "two different methods of pay at different times over the last 3, three and a half years." Tr. at 19:9-13 (Kennedy).  The Plaintiffs contended that "the mere fact that you have one policy that violates the law that was followed by a second policy that violates the law doesn't mean there isn't a single pay policy that violates the law, it means there are two." Tr. at 19:13-19 (Kennedy).  The Plaintiffs noted that they

have defined two classes that correspond to both allegedly illegal pay policies; that is, that the Salary Class corresponds to Swire Oil's single policy regarding salary compensation, while the FWW Class corresponds to Swire Oil's single policy regarding FWW method compensation. <u>See</u> Tr. at 19:19-23 (Kennedy). The Plaintiffs contended, in short, that "[t]he fact that [Swire Oil] rolled one [policy] out and brought in another one doesn't affect the certification of the two separate classes." Tr. at 19:23-20:1 (Kennedy).

93. Swire Oil again took up argument. <u>See</u> Tr. at 20:13 (Gatling). Swire Oil asserted that the proposed class definitions are vague, because the term "manual laborers" gives no "guidance as to what positions they would be defining at Swire." Tr. at 20:16-18 (Gatling). Swire Oil contended, moreover, that the two classes may overlap; that operators could simultaneously be paid a salary and also be paid overtime under the FWW method. <u>See</u> Tr. at 20:20-22 (Gatling). Swire Oil explained that the FWW method "is defined as you pay employees a salary, and then to the extent that they work over 40 [hours], then you recalculate the regular rate to determine if they are in fact entitled to overtime." Tr. at 20:23-21:2 (Gatling).

94. The Court gave the Plaintiffs the last word on their Motion. <u>See</u> Tr. at 21:23-24 (Court).

95. The Plaintiffs stated that their understanding of Swire Oil's argument is that they have not identified an unlawful policy, because they have not "identified a [] written decision or handbook or something like that." Tr. at 22:2-5 (Kennedy). "[T]hat's not the standard," the Plaintiffs asserted. Tr. at 22:5-6 (Kennedy). The Plaintiffs contended that "there is no question that [Swire Oil] paid [operators] either under a salary method or a fluctuating workweek method." Tr. at 22:6-10 (Kennedy). The Plaintiffs concluded that "[t]hat is the plan, the policy." Tr. at 22:10-11 (Kennedy).

96. The Plaintiffs concluded by stressing that the standard for similarity at the notice

stage is "very lenient," and that the cases they cite "usually result[] in the case being certified."  Tr. at 22:12-14 (Kennedy).

97.     The Court took the Motion under advisement.  See Tr. at 22:25-23:2 (Court).  The Court noted, however, that it was inclined to grant conditional certification, because it appears that the Plaintiffs have proffered sufficient evidence to meet the "similarly situated" standard at this stage of the litigation.  Tr. at 23:6-12 (Court).

## LAW REGARDING THE FLSA

1.     The FLSA requires covered employers to pay a minimum wage, and to pay their nonexempt employees overtime pay of time and one half their regular rate of pay for hours worked in excess of forty in a work week.  See 29 U.S.C. §§ 206-207.  The FLSA provides five means of enforcement: (i) criminal prosecutions for willful violators, see 29 U.S.C. § 216(a); (ii) individual civil causes of action to recover unpaid minimum wages, overtime compensation and certain liquidated damages, see 29 U.S.C. § 216(b); (iii) collective actions to recover damages, which are basically opt-in class actions, see 29 U.S.C. § 216(b); (iv) a cause of action allowing the Secretary of the Department of Labor to recover employees' damages and for additional recovery of "an equal amount of liquidated damages," 29 U.S.C. § 216(c); and (v) a suit for injunctive relief, see 29 U.S.C. § 217.  "The principal congressional purpose in enacting the Fair Labor Standards Act of 1938 was to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'"  Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 739 (1981)(alterations in original)(quoting 29 U.S.C. § 202(a)).

1.     **Employers Under the FLSA.**

2.     The FLSA defines "employer" broadly:

"Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.

29 U.S.C. § 203. "Whether an employment relationship exists for the purposes of the FLSA turns on the 'economic reality' of the working relationship." Saavedra v. Lowe's Home Cntrs., Inc., 748 F. Supp. 2d 1273, 1285 (D.N.M. 2010)(Browning, J.)(quoting Goldberg v. Whitaker House Co-op., Inc., 366 U.S. 28, 33 (1961)). The Supreme Court has instructed courts to construe the terms "employer" and "employee" expansively under the FLSA. Nationwide Mutual Ins. Co. v. Darden, 503 U.S. 318, 326 (1992). See Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947)("[T]here is in the [FLSA] no definition that solves problems as to the limits of the employer-employee relationship under the Act . . . . The definition of 'employ' is broad."). The Tenth Circuit has similarly recognized that "[t]he terms 'employ' and 'employer' are given . . . broad . . . definitions." Johnson v. Unified Gov't of Wyandotte Cnty., 371 F.3d 723, 729 (10th Cir. 2004)(Holloway, J.).

The statute is a remedial one, written in the broadest possible terms . . . . It runs counter to the breadth of the statute and to the Congressional intent to impose a qualification which permits an employer who exercises substantial control over a worker, but whose hiring decisions occasionally may be subjected to a third party's veto, to escape compliance with the Act.

Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984)(Timbers, J.). "Employer" includes persons or entities who have "managerial responsibilities" that give the person or entity "substantial control of the terms and conditions of the work of [its] employees." Falk v. Brennan, 414 U.S. 190, 195 (1973). "Corporate officers who have a substantial ownership interest in the corporation, and who are directly involved in decisions affecting employee compensation, may be held personally liable under the FLSA." Saavedra v. Lowe's Home Cntrs., Inc., 748 F. Supp. 2d at 1288 (citing Donovan v. Agnew, 712 F.2d 1509, 1511 (1st Cir. 1983)). See Fegley v. Higgins, 19 F.3d 1126,

1131 (6th Cir. 1994); Reich v. Circle C Inv. Inc., 998 F.2d 324, 329 (5th Cir. 1993); Donovan v. Grim Hotel Co., 747 F.2d 966, 972 (5th Cir. 1984); Donovan v. Janitorial Services, Inc., 672 F.2d 530, 531 (5th Cir. 1982); Shultz v. Mack Farland & Sons Roofing Co., 413 F.2d 1296, 1300 (5th Cir. 1969).

### 2. The FLSA's Minimum Wage, Overtime, and Records Requirements.

3.      FLSA § 7 requires employers to pay covered employees who, in a given workweek, work more than forty hours "at a rate not less than one and one-half times the regular rate at which [the employee] is employed."  29 U.S.C. § 207(a)(1).  "The purpose of FLSA overtime is 'to compensate those who labored in excess of the statutory maximum number of hours for the wear and tear of extra work and to spread employment through inducing employers to shorten hours because of the pressure of extra cost.'"  Chavez v. City of Albuquerque, 630 F.3d 1300, 1304 (10th Cir. 2011)(Briscoe, J.).  The Tenth Circuit has recognized "that a contract cannot designate an artificially low regular rate in order to reduce the minimum statutory overtime due . . . , [as] parties cannot avoid the purposes of the FLSA by designating a fictitious regular rate."  Chavez v. City of Albuquerque, 630 F.3d at 1305 (citing Walling v. Wall Wire Prods. Co., 161 F.2d 470, 473 (6th Cir. 1947)).

4.      Under the FLSA, an employer must pay its employees for the time that it "employ[s]" them, the statutory definition of which means "to suffer or permit to work." 29 U.S.C. § 203(g).  See 29 C.F.R. § 785.6 ("By statutory definition the term 'employ' includes (section 3(g)) 'to suffer or permit to work.'  The act, however, contains no definition of 'work.'").  "'The test for whether an employee's time constitutes working time is whether the time is spent predominantly for the employer's benefit or for the employee's.'"  United Transp. Union Local 1745 v. City of Albuquerque, 178 F.3d 1109, 1116 (10th Cir. 1999)(quoting Gilligan v. City of Emporia, 986 F.2d

410, 412 (10th Cir. 1993)).  The Supreme Court has rejected the argument that Congress' intent in enacting the FLSA was to compensate employees "for all actual work . . . as those words are commonly used -- as meaning physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business."  Armour & Co. v. Wantock, 323 U.S. 126, 132 (1944)(quoting Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 597 (1944)).  The Supreme Court explained:

> [A]n employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen.  Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity.  Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer.  Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case.

Armour & Co. v. Wantock, 323 U.S. at 133.

5.  FLSA § 6 requires employers to pay their employees a minimum wage.  See 29 U.S.C. § 206(a).  Deductions from employees' paychecks, for whatever reason, that bring the employees' pay under the minimum wage violate § 6.  See Donovan v. Simmons Petrol. Corp., 725 F.2d 83, 84 (10th Cir. 1983)(holding that the employer's deductions of "cash register shortages and the amount of uncollectible checks accepted by its employees from the paychecks of employees who were on duty when the shortages occurred" was a willful FLSA violation).  Cf. Dole v. Solid Waste Servs., Inc., 733 F. Supp. 895, 924 (E.D. Pa. 1989)(Huyett, J.)(finding that deductions "for lunch breaks during which [employees were] required to continue with any duties relating to . . . work," bringing employees below minimum wage, violated the FLSA).  Further, FLSA § 11 imposes on an employer a duty to "make, keep, and preserve" records of its employees' wages, hours, and "other conditions and practices of employment" that the employer may maintain.  29 U.S.C. § 211(c).  In Donovan v. Simmons Petrol. Corp., the Tenth Circuit recognized the employers' duty under the

FLSA to keep accurate records in discussing the shift of the burden to prove damages between the

employee and the employer:

> The employee bears the burden of proving he performed work for which he was not properly compensated. <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 687 (1946). However, employers have a duty to keep accurate records. If employers do not keep accurate records the employee's burden is extremely difficult. In order to prevent the employee from being penalized by the employer's failure to keep adequate records, the Supreme Court held in <u>Anderson</u> that an employee carries his burden by proving that he has "in fact performed work for which he was improperly compensated and . . . [producing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." <u>Id.</u> Upon such a showing, the burden shifts to the employer to produce evidence of the precise amount of work performed or to negate the reasonableness of the inference drawn from the employee's evidence. If the employer does not rebut the employee's evidence, then damages may be awarded even though the result is only approximate. The employer cannot complain that the damages lack the precision that would have been possible if the employer had kept the records required by law. <u>Id.</u> at 687-88.

<u>Donovan v. Simmons Petrol. Corp.</u>, 725 F.2d at 85-86. The federal Department of Labor's Wage

and Hour Division requires that employers must maintain in their records the time of day and day of

the week on which the employee's workweek begins, the regularly hourly pay rate for the employee

in any week in which overtime compensation is due, the hours worked each workday and workweek,

the total daily or weekly straight-time earned, and the total overtime. <u>See</u> 29 C.F.R. § 516.2(a).

Where an employer violates its § 211(c) record-keeping duties, including by not counting time

worked before and after an employee's shift begins, the employer cannot meet its burden to rebut the

Labor and Wage investigators' reasonable estimates of backpay due to the employees. <u>See</u> <u>U.S.</u>

<u>Dep't of Labor v. Cole Enters., Inc.</u>, 62 F.3d 775, 781 (6th Cir. 1995)("We agree with the district

court's conclusion that the calculations of the investigator are a reasonable and generous estimate of

the back wages due to the Defendants' employees for the pre-shift and postshift hours worked.");

<u>Metzler v. IBP, Inc.</u>, 127 F.3d 959, 965-66 (10th Cir. 1997)("When the employer has failed to record

compensable time . . . , [t]he employer cannot be heard to complain that the damages lack the

exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [29 U.S.C. § 211(c) ].").

6.      Section 7(a) sets forth the general rule for calculating overtime.  See 29 U.S.C. § 207(a)(1).  Because the FLSA does not put a limit "on the number of hours that an employee may work in any workweek, he may work as many hours a week as he and his employer see fit, [but, the employer must pay] the required overtime compensation . . . for hours worked in excess of the maximum workweek prescribed by section 7(a)."  29 C.F.R. § 778.102.  The statute states:

> Except as otherwise provided in this section, no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).  See 29 C.F.R. § 778.107 ("The general overtime pay standard in section 7(a) requires that overtime must be compensated at a rate not less than one and one-half times the regular rate at which the employee is actually employed.").  The statute's language demands that an employee receive one and one-half times the "regular rate" of pay for hours that he or she works in excess of forty in a given week.  29 U.S.C. § 207(a)(1).

7.      One important principle is that FLSA overtime is based on the number of hours worked in a particular workweek.

> The Act does not . . . require . . . that an employee be paid overtime compensation for hours in excess of eight per day, or for work on Saturdays, Sundays, holidays or regular days of rest.  If not more than the maximum hours prescribed in the Act are actually worked in the workweek, overtime pursuant to section 7(a) need not be paid.

29 C.F.R. § 778.102.  On the other hand, that the FLSA does not require that the employer pay overtime for those hours does not relieve an employer from paying overtime for them if the contract of employment demands them.  See 29 C.F.R. § 778.102.

8.      For purposes of calculating overtime under the FLSA, however, the only concern is

whether the total hours worked in a given workweek are above or below the statutory requirement for overtime compensation. See 29 C.F.R. § 778.102. A second important principle about calculating overtime under the FLSA is that the employee must receive overtime pay at a rate of no less than one and one-half times the "regular rate" for which the employer employs the employee. Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424 (1945)("The keystone of Section 7(a) is the regular rate of compensation."). The Supreme Court described "the regular rate" as "the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed." Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. at 424. Since the Court's opinion in Walling v. Youngerman-Reynolds Hardwood Co., Congress has amended the FLSA to include a description of regular rate, see 29 U.S.C. § 207(e) ("[T]he 'regular rate' at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee," with eight statutory exceptions),[3] and the interpretive bulletins have incorporated the Supreme Court's definition, see 29 C.F.R. § 778.108 ("The Supreme Court has described it as the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed -- an 'actual fact.'"). Generally, the exceptions include overtime pay and compensation that is discretionary on the employer's part. See 29 C.F.R. § 779.108.

### 3. Compensable Time Under the FLSA.

9. Congress enacted the Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251-262, to define certain activities for which employers need not compensate pursuant to the FLSA.[4] The Portal-to-

---

[3]The FLSA now contains a description of what is included in the regular rate, but still contains no definition precisely setting forth how it is calculated. See Scott v. City of New York, 592 F. Supp. 2d 475, 482 (S.D.N.Y. 2008)(Scheindlin, J.)("The words 'regular rate' are not defined in the Act." (quoting Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 40 (1944))(internal quotation marks omitted)).

[4]The Portal-to-Portal Act provides:

Portal Act excludes from compensation certain preliminary and postliminary activities, like pre-shift walking and, in some cases, changing clothes and putting on specific gear. See Steiner v. Mitchell, 350 U.S. 247, 252 (1956); Reich v. IBP, Inc., 38 F.3d 1123, 1126 (10th Cir. 1994)(holding that the donning and doffing of safety glasses, ear plugs, a hard hat, and safety shoes are non-compensable preliminary and postliminary activities). Under Department of Labor regulations explaining the Portal-to-Portal Act, see 29 C.F.R. § 790.6 (1947), the workday begins with the "first principal activity" and ends with the last, see IBP, Inc. v. Alvarez, 546 U.S. 21, 34 (2005).

        10.     The Supreme Court clarified what constitutes a "principal activity" in IBP, Inc. v. Alvarez, 546 U.S. at 34. It held that anything that is "integral and indispensable" to a "principal activity" is itself a "principal activity" under the Portal-to-Portal Act, which makes it compensable. 546 U.S. at 37. The Supreme Court noted that, to the extent that standard protective clothing and gear are "integral and indispensable" to a principal activity, the donning and doffing of those items are principal activities and are therefore compensable. 546 U.S. at 36-37. Accordingly, the key issue to determining compensability is whether the pre-shift activities are integral and indispensable to the employee's principal activities. See Lindow v. United States, 738 F.2d 1057, 1060 (9th Cir. 1984)(Choy, J.)(concluding that pre-shift activities may be compensable if they are an "integral and

---

[N]o employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, . . . on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee . . . --

(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a)(emphasis added).

indispensable" part of the principal activities).

11.     The Tenth Circuit has interpreted what constitutes preliminary, non-compensable activities.  In <u>Smith v. Aztec Well Servicing Co.</u>, 462 F.3d 1274 (10th Cir. 2006), the plaintiffs argued that they were entitled to compensation for time spent loading their trucks with safety and protective gear, then traveling to the job site.  <u>See</u> 462 F.3d at 1276-77.  The Tenth Circuit acknowledged that, if the plaintiffs' first principal activity -- loading their trucks with protective gear -- occurred before traveling to the job site, then the plaintiffs' travel time constituted compensable work.  462 F.3d at 1289.  Nonetheless, the Tenth Circuit explained that, where

> an employee's activity "takes all of a few seconds and requires little or no concentration," then the activity is "properly considered not work at all."  Moreover, "[r]equiring employees to show up at their work stations with such standard equipment [as a hard hat, safety glasses, earplugs, and safety shoes] is no different from having a baseball player show up in uniform, . . . or a judge with a robe."  It is simply a prerequisite for the job, and is purely preliminary in nature.  Consequently, the plaintiffs' travel to and from the well sites was not integral and indispensable to their principal activities merely because they were required to carry their personal safety equipment along with them.

462 F.3d at 1289 (quoting <u>Reich v. IBP, Inc.</u>, 38 F.3d at 1125, 1126 n.1).  In arriving at its decision that loading protective gear into the truck was not integral and indispensable to the plaintiffs' job, the Tenth Circuit considered the amount of time it took and the level of concentration.  The safety equipment was clearly required to do the job, yet the Tenth Circuit still found that it was not integral and indispensable to the employees' principal activities.  Similarly, in <u>Reich v. IBP, Inc.</u>, the Tenth Circuit held that putting on safety glasses, ear plugs, a hard hat, and safety shoes was not compensable, because it "requires little or no concentration," and can easily be done while focusing on other things.  38 F.3d at 1126.  "Thus, although essential to the job, and required by the employer, any time spent on these items is not work."  38 F.3d at 1126.  In contrast, putting on special protective gear that was "heavy and cumbersome," and required "physical exertion, time, and a

modicum of concentration to put them on securely and properly," was compensable, as this donning differed in kind rather than merely degree.  38 F.3d at 1126.

12.     Because mandatory pre-shift briefings may be integral and indispensable to an employee's principal activities, they may form the basis of an FLSA overtime violation.  That "certain preshift activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable,'" however.  IBP, Inc. v. Alvarez, 546 U.S. at 40.  An activity is integral and indispensable if it is an "intrinsic element" of the employee's principal activities, and one with which the employee cannot dispense if he or she is to perform his or her principal activities.  See Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. 513, 514 (2014).  Consequently, the Supreme Court has held that time spent waiting to don protective gear is not compensable, while time spent sharpening knives at a meatpacking plant is compensable, as dull knives would slow the assembly line production, cause waste, lead to accidents, and "affect the appearance of the meat as well as the quality."  Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 518 (quoting Mitchell v. King Packing Co., 350 U.S. 260, 262 (1956)).  In other words, the employees could not perform their jobs adequately without sharpening their knives.  See Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 514.

13.     Recently, the Supreme Court held that time spent undergoing mandatory security screenings were not compensable.  See Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 518.  The Supreme Court stated that, although the employer required employees to undergo the screenings, the screenings were not integral and indispensable to the principal task they were paid to perform -- stocking warehouse shelves and packaging products.  See 135 S. Ct. at 519.  Importantly, the Supreme Court stated that the "Court of Appeals erred by focusing on whether an employer required a particular activity.  The integral and indispensable test is tied to the productive work that

the employee is *employed to perform*." 135 S. Ct. at 519 (emphasis in original). Moreover, the

Supreme Court held that it was not determinative whether the task benefitted the employer. See 135

S. Ct. at 519.

> [I]t is not enough to make an activity compensable under the Fair Labor Standards
> Act that the employer requires it and it is done for the benefit of the employer. Even
> activities required by the employer and for the employer's benefit are "preliminary"
> or "postliminary" if not integral and indispensable to "the productive work that the
> employee is *employed to perform*."

Balestrieri v. Menlo Park Fire Prot. Dist., 800 F.3d 1094, 1101 (9th Cir. 2015)(Kleinfeld,

J.)(emphasis in original)(quoting Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 519).

14.     Finally, the Supreme Court reaffirmed its statement that, if the employee need not

perform a task before every shift or the task can be eliminated altogether, it is not integral and

indispensable. See Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 513 (finding that an

activity was not integral and indispensable when the employees did not participate in them every

day); id. at 518 (finding that activities were not integral and indispensable if the employer could have

eliminated the required practice without impairing the employees' ability to complete their work).

Unlike activities that are "*always* essential if the worker is to do his job," certain activities "may or

may not be necessary in particular situations or for every employee." IBP, Inc. v. Alvarez, 546 U.S.

at 40. When certain tasks are not necessary, the activity "comfortably qualif[ies] as a 'preliminary'

activity." IBP, Inc. v. Alvarez, 546 U.S. at 40.

### 4.     The FLSA's Remedies.

15.     Actions to enforce the FLSA's overtime provisions are generally subject to a two-

year statute of limitations unless the violation is willful, in which case the limitations period is three

years. See 29 U.S.C. § 255(a). A lawsuit to enforce a cause of action for unpaid minimum wages,

unpaid overtime compensation, or liquidated damages

may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued . . . .

29 U.S.C. § 255(a). Willful violations occur when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988)(citing Trans World Airlines, Inc. v. Thurston, 469 U.S. 111 (1985)).

16.    Beyond the actual damages to cover the amount of unpaid minimum wages or overtime compensation, FLSA § 16(c) allows additional recovery of "an equal amount of liquidated damages." 29 U.S.C. § 216(c). The Tenth Circuit has noted: "The purpose for the award of liquidated damages is 'the reality that the retention of a workman's pay may well result in damages too obscure and difficult of proof for estimate other than by liquidated damages.'" Renfro v. Emporia, 948 F.2d 1529, 1540 (10th Cir. 1991)(quoting Laffey v. Nw. Airlines, Inc., 567 F.2d 429, 463 (D.C. Cir. 1976)). If the employer can show that the conduct giving rise to the action to recover back pay was in good faith, and that the employer had reasonable grounds to believe the conduct was lawful, the court may refuse to award some or all liquidated damages:

Under 29 U.S.C. § 260, if in any action to recover unpaid overtime compensation an employer "shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the FLSA," the court may refuse to award liquidated damages.

All circuits that have considered the matter hold that the trial court may eliminate or reduce the award of liquidated damages only if the employer shows both that he acted in good faith and that he had reasonable grounds for believing that his actions did not violate the Act.

Renfro v. Emporia, 948 F.2d at 1540 (quoting Doty v. Elias, 733 F.2d 720, 725 (10th Cir. 1984)). The employer bears the burden to prove that the conduct was reasonable and in good faith. See

Renfro v. Emporia, 948 F.2d at 1540.  For purposes of assessing whether the employer meets its burden, "[t]he good faith requirement mandates the employer have 'an honest intention to ascertain and follow the dictates of the Act.  The additional requirement that the employer have reasonable grounds for believing that his conduct complies with the Act imposes an objective standard by which to judge the employer's behavior.'"  Renfro v. Emporia, 948 F.2d at 1540 (quoting Doty v. Elias, 733 F.2d at 725).  See Garcia v. Tyson Foods, Inc., 890 F. Supp. 2d 1273, 1295 (D. Kan. 2012) (Marten, J.)("While the employer must prove subjective good faith, it must also prove that its actions were objectively reasonable.  If the employer meets that burden the court retains discretion whether to award liquidated damages.")(citations omitted).

17.     FLSA § 17 provides that district courts "shall have jurisdiction, for cause shown, to restrain [FLSA] violations . . . including . . . the restraint of any withholding of payment of minimum wages or overtime compensation found by the court to be due to employees under this chapter . . . ." 29 U.S.C. § 217(c).  The question whether a court should grant an injunction is left to the court's sound discretion.  See Mitchell v. Hertzke, 234 F.2d 183, 187 (10th Cir. 1956)("Although it is not clearly stated in these Labor Standards Act cases that the burden of proving the need for an injunction is upon the movant[,] that is a general principle of law and applies with legal force here.").  "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. Current compliance alone, particularly when achieved by direct scrutiny of the government, is not sufficient ground for denying injunctive relief." Metzler v. IBP, Inc., 127 F.3d at 963 (alterations and citations omitted)(quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)); Brock v. Big Bear Market No. 3, 825 F.2d 1381, 1383 (9th Cir. 1987).  In exercising its discretion to grant a prospective injunction after finding a previous FLSA violation, "courts balance that finding against

factors indicating a reasonable likelihood that the violation will not recur, such as the employer's intent to comply, extraordinary efforts taken to prevent recurrence, the absence of repetitive violations, and the absence of bad faith." Metzler v. IBP, Inc., 127 F.3d at 963-64 (citing Martin v. Coventry Fire Dist., 981 F.2d 1358, 1362 (1st Cir. 1992)).

### LAW REGARDING COLLECTIVE ACTIONS UNDER FLSA § 216(b)

18.     Under FLSA § 216(b), "any one or more employees" may bring an action to recover unpaid overtime wages "for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). This provision provides the exclusive mechanism to certify an FLSA collective action. See Prickett v. DeKalb Cnty., 349 F.3d 1294, 1296 (11th Cir. 2003)(per curiam). The United States Court of Appeals for the Eleventh Circuit has explained that "FLSA plaintiffs may not certify a class under Rule 23," because § 216(b)'s opt-in requirement demonstrates that Congress intended FLSA plaintiffs to use § 216(b). Prickett v. DeKalb Cnty., 349 F.3d at 1296. Indeed, the Tenth Circuit has reasoned, "the principal difference between a Rule 23 class action and a § 216(b) collective action is that the similarly situated employee must 'opt-in' to be bound by a judgment in a § 216(b) suit." Dolan v. Project Const. Corp., 725 F.2d 1263, 1266 (10th Cir. 1984), abrogated on other grounds by Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165 (1989). "Correspondingly, § 216(b) fails to provide for mandatory notice to similarly situated employees since no individual rights are jeopardized by the FLSA procedures." Dolan v. Project Const. Corp., 725 F.2d at 1266 (citations omitted). These differences reflect "almost diametrically opposed" policies, with rule 23's opt-out procedure enshrining a "policy of encouraging a single suit," whereas § 216(b)'s requirement of an affirmative act by each plaintiff "tends to discourage collective litigation." Dolan v. Project Const. Corp., 725 F.2d at 1267.

19.     Section 216(b) requires a potential collective-action member to "give his consent in

writing" to become a party. 29 U.S.C. § 216(b). Rule 23(b), by contrast, treats each person within the class description as a class member unless he or she opts out. <u>See</u> Fed. R. Civ. P. 23(b). <u>See also</u> <u>Dolan v. Project Const. Corp.</u>, 725 F.2d at 1266 ("[A] Rule 23 class action [differs from] a § 216(b) collective action i[n] that the similarly situated employee must 'opt-in' to be bound by a judgment in a § 216(b) suit."); <u>LaChapelle v. Owens Illinois, Inc.</u>, 513 F.2d 286, 289 (5th Cir. 1975)(per curiam)("There is a fundamental, irreconcilable difference between the class action described by Rule 23 and that provided for by FLSA § 216(b)."). Because of the procedural discrepancy between § 216(b) collective actions and rule 23 class actions, courts have found that FLSA § 216(b)'s opt-in procedure preempts rule 23's class-action procedure. <u>See</u>, <u>e.g.</u>, <u>Dolan v. Project Const. Corp.</u>, 725 F.2d at 1267 (noting that § 216(b) and rule 23 are "almost diametrically opposed" and that with § 216(b) Congress "[c]learly . . . sought to limit the nature of a class action suit based upon an alleged FLSA violation"). <u>See also</u> <u>King v. Gen. Elec. Co.</u>, 960 F.2d 617, 621 (7th Cir. 1992)(Cudahy, J.)(concluding that FLSA § 16(b)'s opt-in procedure preempts rule 23's class-action procedure); <u>Lusardi v. Lechner</u>, 855 F.2d 1062, 1068 n.8 (3d Cir. 1988)(Hutchinson, J.)("Courts have generally recognized that Rule 23 class actions may not be used under FLSA § 16(b)."); <u>Grayson v. K Mart Corp.</u>, 79 F.3d 1086, 1106 (11th Cir. 1996)(Garth, J.)("Congress clearly adopted the opt-in joinder procedures of Section 216(b) of the FLSA and thus impliedly rejected the Rule 23 class action procedures.").

  20. To use § 216(b)'s collective-action mechanism, each employee who wishes to pursue his or her claims under the FLSA must affirmatively opt into the case in writing. <u>See</u> 29 U.S.C. § 216(b)("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such an action is brought."). Potential Plaintiffs must therefore obtain notice regarding the pending collective action

so they can decide whether to participate.  See Hoffmann-La Roche Inc. v. Sperling, 493 U.S. at 170.

The FLSA authorizes parties to send notice of the opportunity to opt into the collective action if

members of the proposed class are "similarly situated."  29 U.S.C. §216(b).

21.     Although the FLSA does not define the phrase "similarly situated," the Tenth Circuit

has established an ad hoc approach whereby the court determines on a case-by-case basis whether

proposed class' members are similarly situated.  See Thiessen v. Gen. Elec. Capital Corp., 267 F.3d

at 1105.  By adopting the "similarly situated" standard, as opposed to rule 23's standard, the Tenth

Circuit has found that Congress chose to authorize collective actions under a less-stringent standard

than rule 23 class actions.  Thiessen v. Gen. Elec. Capital Corp., 267 F.3d at 1105 ("Congress clearly

chose not to have the Rule 23 standards apply to class actions under the ADEA, and instead adopted

the 'similarly situated' standard.  To now interpret this 'similarly situated' standard by simply

incorporating the requirements of Rule 23 . . . would effectively ignore Congress' directive.").  See

Hoffman-La Roche Inc. v. Sperling, 493 U.S. at 170 (interpreting the ADEA and concluding that, by

enacting § 216(b)'s "similarly situated" language, "Congress has stated its policy that . . . plaintiffs

should have the opportunity to proceed collectively").

22.     Under the Tenth Circuit's approach, the court engages in a two-step process.  First, at

the notice stage before the completion of discovery, the court makes an initial determination whether

the proposed class members are "similarly situated."  Thiessen v. General Electric Capital Corp., 267

F.3d at 1102.  This initial determination decides whether a collective action should be conditionally

certified for purposes of notifying potential class members.  See Myers v. Hertz Corp., 624 F.3d 537,

555 (2d Cir. 2010)(Livingston, J.); Renfro v. Spartan Computer Servs., Inc., 243 F.R.D. at 432.  The

plaintiff bears the burden of demonstrating that he or she is "similarly situated" to the other potential

class members; however, this burden is not great.  A plaintiff "need only describe the potential class

within reasonable limits and provide some factual basis from which the court can determine if similarly situated potential plaintiffs exist." Schwed v. Gen. Elec. Co., 159 F.R.D. at 375-76. See Renfro v. Spartan Computer Servs., Inc., 243 F.R.D. at 432 (concluding that the notice stage requires nothing more than substantial allegations that the proposed class members were together the "victims of a single decision, policy or plan").

23.     Courts of Appeals which have considered the meaning of "similarly situated" have consistently concluded that the phrase requires a minimal showing. See, e.g., Myers v. Hertz Corp., 624 F.3d at 555 (requiring plaintiffs to "make a 'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law'")(citing Hoffmann v. Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997)(Sotomayor, J.)); Morgan v. Family Dollar Stores, Inc., 551 F.3d at 1260 ("Under § 216(b), courts determine whether employees are similarly situated -- not whether their positions are identical."). The plaintiff must support this "modest factual showing," Dybach v. State of Fla. Dep't of Corrections, 942 F.2d 1562, 1567 (11th Cir. 1991)(Kaufman, J.), "but it should remain a low standard of proof because the purpose of this first stage is merely to determine *whether* 'similarly situated' plaintiffs do in fact exist," Myers v. Hertz Corp., 624 F.3d at 555 (emphasis in original)(citing Hoffmann v. Sbarro, Inc., 982 F. Supp. at 261). The United States Court of Appeals for the Fifth Circuit has described the standard for conditional certification at this stage as "lenient," typically resulting in class certification. Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1214 (5th Cir. 1995), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003).

24.     The second step occurs at the close of discovery, after all potential plaintiffs have opted into the action. See Thiessen v. Gen. Elec. Capital Corp., 267 F.3d at 1103. See also Comer v. Wal-Mart Stores, Inc., 454 F.3d 544, 546 (6th Cir. 2006)(Boggs, J.). At this stage, often prompted

by a motion to decertify, the court "makes a second determination, utilizing a stricter standard of 'similarly situated.'" Thiessen v. General Electric Capital Corp., 267 F.3d at 1102-03 (citation omitted). This determination requires that the court evaluate several factors, including: (i) individual plaintiffs' "disparate factual and employment settings"; (ii) the defendants' various defenses "which appear to be individual to each plaintiff"; and (iii) fairness and procedural considerations. Thiessen v. Gen. Elec. Capital Corp., 267 F.3d at 1102-03. If the court, applying these factors, concludes that the potential class members are similarly situated, it may certify the case as a collective action that may proceed to trial.

## ANALYSIS

25. The primary issues are (i) whether the Court should conditionally certify this case as a collective action pursuant to FLSA § 216(b); (ii) whether the Court should approve the Plaintiffs' proposed Notice and Consent Form; (iii) whether the Court should authorize two mailings of the Notice and Consent Form to all potential Plaintiffs via regular mail, email, and text message, and allow class members to execute their consent forms electronically; and (iv) whether the Court should order Swire Oil to produce all potential Plaintiffs' names and known addresses, cellular telephone numbers, and email addresses, so that notice may be implemented. Because the Plaintiffs have made substantial allegations that the proposed Salary Class and FWW Class are similarly situated with respect to Swire Oil's alleged FLSA violations, the Court will conditionally certify the case as a collective action. As to the second issue, the Court approves the proposed Notice and Consent Form. The Court will, however, order that the form include a statement regarding the Plaintiffs' potential liability for court costs and expenses in the event that they lose. Next, the Court concludes that the methods of notice that the Plaintiffs propose are proper, and, thus, the Court authorizes the Plaintiffs to use those methods. Last, the Court will order Swire Oil to produce the potential Plaintiffs' names

and known contact information so that notice may be implemented in the manner that the Plaintiffs request.

26.     As discussed in the Procedural Background section, <u>supra</u>, the Motion also raises several ancillary requests that relate to the mechanics of notice implementation and opting into this lawsuit.  These requests include (i) that the Court order Swire Oil to produce the potential Plaintiffs' names and contact information within ten days; (ii) that the Court authorize the Plaintiffs to send the Notice and Consent Form within seven days of that information's production; (iii) that the Court permit the Plaintiffs to hire a third-party class action administration company to mail the Notice and Consent Forms; (iv) that the Court authorize the Plaintiffs to send a reminder notice thirty days into the opt-in period; (v) that the Court give potential Plaintiffs seventy-five days to opt into this lawsuit; and (vi) that the Court prohibit Swire Oil from communicating with potential Plaintiffs about this lawsuit or its resolution during the seventy-five-day opt-in period.  Swire Oil does not specifically object to these requests, and the Court concludes that these requests are appropriate.  The Court will discuss these requests in conjunction with its analysis of the Plaintiffs' requests that relate to the Notice and Consent Form, <u>infra</u>.

27.     The Court divides its analysis into two primary sections.  First, the Court considers whether the Salary Class and FWW Class members are similarly situated with respect to Swire Oil's alleged FLSA violations.  Second, the Court discusses the proposed Notice and Consent Form's content, and the Plaintiffs' requests that relate to the form's mailing, Swire Oil's production of class members' names and contact information, and the mechanics of notice implementation and opting into this lawsuit.

## I.     THE PROPOSED CLASSES' MEMBERS ARE "SIMILARLY SITUATED" WITH RESPECT TO SWIRE OIL'S ALLEGED FLSA VIOLATIONS.

28.     FLSA § 216(b) allows "any one or more employees" to maintain an action to recover

unpaid overtime wages "for and on behalf of himself or themselves and other employees similarly situated."  The Tenth Circuit has approved an ad hoc, two-step approach to determine similarity.  <u>See</u> <u>Thiessen v. Gen. Elec. Capital Corp.</u>, 267 F.3d at 1105.  At the notice stage, before the completion of discovery, the Court makes an initial determination whether potential plaintiffs are similarly situated.  <u>See</u> <u>Thiessen v. Gen. Elec. Capital Corp.</u>, 267 F.3d at 1105.  "That is, the court determines whether a collective action should be [conditionally] certified for purposes of sending notice of the action to potential class members."  <u>In re Bank of Am. Wage & Hour Emp't Litig.</u>, 286 F.R.D. 572, 576 (D. Kan. 2012)(Lungstrum, J.).  After discovery concludes, often prompted by a motion to decertify, the Court uses a "stricter standard of 'similarly situated'" to determine whether the case can proceed as a collective action.  <u>Thiessen v. General Electric Capital Corp.</u>, 267 F.3d at 1102-03 (citation omitted).

29.    For conditional certification at the notice stage, the Tenth Circuit "requires nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan."  <u>Thiessen v. General Electric Capital Corp.</u>, 267 F.3d at 1102 (brackets and internal quotation marks omitted)(quoting <u>Vaszlavik v. Storage Tech. Corp.</u>, 175 F.R.D. 672, 678 (D. Colo. 1997)(Babcock, J.)(quoting <u>Bayles v. Am. Med. Response</u>, 950 F. Supp. 1053, 1066 (D. Colo. 1996)(Babcock, J.))).  Although the plaintiff must support this "modest factual showing," <u>Dybach v. State of Fla. Dep't of Corrections</u>, 942 F.2d at 1567, "it should remain a low standard of proof because the purpose of this first stage is merely to determine <i>whether</i> 'similarly situated' plaintiffs do in fact exist," <u>Myers v. Hertz Corp.</u>, 624 F.3d at 555 (emphasis in original)(citing <u>Hoffmann v. Sbarro, Inc.</u>, 982 F. Supp. at 261).  At this stage, the Court "does not weigh the evidence, resolve factual disputes, or rule on the merits of plaintiffs' claims."  <u>Greenstein v. Meredith Corp.</u>, 948 F. Supp. 2d at 1267 (citation omitted).  Indeed, the standard for conditional certification is "a lenient one that typically results in class certification."  <u>Greenstein v. Meredith</u>

Corp., 948 F. Supp. 2d at 1267 (citing Brown v. Money Tree Mortg., Inc., 222 F.R.D. at 679).

30.     In making the initial similarity determination, courts evaluate several factors, such as whether potential class members: (i) have the same employer; (ii) are subject to the same employer practices; (iii) suffer the same method of wage calculation; and (iv) allege FLSA violations based on the same conduct.  See, e.g., Hasken v. City of Louisville, 213 F.R.D. 280, 282 (W.D. Ky. 2003)(Simpson, J.).  In Hasken v. City of Louisville, for example, the United States District Court for the Western District of Kentucky concluded that a proposed class of firefighters was similarly situated, because they worked for the same employer and were subject to the same allegedly illegal method for calculating overtime wages.  See 213 F.R.D. at 282.  Similarly, in Bustillos v. Bd. of Cnty. Comm'rs of Hidalgo Cnty., the Court concluded that a proposed class of correctional officers was similarly situated, because they worked for the same employer, had similar job duties, operated under the same employment policies, and alleged injuries arising from the same FLSA violations. See 310 F.R.D. at 665.  The Court noted that no single factor is dispositive in this multi-factor analysis.  See Bustillos v. Bd. of Cnty. Comm'rs of Hidalgo Cnty., 310 F.R.D. at 664.  See also Thiessen v. General Electric Capital Corp., 267 F.3d at 1102 (providing that similarity is determined on an "*ad hoc*, case-by-case basis")(emphasis in original).

31.     Courts applying this multi-factor approach emphasize certain factors in light of the facts before them.  Some courts focus more on the similarity of the plaintiffs' and the proposed class members' job duties and compensation structures.  See, e.g., Bradford v. Bed Bath & Beyond, Inc., 184 F. Supp. 2d 1342, 1345 (N.D. Ga. 2002)(Story, J.)("The only determinative issue is whether Plaintiffs' job duties were similar."); Tucker v. Labor Leasing, Inc., 872 F. Supp. 941, 948 (M.D. Fla. 1994)(Schlesinger, J.)(examining whether "individuals are 'similarly situated' with respect to their job requirements and with regard to their pay provisions")(citation omitted).  Others focus more

on the similarity of the plaintiffs' and the proposed class members' claims. See, e.g., O'Brien v. Ed Donnelly Enter., Inc., 575 F.3d 567, 585 (6th Cir. 2009)(holding that "the plaintiffs were similarly situated, because their claims were unified by common theories of defendants' statutory violations," namely, "forcing employees to work off the clock and improperly editing time-sheets"); Barron v. Henry Cnty. Sch. Sys., 242 F. Supp. 2d 1096, 1103 (M.D. Ala. 2003)(Albritton, C.J.)(requiring some "showing of commonality between the basis for [the plaintiff's] claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions"). In general, however, courts avoid establishing "comprehensive criteria for informing the similarly-situated analysis." O'Brien v. Ed Donnelly Enter., Inc., 575 F.3d at 585.

32.     Here, the Plaintiffs seek conditional certification of two nationwide classes: (i) the Salary Class, i.e., Swire Oil operators who were paid on a salary basis without overtime in the last three years; and (ii) the FWW Class, i.e., Swire Oil operators who were paid a sub-minimum wage under the FWW method in the last three years. See Motion at 1. The Plaintiffs assert that the Salary Class is similarly situated, because it includes employees with substantively similar positions who Swire Oil misclassified as exempt from overtime pay. See Motion at 17-18. Likewise, the Plaintiffs argue that the FWW Class is similarly situated, because it includes employees with similar job duties who Swire Oil paid according to an improper method for calculating overtime compensation. See Motion at 14-15. The Plaintiffs thus contend that the proposed classes' members share many of the attributes that courts have found sufficient to meet § 216(b)'s standard: that they have similar job duties, cf. Bradford v. Bed Bath & Beyond, Inc., 184 F. Supp. 2d at 1345 (focusing on job duties); that they were paid under the same wage calculation methods, cf. Hasken v. City of Louisville, 213 F.R.D. 282 (focusing on pay provisions); and that their claims are based on common theories of how Swire Oil violated the FLSA, cf. O'Brien v. Ed Donnelly Enter., Inc., 575 F.3d at 585 (focusing on

"common theories of defendants' statutory violations").  The Plaintiffs support these assertions with the declarations of several Swire Oil employees regarding their job duties and compensation at Swire Oil.  See generally Landry Decl.; Sutton Decl.; Ruiz Decl.; Acosta Decl.; Silva Decl.; Constancio Decl.; Cook Decl.  In the Plaintiffs' view, these declarations constitute "substantial allegations" that the proposed classes' members are similarly situated under § 216(b).  Reply at 3.

33.     In general, if proposed class members are "employees with similar positions," courts hold that "allegations that the defendants 'engaged in a pattern or practice of not paying overtime [are] sufficient to allege that plaintiffs were together the victims of a single decision, policy or plan.'"  Foster v. Nova Hardbanding, LLC, 2016 U.S. Dist. LEXIS 53426, at *7 (alteration added)(quoting Renfro v. Spartan Computer Servs., Inc., 243 F.R.D. at 433-34 (citing Brown v. Money Tree Mortg., Inc., 222 F.R.D. at 681)).  See Bustillos v. Bd. of Cnty. Comm'rs of Hidalgo Cnty., 310 F.R.D. at 665 ("Where proposed class members are employed in similar positions, that the employer defendant engaged in a pattern of not paying overtime is sufficient to allege that plaintiffs are similarly situated with potential opt-in plaintiffs.")(citations omitted).  By the same logic, allegations that an employer "engaged in a pattern or practice" of not paying minimum wage are sufficient to allege that "employees with similar positions" were the victims of a single decision, policy, or plan.  Thus, here, the Court will determine whether the proposed Salary Class and FWW Class members are similarly situated by examining: (i) whether the classes include "employees with similar positions"; and (ii) whether Swire Oil had "had a single decision, policy, or plan" to not pay Salary Class members overtime and a decision, policy, or plan to not pay FWW Class members the minimum wage.  Cf. Foster v. Nova Hardbanding, LLC, 2016 U.S. Dist. LEXIS 53426, at *7 (articulating this test in the context of alleged overtime pay violations).

## A. THE PLAINTIFFS HAVE MADE "SUBSTANTIAL ALLEGATIONS" THAT THE PROPOSED CLASSES' MEMBERS ARE EMPLOYEES WITH SIMILAR POSITIONS.

34.     At the notice stage, the scope of the Court's similarity analysis is limited to "the substantial allegations of the complaint along with any supporting affidavits or declarations." Renfro v. Spartan Computer Servs., Inc., 243 F.R.D. at 434 (footnote omitted)(citing, among others, Thiessen v. General Electric Capital Corp., 267 F.3d at 1102). See McGlon v. Sprint Corp., 2016 U.S. Dist. LEXIS 168694, at *3-4 (D. Kan. 2016)(Robinson, J.). Here, examining the Complaint, along with the supporting declarations that the Plaintiffs attach to the Motion and the Reply, the Court concludes that the Plaintiffs have made sufficiently substantial allegations that the proposed classes are comprised of employees with similar positions.

35.     As outlined in the Court's Findings of Fact, supra, although Swire Oil hired operators under various job titles, all operators had essentially the same primary duties: rigging up, monitoring, maintaining, and rigging down water transfer and chemical blending equipment at oil well sites. See Landry Decl. ¶ 2, at 1 (describing duties such as "rig[ging] up jobs," "servicing," and "maintaining fluid transfer equipment"); Sutton Decl. ¶ 2, at 1 ("rig up jobs," "monitor[] water tank levels," and "rig down equipment"); Ruiz Decl. ¶ 2, at 1 ("rigging up and rigging down jobs" and "maintenance on wellsite equipment"); Acosta Decl. ¶ 2, at 1 ("maintaining water transfer equipment," "rigging up and down jobs," and "monitor[ing] water levels"); Silva Decl. ¶ 2, at 1 ("maintaining water transfer or chemical blending equipment," "rigging up and down jobs," and "mak[ing] sure equipment was well kept and ready for use"); Constancio Decl. ¶ 2, at 1 ("maintaining water and fluid transfer equipment," "rigging up and rigging down jobs," and "mak[ing] sure equipment was well kept and ready for use"); Cook Decl. ¶ 2, at 1 ("maintaining fluid transfer equipment"). All operators' duties were "physically intense," Landry Decl. ¶ 2, at 1; Sutton Decl. ¶ 2, at 1; Ruiz Decl. ¶ 2, at 1; Acosta

Decl. ¶ 2, at 1; Silva Decl. ¶ 2, at 1; Constancio Decl. ¶ 2, at 1; Cook Decl. ¶ 2, at 1, requiring them to continuously move around jobsites to "check the frack tanks, check the fluids, and make sure pressure was sustained in accordance with [Swire Oil] procedures," Landry Decl. ¶ 2, at 1.

36.     To accomplish these duties, all operators commonly worked "in excess of 12 hours a day, often more than 90 hours a week" and were "commonly called upon to work day after day with little rest." Complaint ¶ 31, at 6. Indeed, operators all worked long hours on extended rotations, resulting in many weeks where they logged substantial hours of overtime. See Landry Decl. ¶ 4, at 1 (stating that he "regularly worked 100 hours or more hours per workweek"); Sutton Decl. ¶ 4, at 2 ("120 or more hours per workweek"); Ruiz Decl. ¶ 4, at 2 ("80 or more hours per workweek"); Acosta Decl. ¶ 4, at 1 ("120 or more hours per workweek"); Silva Decl. ¶ 4, at 2 ("120 or more hours per workweek"); Constancio Decl. ¶ 4, at 2 ("80 or more hours per workweek"); Cook Decl. ¶ 3, at 1 ("84 or more hours per workweek").

37.     Finally, operators in the proposed classes were lower-level employees with limited authority; they reported to jobsites as Swire Oil instructed, followed relevant policies and procedures that pertained to each jobsite, and followed clients' instructions regarding how work was to be performed. See Complaint ¶¶ 34-38, at 7. See also Landry Decl. ¶ 7, at 2 (stating that he "did not have the authority to hire and/or fire any employees" and "did not make decisions . . . regarding how or when a job was to be performed," but "instead reported to a jobsite as [Swire Oil] instructed," "followed [Swire Oil's and its clients'] safety policies and procedures," and "followed [clients'] instructions . . . about how a job was to be performed"); Sutton Decl. ¶ 7, at 2 (same); Ruiz Decl. ¶ 7, at 2 (same); Acosta Decl. ¶ 7, at 2 (same); Silva Decl. ¶ 7, at 2 (same); Constancio Decl. ¶ 7, at 2 (same); Cook Decl. ¶ 6, at 2 (same).

38.     Swire Oil's principal objection is that, although operators in the proposed classes

"engaged in a common enterprise," their "specific job duties differed." Response at 4-5. Swire Oil admits that all operators "played some role in setting up the equipment on site and rigging it down after the job was complete." Response at 4. Swire Oil contends, however, that operators "performed differing duties." Response at 6. Swire Oil notes, for example, that, whereas Field Supervisors such as Landry "check the frack tanks, check the fluids, and make sure pressure is sustained in accordance with procedures," Water Transfer Technicians such as Constancio "work with pump and tank operators to run the pump, flow the tank, record how much water was pumped and make sure equipment is maintained." Response at 4-5. In further contrast, Swire Oil argues, Pump Operators such as Acosta "monitor levels in tanks and keep in contact with pump operators about water and flow levels," while Mechanics such as Ruiz "maintain well-site equipment and respond to calls to repair oilfield equipment." Response at 5.

39.     Swire Oil's objection is unavailing at this initial stage of the litigation. At the notice stage, the Plaintiffs "need only show that [their] positions [are] similar, not identical, to the positions held by the putative class members." Pritchard v. Dent Wizard Int'l, Corp., 210 F.R.D. 591, 595 (S.D. Ohio 2002)(Sargus, J.)(alterations added)(citations and internal quotation marks omitted). See Morgan v. Family Dollar Stores, Inc., 551 F.3d at 1260 ("[U]nder § 216(b), courts determine whether employees are similarly situated -- not whether their positions are identical.")(citing Grayson v. K Mart Corp., 79 F.3d at 1096). Thus, "some variation [in the Plaintiffs'] specific job duties will not destroy [a similarly situated] designation at this stage of the litigation." Bustillos v. Bd. of Cnty. Comm'rs of Hidalgo Cnty., 310 F.R.D. at 665 (citing Renfro v. Spartan Computer Servs., Inc., 243 F.R.D. at 434; Pivonka v. Bd. of Cnty. Comm'rs of Johnson Cnty., Kan., 2005 U.S. Dist. LEXIS 17553, at *4 (D. Kan. 2005)(Lungstrum, J.)). In Renfro v. Spartan Computer Servs., Inc., for example, the United States District Court for the District of Kansas held that a class of field

technicians and restaurant point-of-sale installers were similarly situated despite "some inherent variation in the[ir] specific duties," because "their shared responsibility to maintain point-of-sale systems is sufficient at th[e] [notice] stage of the litigation to find that the putative class members are similarly employed." 243 F.R.D. at 434 (footnote and citation omitted). Similarly, in <u>Pivonka v. Bd. of Cnty. Comm'rs of Johnson Cnty., Kan.</u>, the United States District Court for the District of Kansas held that variations in employees' specific job duties did not defeat conditional certification, because all employees shared general duties and their injuries all arose from their employer's failure to pay overtime. <u>See</u> 2005 U.S. Dist. LEXIS 17553, at *4.

40.     Here, operators in the proposed classes had a shared responsibility to rig up, monitor, maintain, and rig down water transfer and chemical blending equipment at oil well sites. <u>See</u> Landry Decl. ¶ 2, at 1; Sutton Decl. ¶ 2, at 1; Ruiz Decl. ¶ 2, at 1; Acosta Decl. ¶ 2, at 1; Silva Decl. ¶ 2, at 1; Constancio Decl. ¶ 2, at 1; Cook Decl. ¶ 2, at 1. Operators all worked long hours performing physically intense duties, and all were lower-level employees with limited authority. <u>See</u> Landry Decl. ¶¶ 2, 4, at 1; <u>id.</u> ¶ 7, at 2; Sutton Decl. ¶ 2, at 1; <u>id.</u> ¶¶ 4, 7, at 2; Ruiz Decl. ¶ 2, at 1; <u>id.</u> ¶¶ 4, 7, at 2; Acosta Decl. ¶¶ 2, 4, at 1; <u>id.</u> ¶ 7, at 2; Silva Decl. ¶ 2, at 1; <u>id.</u> ¶¶ 4, 7, at 2; Constancio Decl. ¶ 2, at 1; <u>id.</u> ¶¶ 4, 7, at 2; Cook Decl. ¶¶ 2, 3, at 1; <u>id.</u> ¶ 6, at 2. That the operators' specific job duties at the well sites varied somewhat does not prevent the Court from finding them similarly situated for purposes of conditional certification. <u>See</u> <u>Bustillos v. Bd. of Cnty. Comm'rs of Hidalgo Cnty.</u>, 310 F.R.D. at 665. Such alleged differences raise fact questions which are better suited for determination at the second stage, when the Court may consider several factors such as (i) individual Plaintiffs' "disparate factual and employment settings"; (ii) Swire Oil's various defenses "which appear to be individual to each plaintiff"; and (iii) fairness and procedural considerations. <u>Thiessen v. Gen. Elec. Capital Corp.</u>, 267 F.3d at 1102-03. At this initial stage, the Court concludes that the Complaint and

the supporting declarations provide "substantial allegations" that the proposed classes' members are employees with similar positions. Thiessen v. General Electric Capital Corp., 267 F.3d at 1102.

**B.    THE PLAINTIFFS HAVE MADE "SUBSTANTIAL ALLEGATIONS" THAT SWIRE OIL HAD A SINGLE DECISION, POLICY, OR PLAN TO NOT PAY SALARY CLASS MEMBERS OVERTIME AND A SINGLE DECISION, POLICY, OR PLAN TO NOT PAY FWW CLASS MEMBERS THE MINIMUM WAGE.**

41.    The second inquiry in the similarly-situated analysis is whether the Plaintiffs have made "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." Thiessen v. General Electric Capital Corp., 267 F.3d at 1102 (brackets, citations, and internal quotation marks omitted). Examining the Complaint along with its supporting declarations, see Renfro v. Spartan Computer Servs., Inc., 243 F.R.D. at 434, the Court concludes that the Plaintiffs have made substantial allegations that Swire Oil had a decision, policy, or plan to not pay Salary Class members overtime, and a decision, policy, or plan to not pay FWW Class members the minimum wage.

42.    First, with respect to the Salary Class, Swire Oil made a company-wide decision to classify "nearly all," Motion at 4, operators as exempt from the FLSA's overtime requirements, and paid them on a flat salary basis or on a salary basis with a day rate payment for each day spent in the field, see Complaint ¶¶ 33-39, at 6-7. See also Landry Decl. ¶ 5, at 2; Sutton Decl. ¶ 2, at 1; Ruiz Decl. ¶ 5, at 2. Although Swire Oil reclassified some of its workforce to non-exempt status in late 2013 and early 2014, see Ruiz Decl. ¶ 5, at 2, some job titles remained misclassified as exempt and were therefore denied overtime pay, see Sutton Decl. ¶ 2, at 1. Second, regarding the FWW Class, Swire Oil made a company-wide decision in late 2014 to transition salaried operators off a flat salary basis and began paying them overtime under the FWW method. See Complaint ¶ 40, at 7. See also Ruiz Decl. ¶¶ 4, 8, at 2; Constancio Decl. ¶ 5, at 2. Several operators compensated under the FWW

method, such as Constancio and Ruiz, experienced numerous weeks in which their salaries fell below the $7.25 per hour minimum wage rate. See Constancio Paystub at 1; Ruiz Paystubs at 1-2; Ruiz Decl. ¶ 5, at 2; Constancio Decl. ¶ 5, at 2. Finally, with respect to both classes, the declarants assert that they are aware of other Swire Oil operators who were denied overtime as salaried employees and who were paid a sub-minimum wage under the FWW method. See Landry Decl. ¶ 9, at 3; Sutton Decl. ¶ 9, at 3; Ruiz Decl. ¶ 9, at 3; Acosta Decl. ¶ 9, at 3; Silva Decl. ¶ 9, at 3; Constancio Decl. ¶ 9, at 3; Cook Decl. ¶ 7, at 2.

43.    Swire Oil advances several arguments disputing that it had a "single 'decision, policy, or plan'" regarding the Salary Class or the FWW Class, Response at 3; none are persuasive at this stage of the litigation. Swire Oil contends, first, that it did not have a single decision, policy, or plan to violate the Salary Class' FLSA rights, because, if "'nearly' all of Swire's manual laborers were paid on a salaried basis," then "some manual laborers were not paid in this manner." Response at 3. It is immaterial, however, that some operators had different pay provisions. Swire Oil's decision to classify as exempt certain operators was singular as to only those operators; operators compensated under different methods are, by definition, outside the Salary Class' scope, and their existence does not defeat the singularity of Swire Oil's decision with respect to its salaried operators. Second, and relatedly, Swire Oil notes that "[s]ome Plaintiffs admit that they were paid hourly for most of 2014, but allege other positions were improperly classified as exempt." Response at 3. In Swire Oil's view, "[t]hat is not evidence of a single 'decision, policy, or plan[.]'" Response at 3. Again, that Swire Oil paid certain operators on an hourly basis with overtime, while paying others on a salary basis without overtime, is irrelevant to the singularity of Swire Oil's compensation decision as to the latter subset of operators. Section 216(b) does not require for certification an alleged decision to violate every employee's FLSA rights; it requires a decision to violate the FLSA rights of only those

employees in the proposed class.  See Thiessen v. General Electric Capital Corp., 267 F.3d at 1102.

44.     Finally, Swire Oil argues that the Plaintiffs "are just asserting the fact that some of these employees were classified as salary and they haven't identified any decision or policy of Swire to do that."  Tr. at 13:9-13 (Gatling).  At this stage, however, the Plaintiffs need not identify with specificity an official manifestation of Swire Oil's decision to not pay overtime.  "[I]f putative class members are employees with similar positions, 'allegations that the defendants 'engaged in a pattern or practice of not paying overtime [are] sufficient to allege that plaintiffs were together the victims of a single decision, policy or plan.'"  Foster v. Nova Hardbanding, LLC, 2016 U.S. Dist. LEXIS 53426, at *7 (alteration added)(citations omitted).  The Court has already concluded that the Salary Class is comprised of "employees with similar positions[.]"  Foster v. Nova Hardbanding, LLC, 2016 U.S. Dist. LEXIS 53426, at *7 (citations omitted).  Accordingly, the Plaintiffs' allegation that Salary Class members were "subjected to the same illegal pay practice[]," i.e., that Swire Oil denied them overtime compensation, Complaint ¶ 48, at 8-9, is "sufficient to allege that plaintiffs were together the victims of a single decision, policy or plan,'"  Foster v. Nova Hardbanding, LLC, 2016 U.S. Dist. LEXIS 53426, at *7 (citations omitted).

45.     Turning to the FWW Class, Swire Oil notes that it began transitioning hourly workers to the FWW method in late 2014, "at least a year and a half after Swire had allegedly made another alleged 'decision, policy, or plan' to improperly classify certain positions as exempt."  Response at 3-4.  Swire Oil contends that these "varying alleged decisions" do not amount to a "single 'decision, policy, or plan' by Swire to deprive [the Plaintiffs] of their rights under the FLSA."  Response at 4.  This argument improperly presupposes the existence of one, not two, classes.  Although Swire Oil's decisions to classify as exempt certain operators and then to pay operators under the FWW method do not together constitute a single "decision, policy, or plan," the Plaintiffs do not seek to certify one

class of operators based on a unified theory of both overtime and minimum-wage violations. Rather, the Plaintiffs define two classes that correspond individually to each compensation decision, i.e., the Salary Class corresponds to Swire Oil's single decision regarding salary compensation, while the FWW Class corresponds to Swire Oil's single decision regarding FWW-method compensation. In short, although Swire Oil is correct that the Plaintiffs identify two separate compensation decisions, the Plaintiffs seek to certify two classes, each of which is defined in relation to a single decision.

46.     Swire Oil contends, moreover, that operators within the FWW Class were "subject to differing methods of pay at differing times." Response at 3. Swire Oil notes that it did not transition all operators to the FWW method at the same time; for example, it paid Fluid Technicians under the FWW method, before it paid Service Operators and Service Specialists under that method. See Tr. at 13:20-23 (Gatling)(relying on Tucker Decl.). Thus, Swire Oil concludes, there was no single decision "that would apply to all of these employees." Tr. at 13:24-14:2 (Gatling). This argument is unpersuasive for several reasons. First, that Swire Oil transferred operators to the FWW method at different times does not demonstrate the absence of a single decision to pay operators according to that method; rather, it suggests that Swire Oil decided to pay operators under the FWW method, but that it implemented that decision in phases. Second, § 216(b)'s lenient "similarly situated" standard is not an "identically situated" standard. Grayson v. K Mart Corp., 79 F.3d at 1096. Potential FWW Class members need not have been compensated under the FWW method at precisely the same time for them to be similarly situated; rather, it is sufficient that Swire Oil adopted -- at some point -- the same method to calculate all FWW Class members' pay. The relevant factor is the compensation method's uniformity across the FWW Class and not the method's temporal application to that class.

47.     Ultimately, the Plaintiffs at this stage of the litigation need allege only that Swire Oil "engaged in a pattern or practice" of not paying potential FWW Class members the minimum wage

to allege that those members "were together the victims of a single decision, policy or plan.'" <u>Foster v. Nova Hardbanding, LLC</u>, 2016 U.S. Dist. LEXIS 53426, at *7 (citations omitted). Here, the Plaintiffs allege that Swire Oil violated FWW Class members' FLSA rights by engaging in a pattern or practice of paying them a sub-minimum wage under the FWW method. <u>See</u> Complaint ¶¶ 75-82, at 13-14. Thus, temporal differences notwithstanding, FWW Class members are similarly situated, because their claims are "unified by common theories" of how Swire Oil used a payment method that violated the FLSA's minimum wage requirement. <u>Cf.</u> <u>O'Brien v. Ed Donnelly Enter., Inc.</u>, 575 F.3d at 585 (conditionally certifying a class, because the plaintiffs' claims were "unified by common theories" regarding the defendant's practices of "forcing employees to work off the clock and improperly editing time-sheets").

48.     Swire Oil advances two final arguments regarding the FWW Class: that some FWW Class members "received notice of a change to the FWW method of payment[] while others did not," and that Swire Oil explained the FWW method to some members and not to others. Response at 3 (citing Motion at 4, 6). It is immaterial, however, that FWW Class members had varying levels of knowledge regarding their compensation. As the Court has already explained, the Tenth Circuit "requires nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." <u>Thiessen v. General Electric Capital Corp.</u>, 267 F.3d at 1102 (brackets, citations, and internal quotation marks omitted). The Tenth Circuit's test therefore focuses on whether class members were together the <u>victims</u> of an illegal compensation structure; Swire Oil improperly focuses on whether class members <u>knew</u> they were victims. Whether class members knew that they were illegally compensated does not, however, affect whether they were, in fact, subjected to an illegal compensation system. Thus, at least at this initial stage, it is sufficient that the Plaintiffs allege that FWW Class members were together the victims of Swire Oil's decision

to adopt a compensation method that violated the FLSA's minimum wage requirement.  See

Thiessen v. General Electric Capital Corp., 267 F.3d at 1102.

### C. THE PROPOSED CLASSES' MEMBERS ARE SIMILARLY SITUATED DESPITE SOME OPT-IN PLAINTIFFS' PRIOR SETTLEMENT OF CLAIMS AGAINST SWIRE OIL.

49.     Swire Oil contends, finally, that the proposed classes' members are not similarly

situated, because certain members have already settled their claims with Swire Oil.  See Response at

6.  Swire Oil notes that several opt-in Plaintiffs also opted into the lawsuits that employees filed in

2013 and 2015 against Swire Oil for classifying oilfield manual laborers as exempt from the FLSA's

overtime pay requirements.  See Response at 6 (referencing Bergman v. Swire Oilfield Servs., LLC

and McCain v. Swire Oilfield Servs., LLC).  Swire Oil notes, first, that opt-in Plaintiffs Evans,

Murphy, Salinas, Valdez, and Wilhite also opted into Bergman v. Swire Oilfield Servs., LLC, and

settled their claims against Swire Oil.  See Response at 6.  Swire Oil argues that Valdez and Wilhite

are not entitled to further payment, because it paid them on an hourly basis or as salaried exempt

supervisors from the time they settled their claims until their employment terminated.  See Response

at 6-7 (citing Tucker Dec. ¶¶ 4-5, at 1-2).  Swire Oil adds that, although Tamayo did not opt into

Bergman v. Swire Oilfield Servs., LLC, he later settled his claims with Swire Oil under the formula

used to calculate damages in that case.  See Response at 7 (citing Tucker Decl. ¶ 6, at 2).  Second,

Swire Oil notes that opt-in Plaintiffs Adkison, Mearns, and Sanderford also opted into McCain v.

Swire Oilfield Servs., LLC, and settled their claims against Swire Oil.  See Response at 7.  Swire Oil

asserts that Sanderford and Adkison are not entitled to further payment, because their employment at

Swire Oil terminated on August 15, 2015, and August 17, 2015, respectively.  See Response at 7

(citing Tucker Decl. ¶¶ 9-10, at 2).

50.     Swire Oil is correct that those employees who previously settled their claims and then

terminated their employment at Swire Oil are not entitled to further recovery for unpaid wages. This fact does not, however, defeat conditional certification. That some employees settled their claims is irrelevant to the viability of other employees' claims under the FLSA. <u>Compare</u> 29 U.S.C. § 216(b) (requiring employees who wish to pursue FLSA claims to affirmatively opt into the case in writing to be bound), <u>with</u> Fed. R. Civ. P. 23(b) (treating individuals within the class description as class members unless they affirmatively opt out). <u>See</u> <u>Dolan v. Project Const. Corp.</u>, 725 F.2d at 1266 (noting that "the principal difference between a Rule 23 class action and a § 216(b) collective action is that the similarly situated employee must 'opt-in' to be bound by a judgment in a § 216(b) suit"). Further, employees who continued to work for Swire Oil after settling their claims and who suffered subsequent FLSA violations are entitled to pursue claims stemming from those post-settlement violations. <u>See</u>, <u>e.g.</u>, <u>Allen v. Mill-Tel, Inc.</u>, 2012 U.S. Dist. LEXIS 96344, at *4 (D. Kan. 2012)(Melgren, J.)(certifying a class of employees "who did not opt into either of the prior cases, or whose release is not effective to part of the relevant time period").

51.    Here, the Plaintiffs contend that six of the employees whom Swire Oil identifies as having previously released their claims against it continued to work for Swire Oil and suffered additional FLSA violations after their respective settlement dates. <u>See</u> Reply at 6. These employees include Evans, Murphy, Salinas, Tamayo, Valdez, and Wilhite. <u>See</u> Reply at 6 (noting that Evans, Murphy, Salinas, Valdez, and Wilhite continued working at Swire Oil after their September 1, 2014, settlement date, and that Tamayo continued working after his August 1, 2015, settlement date). The Court concludes that these employees are entitled to join this suit, because they have potential FLSA claims that post-date their release of claims against Swire Oil. The Court also concludes, however, that operators who terminated their employment at Swire Oil after releasing their claims should be excluded from the proposed classes' definitions. This exclusion will ensure that only employees

who did not opt into the previous cases, as well as employees whose FLSA claims post-date the previous settlements, participate in the case.

### D. THE PROPOSED CLASSES' SCOPES ARE APPROPRIATE.

52. Swire Oil requests that, should the Court grant conditional certification, it limit the proposed classes' scopes to employees in New Mexico, Texas, Oklahoma, and North Dakota.[5] See Response at 8. Swire Oil notes that the Plaintiffs proffer declarations from employees only in those states and argues that, therefore, the Plaintiffs "have not demonstrated that alleged misclassification of non-exempt employees or improper payment under the FWW is occurring nationwide." Response at 7. See Tr. at 13:3-5 (Gatling)(asserting that the Plaintiffs do not "have any evidence of any actions that have taken place throughout the United States involving Swire"). In Swire Oil's view, "FLSA violations at one of a company's multiple locations generally are not, without more, sufficient to support company-wide notice." Response at 7 (quoting Graham v. Jet Specialty, Inc., 2016 U.S. Dist. LEXIS 3420, at *10 (quoting McCloud v. McClinton Energy Grp., L.L.C., 2015 U.S. Dist. LEXIS 20374, at *21))(internal quotation marks omitted). The Court finds these arguments unpersuasive and declines to limit the proposed classes' geographic scopes.

53. Swire Oil is correct that, in general, alleged FLSA violations at one of a company's multiple locations are insufficient, without more, for company-wide notice. See, e.g., Huaman v. Ojos Locos Sports Cantina L.L.C., 2014 U.S. Dist. LEXIS 114675, at *6 (N.D. Tex. 2014)(Boyle, J.); England v. New Century Fin. Corp., 370 F. Supp. 2d 504, 511 (M.D. La. 2005)(Polozola, C.J.). "Geographic commonality is not," however, "necessary to satisfy the FLSA collective action's similarly situated requirement, so long as the employees were impacted by a common policy."

---

[5]Swire Oil presumably would have added to this list Louisiana, had the Plaintiffs attached the Cook Decl. to the Motion and not to the Reply.

McCloud v. McClinton Energy Grp., L.L.C., 2015 U.S. Dist. LEXIS 20374, at *21-22 (citations and internal quotation marks omitted).  See Thiessen v. General Electric Capital Corp., 267 F.3d at 1102 (requiring for conditional certification "nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan")(brackets, citations, and internal quotation marks omitted).  Thus, "'if there is reasonable basis to conclude that the same policy applies to multiple locations of a single company, certification is appropriate.'"  McCloud v. McClinton Energy Grp., L.L.C., 2015 U.S. Dist. LEXIS 20374, at *22 (brackets omitted)(quoting Rueda v. Tecon Servs., 2011 U.S. Dist. LEXIS 69356, at *4 (S.D. Tex. 2011)(Rosenthal, J.)).

      54.      Here, there is a "reasonable basis to conclude," McCloud v. McClinton Energy Grp., L.L.C., 2015 U.S. Dist. LEXIS 20374, at *22 (citation omitted), that Swire Oil's salary-without-overtime and FWW-method compensation systems applied to multiple locations nationwide.  Unlike cases in which courts have declined to authorize company-wide notice based on allegations of FLSA violations at a single location, the Plaintiffs proffer declarations from several Swire Oil employees who allege common violations at multiple locations in five states: Texas, New Mexico, Oklahoma, North Dakota, and Louisiana.  Cf. Braun v. Superior Indus. Int'l, 2010 U.S. Dist. LEXIS 102863, at *6 (D. Kan. 2010)(Lungstrum, J.)(declining to authorize company-wide notice, because the plaintiffs adduced evidence of FLSA violations at a single facility, which suggested that the violations resulted from "a handful of 'rogue' supervisors" at that facility); Graham v. Jet Specialty, Inc., 2016 U.S. Dist. LEXIS 3420, at *10-11 (declining to grant company-wide notice based on declarations from employees at a single office, which did not suggest that a "comprehensive, company-wide pay practice exists outside" that office); Rueda v. Tecon Servs., 2011 U.S. Dist. LEXIS 69356, at *14-19 (concluding that evidence of FLSA violations at one office in Houston, Texas, was insufficient to "support certification of a subclass of thousands of Tecon employees who performed manual labor

outside . . . Houston"). The geographical diversity and commonality of these allegations support a reasonable inference that the same violations occurred at other Swire Oil locations nationwide. <u>See</u> <u>McCloud v. McClinton Energy Grp., L.L.C.</u>, 2015 U.S. Dist. LEXIS 20374, at *22. Each declarant's assertion that they are aware of Swire Oil's company-wide pay practices and that they know of other employees who experienced the same pay violations buttresses this inference. <u>See</u> Landry Decl. ¶ 8, at 2; Sutton Decl. ¶ 8, at 2; Ruiz Decl. ¶ 8, at 2; Acosta Decl. ¶ 8, at 2; Silva Decl. ¶ 8, at 2; Constancio Decl. ¶ 8, at 2; Cook Decl. ¶ 7, at 2.

55.     The Plaintiffs need not, as Swire Oil suggests, proffer evidence of violations at <u>every</u> Swire Oil location for the Court to authorize nationwide notice. <u>See</u> Response at 7-8 (arguing that notice should be limited to employees in states in which the declarants worked). Even allegations of company-wide pay practices stemming from employees' first-hand experiences at a single location may be sufficient to support company-wide notice. In <u>Hose v. Henry Indus., Inc.</u>, for example, the United States District Court for the District of Kansas authorized notice to employees at a company's twenty-five facilities in eleven states based on four employees' experiences at a single location in Missouri. <u>See</u> 49 F. Supp. 3d at 918-19. Despite the defendant's objection that the plaintiffs "only have personal knowledge of that facility," the court found it sufficient that the plaintiffs alleged "a company-wide, uniform policy" based on their experiences there. <u>Hose v. Henry Indus., Inc.</u>, 49 F. Supp. 3d at 918. The court also stressed that the plaintiffs proffered "evidence of [three] additional workers who wish to opt-in." <u>Hose v. Henry Indus., Inc.</u>, 49 F. Supp. 3d at 918. Here, the Plaintiffs allege two company-wide payment practices based on employees' experiences at multiple facilities in five states. The Plaintiffs also proffer evidence of more than forty Swire Oil operators who wish to opt into this suit. In both respects, the Plaintiffs' allegations are more substantial than those that the court deemed sufficient for company-wide notice in <u>Hose v. Henry Indus., Inc.</u> By the same

token, the Plaintiffs' substantial allegations distinguish this case from those in which courts have declined to authorize company-wide notice. <u>See</u>, <u>e.g.</u>, <u>Hobbs v. Tandem Envtl. Sols., Inc.</u>, 2011 U.S. Dist. LEXIS 11426, at *6 (D. Kan. 2011)(Vratil, J.)(limiting notice to one location, because the plaintiffs offered "no allegations of company-wide policies or practices"); <u>Blancarte v. Provider Plus, Inc.</u>, 2012 U.S. Dist. LEXIS 137665, at *9 (D. Kan. 2012)(Robinson)(denying conditional certification, because the plaintiff did "not name a single co-worker who shares his concerns, or one willing to provide an affidavit or desire to opt-in to the litigation").

56. Finally, regardless whether the payment practices about which the Plaintiffs complain occurred nationwide, the proposed classes' definitions will ensure that only operators who were paid according to those practices will receive notice. That is, the class definitions are self-limiting; they will by definition exclude employees who were not paid under the salary-without-overtime or FWW method, regardless of the state in which they worked. Thus, the Court concludes that the proposed classes' scopes are not overly broad.

## II. THE COURT APPROVES THE PROPOSED NOTICE AND CONSENT FORM AND GRANTS THE PLAINTIFFS' REQUESTS THAT RELATE TO THE FORM'S MAILING, SWIRE OIL'S PRODUCTION OF POTENTIAL CLASS MEMBERS' NAMES AND CONTACT INFORMATION, AND THE MECHANICS OF NOTICE IMPLEMENTATION AND OPTING INTO THIS LAWSUIT.

57. The Plaintiffs submit a proposed Notice and Consent Form, and make requests that relate to the form's mailing and Swire Oil's production of potential class members' names and contact information. The Plaintiffs also raise several ancillary requests that relate to the mechanics of notice implementation and opting into this lawsuit. Swire Oil's sole objection to all these requests pertains to the Notice and Consent Form's content. Accordingly, the Court begins its analysis with the form's content and then turns to the Plaintiffs' remaining requests.

## A.     THE COURT APPROVES THE NOTICE AND CONSENT FORM.

58.     The proposed Notice and Consent Form briefly describes this case, instructs potential Plaintiffs on how to opt into the case, explains that the FLSA prohibits retaliation for participating in the case, and describes the effects of joining the case.  See Notice and Consent Form at 1-3.  Swire Oil's objection relates to section six, entitled "Effect of Joining the Lawsuit."  That section provides, in relevant part:

> If you join this case by filing your consent, you agree to be represented by the attorneys identified below.  The Plaintiffs' attorneys are experienced in representing employees who claim they are owed wage.  If you join this case by filing your consent, you will be bound by the judgment of the Court on all issues of the case, whether favorable or unfavorable.  If you win, you may be eligible for a monetary award, including overtime wages and liquidated damages.  If you lose, no money will be awarded, and you will not be able to file another lawsuit regarding the matters raise in this lawsuit.

Swire Oil contends that, although this section addresses the potential for an unfavorable outcome for the Plaintiffs, it does not indicate that the Plaintiffs may be responsible for paying court costs in the event that they lose.  See Response at 8-9.  Swire Oil thus requests that the following sentence be appended to the above paragraph: "Also, if plaintiffs lose, they could be responsible for paying court costs and expenses."  Response at 8-9.  The Plaintiffs demur, however, arguing that such language "would only serve to dissuade people from exercising their rights and is clearly retaliatory in nature."  Reply at 8.  The Court disagrees.

59.     "Under the FLSA, the Court has the power and duty to ensure that the notice is fair and accurate, but it should not alter plaintiff's proposed notice unless such alteration is necessary." Creten-Miller v. Westlake Hardware, Inc., 2009 U.S. Dist. LEXIS 60393, at *5-6 (citing Lewis v. ASAP Land Express, Inc., 2008 U.S. Dist. LEXIS 40768 (D. Kan. 2008)(Vratil, J.)).  See Hoffmann-La Roche Inc. v. Sperling, 493 U.S. at 172 (holding that courts should ensure that notice is "timely, accurate, and informative").  Some courts have rejected the argument that fairness and accuracy

require that a notice include a warning about court costs, reasoning that (i) "the FLSA is silent as to whether prevailing defendants may recover their costs"; and (ii) "the warning could discourage potential plaintiffs from participating." Gieseke v. First Horizon Home Loan Corp., 2006 U.S. Dist. LEXIS 76732, at *6 (citation omitted). More recently, however, courts have required such warnings, reasoning that, "because some courts *have* awarded costs to prevailing defendants in FLSA cases, such an award 'is clearly possible and is not merely theoretical.'" Wass v. NPC Int'l, Inc., 2011 U.S. Dist. LEXIS 32761, at *26 (emphasis in original)(quoting Creten-Miller v. Westlake Hardware, Inc., 2009 U.S. Dist. LEXIS 60393, at *3-4). In Wass v. NPC Int'l, Inc., for example, the United States District Court for the District of Kansas held that, "because an award of costs is a possibility under the existing caselaw, potential class members should be informed of that possibility." 2011 U.S. Dist. LEXIS 32761, at *26-27. The court thus required that notice to potential class members in that case include the following language: "If you do not prevail on your claim, court costs and expenses (not including [the defendant's] attorney fees) may possibly be assessed against you." Wass v. NPC Int'l, Inc., 2011 U.S. Dist. LEXIS 32761, at *27.

60.     Here, the Court concludes that, on the whole, the proposed Notice and Consent Form is "timely, accurate, and informative." Hoffmann-La Roche Inc. v. Sperling, 493 U.S. at 172. The Court also concludes, however, that, because costs possibly could be awarded to the prevailing party, fairness and accuracy require that "potential class members [] be informed of that possibility." Wass v. NPC Int'l, Inc., 2011 U.S. Dist. LEXIS 32761, at *26-27. To assuage the Plaintiffs' concern that such a warning may "dissuade people from exercising their rights," Reply at 8, the Court will modify the language of Swire Oil's proposed warning to reflect that liability for court costs does not mean that the Plaintiffs would be responsible for Swire Oil's attorney fees, cf. Wass v. NPC Int'l, Inc., 2011 U.S. Dist. LEXIS 32761, at *26 (concluding that a warning regarding court costs would not

"unreasonably or unfairly discourage participation in the suit, as long as costs are distinguished from a possible award of attorney fees").  Thus, the Court will require that the Plaintiffs append the following sentence to the end of the first paragraph in section six of the Notice and Consent Form: "Also, if Plaintiffs lose, they could be responsible for paying court costs and expenses (not including Defendants' attorney fees)."

61.     In short, the Court approves the Notice and Consent Form, but sustains Swire Oil's objection relating to the form's content.  The Court thus requires that the Notice and Consent Form include, with some modification, the warning about court costs and expenses that Swire Oil requests.

**B.     THE COURT ORDERS SWIRE OIL TO PRODUCE ALL POTENTIAL PLAINTIFFS' NAMES AND KNOWN CONTACT INFORMATION WITHIN TEN DAYS.**

62.     To ensure that the Notice and Consent Form reaches all potential class members, the Plaintiffs request that the Court order Swire Oil to

> produce within ten (10) days of the granting of this Motion in an electronic format such as an excel spreadsheet the names, all known addresses, all phone numbers (home, mobile, etc.), dates of birth, all known email addresses (work and personal), and dates of employment for all the class members employed from three years prior to the filing of this lawsuit to the present.

Motion at 20.  The Plaintiffs contend that "[t]his information will allow Plaintiffs to confirm current addresses and/or to locate those persons who may have moved from their last known addresses." Motion at 20.  Swire Oil does not object to this request.

63.     The Court concludes that this request is appropriate, because the information that the Plaintiffs seek is necessary to alert potential class members of this collective action so that they can decide whether to participate in it.  See Hoffmann-La Roche Inc. v. Sperling, 493 U.S. at 170.  The information also is peculiarly within Swire Oil's possession.  Accordingly, the Court orders Swire

Oil to produce within ten days of this Memorandum Opinion and Order's publication the requested information so that notice may be implemented.

### C. THE COURT AUTHORIZES TWO MAILINGS OF THE NOTICE AND CONSENT FORM VIA REGULAR MAIL, EMAIL, AND TEXT MESSAGE, AND AUTHORIZES CLASS MEMBERS TO EXECUTE THEIR CONSENT FORMS ELECTRONICALLY.

64. The Plaintiffs request that the Court authorize two mailings of the Notice and Consent Form to all potential Plaintiffs via regular mail, email, and text message -- one initial mailing within seven days of receiving the class list from Swire Oil, and one reminder notice thirty days into the opt-in period. See Motion at 20-23. The Plaintiffs offer that their "counsel will oversee the mailing . . . of such notices and pay the up-front charges for same (postage, copying, etc.)," but also request authorization for their counsel to "hire a third-party class action administration company to conduct the actual mailing of the forms if it deems appropriate." Motion at 20. In addition, the Plaintiffs request that the Court authorize class members to execute their consent forms electronically. See Motion at 22. Swire Oil does not object to these requests.

65. The Court concludes that the methods of notice that the Plaintiffs propose are proper. The Court finds persuasive the Plaintiffs' argument that communication via email and text message will "increase the chance of the class members receiving and reading the notice," especially because class members likely are "dispersed to various wellsites around the country and may be away from their homes and addresses of record for weeks or months at a time." Motion at 21. Acknowledging its efficacy and common usage, courts increasingly have authorized notice by email in FLSA cases. See, e.g., Butler v. DirectSAT USA, LLC, 876 F. Supp. 2d at 575 (observing that "'communication through email is now the norm'")(brackets omitted)(quoting In re Deloitte & Touche, LLP Overtime Litig., 2012 U.S. Dist. LEXIS 12641, at *2 (S.D.N.Y. 2012)(Katz, M.J.)). Courts similarly have authorized notice by text message, observing that such notice "is likely to be a viable and efficient

means of communicating with many prospective members of [a] collective action." <u>Bhumithanarn v. 22 Noodle Mkt. Corp.</u>, 2015 U.S. Dist. LEXIS 90616, at *5 (alteration added)(citations omitted). Indeed, given the amount of junk mail that people receive, email and text message likely are more effective methods for communicating with potential class members than traditional, first-class mail.[6] The Court agrees with this reasoning and authorizes the Plaintiffs, within seven days of receiving the class list from Swire Oil, to provide notice to potential opt-in Plaintiffs via regular mail, email, and text message. The Plaintiffs' counsel may oversee notice implementation and may hire a third-party class action administration company to conduct the actual mailing if it desires.

66. The Court also concludes that a follow-up notice thirty days into the opt-in period is appropriate. Although some courts decline to authorize the issuance of a reminder in FLSA cases, reasoning that it "is unnecessary and potentially could be interpreted as encouragement by the court to join the lawsuit," <u>Witteman v. Wis. Bell, Inc.</u>, 2010 U.S. Dist. LEXIS 8845, at *3 (W.D. Wis. 2010)(Crabb, J.), others "recognize[] that a second notice or reminder is appropriate in an FLSA action since the individual is not part of the class unless he or she opts-in," <u>Sanchez v. Sephora USA, Inc.</u>, 2012 U.S. Dist. LEXIS 99924, at *6 (N.D. Cal. 2012)(Armstrong, J.). Those courts that allow a reminder emphasize that it serves the FLSA's broad remedial purpose by ensuring that "as many potential plaintiffs as possible [are informed] of the collective action and their right to opt-in[.]" <u>Chhab v. Darden Rests., Inc.</u>, 2013 U.S. Dist. LEXIS 135926, at *51 (alteration added)(citations omitted). The Court agrees with this reasoning and concludes that a reminder will serve the FLSA's remedial purpose in this case, especially in light of the potential Plaintiffs' remote locations at well

---

[6]Perhaps implicitly acknowledging the superiority of electronic communication, even the United States Postal Service accepts job applications through an online process and not via first-class mail. <u>See</u> USPS® Online Job Application Process, <u>available at</u> https://about.usps.com/careers/job-application/welcome.htm (last accessed April 28, 2017).

sites around the country.

67.     Finally, the Court concludes that class members should be allowed to electronically execute their consent forms.  Recognizing that "we live in a time when all manner of commercial transactions are routinely cemented by electronic submission," Mraz v. Aetna Life Ins. Co., 2014 U.S. Dist. LEXIS 142923, at *5, courts have approved the use of online, electronic signature opt-in forms, see, e.g., Dyson v. Stuart Petrol. Testers, Inc., 308 F.R.D. at 517; Bland v. Calfrac Well Servs. Corp., 2013 U.S. Dist. LEXIS 113094, at *3 (W.D. Pa. 2013)(McVerry, J.); White v. Integrated Elec. Techs., Inc., 2013 U.S. Dist. LEXIS 83298, at *9 (E.D. La. 2013)(Morgan, J.). Indeed, the Federal Rules of Civil Procedure and New Mexico law expressly allow the use of electronic signatures.  See Fed. R. Civ. P. 5(d)(3) ("A court may . . . allow papers to be filed, signed, or verified by electronic means . . . ."); N.M. Stat. Ann. § 14-16-7(c).  Here, similar considerations as those outlined above justify this practice.  As with receiving mail, Swire Oil operators working at remote well sites may have difficulty returning by mail their signed consent forms.  Accordingly, the Court will authorize class members to execute their consent forms electronically.

**D.     THE COURT WILL ALLOW POTENTIAL PLAINTIFFS SEVENTY-FIVE DAYS TO OPT INTO THIS LAWSUIT, AND WILL PROHIBIT SWIRE OIL FROM COMMUNICATING WITH POTENTIAL PLAINTIFFS ABOUT THIS LAWSUIT OR ITS RESOLUTION DURING THE OPT-IN PERIOD.**

68.     The Plaintiffs make two final unopposed requests: (i) that the Court give potential class members seventy-five days to opt into this lawsuit; and (ii) that the Court prohibit Swire Oil from communicating with potential class members about this lawsuit or its resolution during the seventy-five day period.  See Motion at 24.  Courts within the Tenth Circuit regularly authorize opt-in periods of up to ninety days, reasoning that "90 days represents a reasonable period in which to attempt to contact (and repeat efforts to contact, when necessary) potential class members." Wass v. NPC Int'l, Inc., 2011 U.S. Dist. LEXIS 32761, at *34-35 (citing Gieseke v. First Horizon Home

<u>Loan Corp.</u>, 2006 U.S. Dist. LEXIS 76732, at *2)).  Here, the Plaintiffs request a shorter seventy-five day period, arguing that such time is "reasonable and necessary given the unique obstacles in this case that could delay potential plaintiffs' receipt of the notice."  Motion at 24 (footnote omitted).  The Court agrees that this case's circumstances -- that is, the potential class members' remoteness -- necessitate, at a minimum, seventy-five days in which to contact potential class members.  Absent any arguments to the contrary by Swire Oil, the Court concludes that the Plaintiffs' seventy-five-day request is reasonable.  The Court also concludes that potential class members should be free to decide, without explicit or implied pressures by their employer, whether to join this lawsuit.  Thus, the Court will prohibit Swire Oil from communicating with potential class members about this lawsuit during the seventy-five day period.

**IT IS ORDERED** that (i) the requests in the Plaintiffs' Motion for Conditional Certification, *Hoffman La Roche* Notice, and Expedited Ruling, filed January 13, 2017 (Doc. 35), are granted in part; (ii) the following classes are conditionally certified as collective actions pursuant to § 216(b) of the Fair Labor Standards Act, 29 U.S.C. §§ 201-219:

> All of Defendants' current and former operators throughout the United States who were paid on a salary basis without overtime in the last three years, and

> All of Defendants' current and former operators throughout the United States who were paid under the fluctuating work week method during the last three years;

(iii) former operators falling within the above class definitions who previously have settled overtime or minimum wage claims against the Defendants, and who then terminated their employment upon releasing their claims, are excluded from these collective actions; (iv) the Plaintiffs' Proposed Notice and Consent Form, filed January 13, 2017 (Doc. 35-1), is approved, except that the Plaintiffs must add the following sentence to the end of the first paragraph in section six: "Also, if Plaintiffs lose, they could be responsible for paying court costs and expenses (not including Defendants' attorney

fees).";  (v) the Defendants must produce within ten days in an electronic format the names and all known addresses, phone numbers, email addresses, dates of birth, and dates of employment for all class members employed within the three years preceding this lawsuit's filing; (vi) the Plaintiffs may transmit notice of this action via regular mail, email, and text message within seven days of receiving the class list from the Defendants; (vii) the Plaintiffs may transmit via regular mail, email, and text message a follow-up notice thirty days into the opt-in period; (viii) class members may execute their consent forms electronically; (ix) the opt-in period is seventy-five days; and (x) the Defendants are prohibited from communicating with potential class members about this lawsuit or its resolution during the seventy-five-day opt-in period.

_____
UNITED STATES DISTRICT JUDGE

*Counsel and Parties:*

Daniel M. Faber
Law Office of Daniel Faber
Albuquerque, New Mexico

-- and --

Patrick Leyendecker
Ahmad Zavitsanos Anaipakos Alavi & Mensing, P.C.
Houston, Texas

-- and --

Udyogi Hangawatte
Galvin B. Kennedy
Kennedy Hodges L.L.P.
Houston, Texas

     *Attorneys for the Plaintiffs*

Charlotte A. Lamont
Littler Mendelson, P.C.
Albuquerque, New Mexico

-- and --

Yvette V. Gatling
Littler Mendelson, P.C.
Houston, Texas

       *Attorneys for the Defendants*